JURY

# U.S. District Court
## Northern District of Texas (San Angelo)
## CIVIL DOCKET FOR CASE #: 6:23-cv-00033-C

Doe (A.S.) v Wyndham Hotels and Resorts et al
Assigned to: Senior Judge Sam R Cummings
Demand: $1,000,000
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 05/31/2023
Jury Demand: Plaintiff
Nature of Suit: 360 Torts/Pers Inj: Other Personal Injury
Jurisdiction: Federal Question

**Plaintiff**

**Jane Doe (A.S.)**

represented by **Sara J. Fendia**
Fibich Leebron Copeland Briggs
1150 Bissonnet
Houston, TX 77005
713-751-0025
Fax: 713-751-0030
Email: sfendia@fibichlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Annie McAdams**
Annie McAdams PC
2200 Post Oak, Suite 1000
11th Floor, PNC Tower
Houston, TX 77056
713-785-6262
Fax: 866-713-6141
Email: annie@mcadamspc.com
*TERMINATED: 08/08/2023*

**Bryan O Blevins , Jr**
Provost & Umphrey
350 Pine Street
Suite 1100
Beaumont, TX 77701
409-835-6000
Email: bblevins@pulf.com
*ATTORNEY TO BE NOTICED*

**Colin David Moore**
Provost Umphrey Law Firm
PO Box 4905
490 Park St
Beaumont, TX 77701
409-838-8858
Fax: 409-813-8610
Email: cmoore@provostumphrey.com
*ATTORNEY TO BE NOTICED*

**David E Harris**
Sico Hoelscher Harris LLP
819 N Upper Broadway
Corpus Christi, TX 78401
361-653-3300
Fax: 361-653-3333
Email: dharris@shhlaw.com
*TERMINATED: 08/08/2023*

**Jacqueline Ryall**
Provost Umphrey Law Firm
350 Pine Street, Suite 1100
Beaumont, TX 77701
409-835-6000
Fax: 409-838-8888

**Matthew Christopher Matheny**
Provost Umphrey Law Firm LLP
PO Box 4905
490 Park St
Beaumont, TX 77704
409/835-6000
Fax: 409/813-8652
Email: mmatheny@pulf.com
*ATTORNEY TO BE NOTICED*

**Michael T Gallagher**
The Gallagher Law Firm
2905 Sackett Street
Houston, TX 77098
713-222-8080
Email: mike@gld-law.com
*TERMINATED: 08/08/2023*

**Morgan Malouf**
Sico Hoelscher Harris LLP
802 North Carancahua Street
Suite 900
Corpus Christi, TX 78401
713-416-3086
Email: mmalouf@shhlaw.com
*TERMINATED: 08/08/2023*

**Pamela McLemore**
The Gallagher Law Firm
2905 Sackett Street
Houston, TX 77098
713-222-8080
Fax: 713-222-0066
*TERMINATED: 08/08/2023*

V.

**Defendant**

**Wyndham Hotels and Resorts**                    represented by **Jason M Hopkins**
                                                   DLA Piper
                                                   1900 N Pearl Avenue
                                                   Suite 2200
                                                   Dallas, TX 75201
                                                   214-743-4546
                                                   Fax: 972-813-6267
                                                   Email: jason.hopkins@dlapiper.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Christopher Donovan**
                                                   DLA Piper LLP (US)
                                                   845 Texas Avenue
                                                   Suite 3800
                                                   Houston, TX 77002
                                                   713-425-8449
                                                   Fax: 713-300-6040
                                                   Email:
                                                   christopher.b.donovan@dlapiper.com
                                                   *ATTORNEY TO BE NOTICED*

                                                   **David S Sager**
                                                   DLA Piper LLP US
                                                   51 John F Kennedy Parkway
                                                   Suite 120
                                                   Short Hills, NJ 07078-2704
                                                   973-520-2570
                                                   Fax: 973-215-2604
                                                   Email: david.sager@dlapiper.com
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**
**CPLG TX Properties LLC**                         represented by **Jason M Hopkins**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Christopher Donovan**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **David S Sager**
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**
**BRE/LQ TX GP LLC**                               represented by **Jason M Hopkins**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Christopher Donovan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David S Sager**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pristine Hospitality Inc**                    represented by   **Andrew J Upton**
Mayer LLP
750 N Saint Paul Street, Suite 700
Dallas, TX 75201
214-379-6269
Fax: 214-379-6939
Email: aupton@mayerllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trent Wesley Rexing**
Mayer LLP
750 N. Saint Paul Street, Suite 700
Dallas, TX 75201
214 (379) 6923
Fax: (214) 379-6939
Email: trexing@mayerllp.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Vijayalakshmi LP**
*TERMINATED: 08/25/2023*

**Defendant**

**Trinity Lodging LLC**
*TERMINATED: 08/25/2023*

**Defendant**

**Choice Hotel International Inc**              represented by   **Alexis Nicole Del Rio**
Baker Donelson Bearman Caldwell &
Berkowitz, PC
5956 Sherry Lane
20th Floor
Dallas, TX 75225
214-827-0864
Email: adelrio@bakerdonelson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katriel Chaim Statman**
Baker Donelson Bearman Caldwell &
Berkowitz PC
1301 McKinney Street, Suite 3700

District Version 1.7.1.1

Houston, TX 77010
713-650-9700
Fax: 713-650-9701
Email: kstatman@bakerdonelson.com
*ATTORNEY TO BE NOTICED*

**Sara M Turner**
Baker Donelson
1901 Sixth Avenue North
Suite 2600
Birmingham, AL 35203
205-250-8316
Fax: 205-488-3716
Email: smturner@bakerdonelson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Inn of the West LLC**

**Defendant**

**Gurkarn Diamond Hotel Corporation**
c/o Jaswant Gill
gurkarngill@gmail.com

**Defendant**

**Capital Spring SBLC LLC**
*TERMINATED: 08/25/2023*

**Defendant**

**West Texas Hotel Group LLC**
*TERMINATED: 08/25/2023*

**Defendant**

**Niyati 01 LLC**
*TERMINATED: 08/25/2023*

**Defendant**

**Red Lion Hotels Corporation (RLH)**

**Defendant**

**Bankhead Hotels LLC**

**Defendant**

**La Quinta Holdings Inc**                    represented by **Jason M Hopkins**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**LQ Management LLC**                         represented by **Jason M Hopkins**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

District Version 1.7.1.1

**Defendant**

**LQ Franchising LLC**                                 represented by **Jason M Hopkins**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Vantage Hospitality Group Inc (VHGI)**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/31/2023 | 1 | COMPLAINT WITH JURY DEMAND against All Defendants filed by Jane Doe A.S.. (Filing $402; Receipt number ATXNDC-13780487) Summons(es) not requested at this time. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Certificate of Interested Party Disclosure Statement) (Moore, Colin) (Entered: 05/31/2023) |
| 06/01/2023 | 2 | ADDITIONAL ATTACHMENTS (Civil Cover Sheet) to 1 Complaint, by Plaintiff Jane Doe (A.S.). (DISREGARD, attached in error, Attachments: # 1 Cover Sheet) (Moore, Colin) (Main Document 2 replaced on 6/1/2023 after filer submitted corrected (Cause of Action) form) (amg). (Entered: 06/01/2023) |
| 06/01/2023 | 3 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Jane Doe (A.S.). (Clerk QC note: No affiliate entered in ECF). (Moore, Colin) (Entered: 06/01/2023) |
| 06/01/2023 | 4 | New Case Notes: A filing fee has been paid. (amg) (Entered: 06/01/2023) |
| 08/03/2023 | 5 | NOTICE of Attorney Appearance by Colin David Moore for Sara J. Fendia on behalf of Jane Doe (A.S.). (Moore, Colin) (Entered: 08/03/2023) |
| 08/07/2023 | 6 | MOTION to Withdraw as Attorney filed by Jane Doe (A.S.) (Attachments: # 1 Proposed Order) (Moore, Colin) (Entered: 08/07/2023) |
| 08/08/2023 | 7 | ORDER. The Court, having considered Plaintiff's Motion to Withdraw Counsel of Record, filed August 7, 2023, is of the opinion that the same should be GRANTED. Accordingly, attorneys Annie McAdams, David E. Harris, Morgan A. Malouf, Michael T. Gallagher, and Pamela McLemore are hereby WITHDRAWN as counsel of record for Plaintiff Jane Doe (A.S.) in the above-styled and -numbered civil action. (Ordered by Senior Judge Sam R Cummings on 8/8/2023) (ada) (Entered: 08/08/2023) |
| 08/25/2023 | 8 | AMENDED COMPLAINT WITH JURY DEMAND *Jane Doe (A.S.)* against BRE/LQ TX GP, LLC, Bankhead Hotels, LLC, CPLG TX Properties, LLC, Choice Hotel International, Inc, Gurkarn Diamond Hotel Corporation, Inn of the West, LLC, Pristine Hospitality, Inc, Red Lion Hotels Corporation (RLH), Wyndham Hotels and Resorts filed by Jane Doe (A.S.). (One or more defendant(s) is no longer named.) Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If |

District Version 1.7.1.1

| | | admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Moore, Colin) (Entered: 08/25/2023) |
|---|---|---|
| 08/25/2023 | 9 | **DISREGARD** Request for Clerk to issue summons filed by Jane Doe (A.S.). (Attachments: # 1 Additional Page(s)) (Moore, Colin) Modified on 8/25/2023 Due to changed needed in document; Filer re-filed at 10 (ada). (Entered: 08/25/2023) |
| 08/25/2023 | 10 | Request for Clerk to issue summons filed by Jane Doe (A.S.). (Attachments: # 1 Additional Page(s)) (Moore, Colin) (Entered: 08/25/2023) |
| 08/25/2023 | 11 | Summons Issued as to BRE/LQ TX GP, LLC, Bankhead Hotels, LLC, CPLG TX Properties, LLC, Choice Hotel International, Inc, Gurkarn Diamond Hotel Corporation, Inn of the West, LLC, Pristine Hospitality, Inc, Red Lion Hotels Corporation (RLH), Wyndham Hotels and Resorts. (ada) (Entered: 08/25/2023) |
| 09/07/2023 | 12 | SUMMONS Returned Executed as to BRE/LQ TX GP, LLC ; served on 8/28/2023. (Blevins, Bryan) (Entered: 09/07/2023) |
| 09/07/2023 | 13 | SUMMONS Returned Executed as to Choice Hotel International, Inc ; served on 8/28/2023. (Blevins, Bryan) (Entered: 09/07/2023) |
| 09/07/2023 | 14 | SUMMONS Returned Executed as to CPLG TX Properties, LLC ; served on 8/28/2023. (Blevins, Bryan) (Entered: 09/07/2023) |
| 09/07/2023 | 15 | SUMMONS Returned Executed as to Inn of the West, LLC ; served on 8/29/2023. (Blevins, Bryan) (Entered: 09/07/2023) |
| 09/07/2023 | 16 | SUMMONS Returned Executed as to Red Lion Hotels Corporation (RLH) ; served on 8/28/2023. (Blevins, Bryan) (Entered: 09/07/2023) |
| 09/11/2023 | 17 | ORDER: Plaintiff's claims against a Defendant will be dismissed without prejudice if proof of service has not been filed as to that particular Defendant by 9:00 a.m. on September 29, 2023. (Ordered by Senior Judge Sam R Cummings on 9/11/2023) (dsr) (Entered: 09/11/2023) |
| 09/12/2023 | 18 | SUMMONS Returned Executed as to Wyndham Hotels and Resorts; served on 9/6/2023. (Moore, Colin) (Entered: 09/12/2023) |
| 09/15/2023 | 19 | Unopposed Motion for Extension of Time to File Answer filed by BRE/LQ TX GP, LLC, CPLG TX Properties, LLC, Wyndham Hotels and Resorts with Brief/Memorandum in Support. (Attachments: # 1 Proposed Order)Attorney Jason M Hopkins added to party BRE/LQ TX GP, LLC(pty:dft), Attorney Jason M Hopkins added to party CPLG TX Properties, LLC(pty:dft), Attorney Jason M Hopkins added to party Wyndham Hotels and Resorts(pty:dft) (Hopkins, Jason) (Entered: 09/15/2023) |
| 09/18/2023 | 20 | ORDER. Motion 19 is GRANTED and the new deadline for said Defendants (Wyndham Hotels & Resorts, Inc., CPLG TX Properties L.L.C., and BRE/LQ TXGP L.L.C) to answer or otherwise respond to Plaintiff's First Amended Complaint is October 4, 2023. (Ordered by Senior Judge Sam R Cummings on 9/18/2023) (ada) (Entered: 09/18/2023) |
| 09/18/2023 | 21 | MOTION to Dismiss *Amended Complaint and Partial Motion to Strike* filed by Choice Hotel International, Inc with Brief/Memorandum in Support. (Attachments: # 1 Proposed Order) (Statman, Katriel) (Entered: 09/18/2023) |
| 09/18/2023 | 22 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Choice Hotel International, Inc. (Clerk QC note: No affiliate entered in ECF). (Statman, Katriel) (Entered: 09/18/2023) |
| 09/22/2023 | 23 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-14053396) filed by Choice Hotel International, Inc |

| | | (Attachments: # 1 Exhibit(s) Certificate of Good Standing) (Turner, Sara) (Main Document 23 replaced on 9/22/2023 after flattening) (ada). (Entered: 09/22/2023) |
|---|---|---|
| 09/25/2023 | 24 | ORDER granting 23 Application for Admission Pro Hac Vice of Sara M. Turner. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Senior Judge Sam R Cummings on 9/25/2023) (ada) (Entered: 09/25/2023) |
| 09/25/2023 | 25 | SCHEDULING ORDER: Pursuant to Rule 16(b), Fed. R. Civ. P., the Court establishes the following schedule for this case: Joinder of Parties due by 2/1/2024. Amended Pleadings due by 2/1/2024. Motions for Summary Judgment due by 10/1/2024. Mediation deadline is on or before 10/1/2024. Discovery and Motions in limine due by 2/24/2025. Jury Trial set for 3/17/2025 at 09:00 AM in US Courthouse, Courtroom 216, 33 East Twohig Avenue, San Angelo, TX 76903-6451 before Senior Judge Sam R Cummings. See Order for additional deadlines and instructions. (Ordered by Senior Judge Sam R Cummings on 9/25/2023) (ada) (Entered: 09/25/2023) |
| 09/28/2023 | 26 | MOTION to Extend Time for Service and for Substituted Service on Defendant Pristine Hospitality, Inc. filed by Jane Doe (A.S.) (Attachments: # 1 Exhibit(s), # 2 Exhibit(s), # 3 Exhibit(s), # 4 Exhibit(s), # 5 Proposed Order) (Moore, Colin) (Entered: 09/28/2023) |
| 09/28/2023 | 27 | MOTION to Extend Time for Service and for Substituted Service on Defendant Bankheads Hotels, LLC filed by Jane Doe (A.S.) (Attachments: # 1 Exhibit(s), # 2 Exhibit(s), # 3 Exhibit(s), # 4 Proposed Order) (Moore, Colin) (Entered: 09/28/2023) |
| 09/28/2023 | 28 | MOTION to Extend Time for Service and for Substituted Service on Defendant Gurkarn Diamond Hotel Corporation filed by Jane Doe (A.S.) (Attachments: # 1 Exhibit(s), # 2 Exhibit(s), # 3 Exhibit(s), # 4 Proposed Order) (Moore, Colin) (Entered: 09/28/2023) |
| 10/02/2023 | 29 | ORDER granting 27 Plaintiff's Motion for Extension of Time for Service and For Substitute Service of Process on Defendant Bankheads Hotels, LLC. The Court finds that the Motion should be GRANTED. As such, the Plaintiff has 30 days to serve Defendant Bankheads Hotels, LLC. (Ordered by Senior Judge Sam R Cummings on 10/2/2023) (ada) Modified on 10/2/2023 spelling of Defendant changed(ada). (Entered: 10/02/2023) |
| 10/02/2023 | 30 | ORDER granting 26 Plaintiff's Motion for Extension of Time for Service and For Substitute Service of Process on Defendant Pristine Hospitality, Inc. The Court finds that the Motion should be GRANTED. As such, the Plaintiff has 30 days to serve Defendant Pristine Hospitality, Inc. (Ordered by Senior Judge Sam R Cummings on 10/2/2023) (ada) (Entered: 10/02/2023) |
| 10/02/2023 | 31 | ORDER granting 28 Plaintiff's Motion for Extension of Time for Service and For Substitute Service of Process on Defendant Gurkarn Diamond Hotel Corporation. The Court finds that the Motion should be GRANTED. As such, the Plaintiff has 30 days to serve Defendant Gurkarn Diamond Hotel Corporation. (Ordered by Senior Judge Sam R Cummings on 10/2/2023) (ada) (Entered: 10/02/2023) |
| 10/04/2023 | 32 | SUMMONS Returned Executed as to Gurkarn Diamond Hotel Corporation ; served on 10/2/2023. (Moore, Colin) (Entered: 10/04/2023) |
| 10/04/2023 | 33 | SUMMONS Returned Executed as to Pristine Hospitality, Inc ; served on 10/3/2023. (Moore, Colin) (Entered: 10/04/2023) |
| 10/04/2023 | 34 | Motion to Dismiss for Failure to State a Claim filed by BRE/LQ TX GP, LLC, CPLG TX Properties, LLC, Wyndham Hotels and Resorts with Brief/Memorandum in Support. (Attachments: # 1 Proposed Order) (Hopkins, Jason) (Entered: 10/04/2023) |

| 10/04/2023 | 35 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by BRE/LQ TX GP, LLC, CPLG TX Properties, LLC, Wyndham Hotels and Resorts. (Clerk QC note: No affiliate entered in ECF). (Hopkins, Jason) (Entered: 10/04/2023) |
| --- | --- | --- |
| 10/06/2023 | 36 | SUMMONS Returned Executed as to Bankhead Hotels LLC ; served on 10/5/2023. (Moore, Colin) (Entered: 10/06/2023) |
| 10/06/2023 | 37 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-14087171) filed by BRE/LQ TX GP LLC, CPLG TX Properties LLC, Wyndham Hotels and Resorts (Attachments: # 1 Exhibit(s) Cert of Good Standing, # 2 Proposed Order) (Sager, David) (Entered: 10/06/2023) |
| 10/09/2023 | 38 | RESPONSE AND OBJECTION filed by Jane Doe (A.S.) re: 21 MOTION to Dismiss *Amended Complaint and Partial Motion to Strike* (Blevins, Bryan) (Entered: 10/09/2023) |
| 10/09/2023 | 39 | ORDER granting 37 Application for Admission Pro Hac Vice of David S. Sager. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Senior Judge Sam R Cummings on 10/9/2023) (ada) (Entered: 10/10/2023) |
| 10/23/2023 | 40 | MOTION to Dismiss filed by Gurkarn Diamond Hotel Corporation. ***FILED USING EMERGENCY FILING EMAIL*** (cea) (Additional attachment(s) added on 10/24/2023: # 1 Motion received by mail, # 2 FedEx Envelope) (ada). Clerks note*** Motion received via Overnight FedEx on 10/24/2023 (ada). (Entered: 10/23/2023) |
| 10/23/2023 | 41 | REPLY filed by Choice Hotel International Inc re: 38 Response/Objection (Statman, Katriel) (Entered: 10/23/2023) |
| 10/24/2023 | 42 | Motion for Extension of Time to File Answer *or Responsive Pleading* filed by Pristine Hospitality Inc (Attachments: # 1 Proposed Order)Attorney Andrew J Upton added to party Pristine Hospitality Inc(pty:dft) (Upton, Andrew) (Entered: 10/24/2023) |
| 10/25/2023 | 43 | ORDER. Having considered Defendant Pristine Hospitality, Inc.'s Unopposed Motion to Extend Deadline to Answer or File Responsive Pleading to Plaintiff's First Amended Complaint, the Court finds that said Motion should be GRANTED. As such, the deadline for Pristine Hospitality, Inc. to answer or otherwise respond is reset to November 7, 2023. (Ordered by Senior Judge Sam R Cummings on 10/25/2023) (ada) (Entered: 10/25/2023) |
| 10/25/2023 | 44 | RESPONSE AND OBJECTION filed by Jane Doe (A.S.) re: 34 Motion to Dismiss for Failure to State a Claim (Moore, Colin) (Entered: 10/25/2023) |
| 10/25/2023 | 45 | MOTION for Leave to File Second Amended Complaint filed by Jane Doe (A.S.) (Attachments: # 1 Proposed Order, # 2 Exhibit(s) Amended Complaint) (Moore, Colin) Modified on 10/26/2023 (ada). (Entered: 10/25/2023) |
| 10/30/2023 | 46 | ORDER. The Court, having considered Plaintiff's Motion for Leave to File Second Amended Complaint 45 , filed October 25, 2023, is of the opinion that the same should be GRANTED. All pending Motions to Dismiss are **DENIED AS MOOT** WITHOUT PREJUDICE TO REFILING because they now address a non-live pleading. (Unless the document has already been filed, clerk to enter the document as of the date of this order.) (Ordered by Senior Judge Sam R Cummings on 10/30/2023) (ada) (Entered: 10/30/2023) |
| 10/30/2023 | 47 | SECOND AMENDED COMPLAINT WITH JURY DEMAND against BRE/LQ TX GP LLC, Bankhead Hotels LLC, CPLG TX Properties LLC, Choice Hotel International Inc, Gurkarn Diamond Hotel Corporation, Inn of the West LLC, LQ Franchising LLC, LQ Management LLC, La Quinta Holdings Inc, Pristine Hospitality Inc, Red Lion Hotels Corporation (RLH), Vantage Hospitality Group Inc (VHGI), Wyndham Hotels and Resorts |

filed by Jane Doe (A.S.). Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: <u>Attorney Information - Bar Membership</u>. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (ada) (Entered: 10/30/2023)

| 11/07/2023 | <u>48</u> | (Document Restricted) SEALED - Notice To Court And Counsel (Sealed pursuant to SO 19-1, statute, or rule) filed by Pristine Hospitality Inc (Attachments: # <u>1</u> Exhibit(s) Exhibit A) (Rexing, Trent) (Entered: 11/07/2023) |
|---|---|---|
| 11/13/2023 | <u>49</u> | Unopposed Motion for Extension of Time to File Answer filed by BRE/LQ TX GP LLC, CPLG TX Properties LLC, LQ Franchising LLC, LQ Management LLC, La Quinta Holdings Inc, Wyndham Hotels and Resorts (Attachments: # <u>1</u> Proposed Order). Party La Quinta defendants added.Attorney Jason M Hopkins added to party LQ Franchising LLC(pty:dft), Attorney Jason M Hopkins added to party LQ Management LLC(pty:dft), Attorney Jason M Hopkins added to party La Quinta Holdings Inc(pty:dft) (Hopkins, Jason) (Entered: 11/13/2023) |
| 11/13/2023 | <u>50</u> | MOTION to Dismiss *Second Amended Complaint and Partial Motion to Strike* filed by Choice Hotel International Inc with Brief/Memorandum in Support. (Statman, Katriel) (Entered: 11/13/2023) |
| 11/13/2023 | <u>51</u> | Motion to Dismiss for Failure to State a Claim filed by Pristine Hospitality Inc with Brief/Memorandum in Support. (Attachments: # <u>1</u> Proposed Order) (Rexing, Trent) (Entered: 11/13/2023) |
| 11/14/2023 | <u>52</u> | ORDER. Before the Court is the Unopposed Motion to Extend Answer Deadline <u>49</u> . The Court GRANTS the motion and orders Movants to answer or otherwise respond to Plaintiff's Second Amended Complaint on or before December 4, 2023. (Ordered by Senior Judge Sam R Cummings on 11/14/2023) (ada) (Entered: 11/14/2023) |
| 12/04/2023 | <u>53</u> | RESPONSE AND OBJECTION filed by Jane Doe (A.S.) re: <u>51</u> Motion to Dismiss for Failure to State a Claim (Blevins, Bryan) (Entered: 12/04/2023) |
| 12/04/2023 | <u>54</u> | RESPONSE AND OBJECTION filed by Jane Doe (A.S.) re: <u>50</u> MOTION to Dismiss *Second Amended Complaint and Partial Motion to Strike* (Blevins, Bryan) (Entered: 12/04/2023) |
| 12/04/2023 | <u>55</u> | Motion to Dismiss for Failure to State a Claim filed by BRE/LQ TX GP LLC, CPLG TX Properties LLC, LQ Franchising LLC, LQ Management LLC, La Quinta Holdings Inc, Wyndham Hotels and Resorts with Brief/Memorandum in Support. (Hopkins, Jason) (Entered: 12/04/2023) |
| 12/18/2023 | <u>56</u> | REPLY filed by Choice Hotel International Inc re: <u>50</u> MOTION to Dismiss *Second Amended Complaint and Partial Motion to Strike* (Statman, Katriel) (Entered: 12/18/2023) |
| 12/18/2023 | <u>57</u> | AMENDED REPLY filed by Choice Hotel International Inc re: <u>50</u> MOTION to Dismiss *Second Amended Complaint and Partial Motion to Strike* (Statman, Katriel) Modified on 12/19/2023 (ada). (Entered: 12/18/2023) |
| 12/19/2023 | <u>58</u> | RESPONSE AND OBJECTION filed by Jane Doe (A.S.) re: <u>55</u> Motion to Dismiss for Failure to State a Claim (Moore, Colin) (Entered: 12/19/2023) |
| 01/02/2024 | <u>59</u> | REPLY filed by BRE/LQ TX GP LLC, CPLG TX Properties LLC, LQ Franchising LLC, LQ Management LLC, La Quinta Holdings Inc, Wyndham Hotels and Resorts re: <u>55</u> Motion to Dismiss for Failure to State a Claim (Hopkins, Jason) (Entered: 01/02/2024) |

2/14/24, 9:32 AM

District Version 1.7.1.1

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/14/2024 09:31:55 | | | |
| **PACER Login:** | bblevins110290 | **Client Code:** | HT-1 mms |
| **Description:** | Docket Report | **Search Criteria:** | 6:23-cv-00033-C |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

| | |
|---|---|
| JANE DOE A.S. (A.S.),<br><br>　　　　Plaintiff<br><br>v.<br><br>WYNDHAM HOTELS AND RESORTS;<br>CPLG, TX PROPERTIES, LLC; BRE/LQ<br>TXGP, LLC; CHOICE HOTELS<br>INTERNATONAL, INC.; PRISTINE<br>HOSPITALITY, INC.; INN OF THE WEST<br>LLC; GURKARN DIAMOND<br>HOTEL CORPORATION;<br>RED LION HOTELS CORPORATION<br>(RLH); BANKHEAD HOTELS, LLC; LA<br>QUINTA HOLDINGS, INC.; LQ<br>MANAGEMENT, LLC; LQ FRANCHISING,<br>LLC; VHGI, INC., f/k/a VANTAGE<br>HOSPITALITY GROUP, INC.<br><br>　　　　Defendants. | Cause No. 6:23-cv-00033<br><br><br>**PLAINTIFF'S SECOND AMENDED<br>COMPLAINT WITH JURY DEMAND** |

## PLAINITFF'S SECOND AMENDED COMPLAINT

Jane Doe A.S., Plaintiff in the above-styled and numbered cause, files this Original Complaint against WYNDHAM HOTELS AND RESORTS; LA QUINTA HOLDINGS. INC.; LQ MANAGEMENT, LLC; LQ FRANCHISING, LLC; CPLG TX PROPERTIES; BRE/LQ TXGP, LLC; PRISTINE HOSPITALITY, INC.; CHOICE HOTEL INTERNATIONAL; INN OF THE WEST LLC; GURKARN DIAMOND HOTEL CORPORATION; RED LION HOTEL BANKHEAD HOTELS, LLC; and VHGI, Inc., f/k/a VANTAGE HOSPITALITY GROUP, INC., and respectfully shows the Court as follows:

## SUMMARY

1.     Jane Doe A.S. files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3.     Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.     Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.     In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.     As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including victims like

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

Jane Doe A.S., with minimal risk of detection or interruption. Defendants continued providing support for traffickers, including Jane Doe A.S. A. S.'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

### I.   Plaintiff, Jane Doe A.S.

7.      Plaintiff, Jane Doe A.S. is a resident of Fort Worth, Texas. She may be contacted through her lead counsel, whose information is contained below.

8.      Jane Doe A.S. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

9.      The trafficking of Jane Doe A.S. occurred in or affected interstate commerce.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe A.S.

### II.   La Quinta Defendants

11.     LQ Management LLC ("LQ Management") is a for-profit Delaware limited liability company doing business Texas. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the La Quinta Inn & Suites hotels located at 2307 W 306 Loop, San Angelo, TX 76904, 2606 N Loop 250 W, Midland, TX 79707, 4130 West Wall Avenue, Midland, TX 79703, and 5001 W. Hwy. 80 E, Odessa, TX 79761 (collectively "subject La Quinta hotels").

12.     La Quinta Franchising LLC ("LQ Franchising") is a for-profit Nevada limited liability company doing business in Texas. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Subject La Quinta hotels.

13.     CPLG TX Properties ("CPLG TX") is a for-profit limited liability company with its principal place of business in Irving, Texas. CPLG TX Properties LLC may be served through its registered agent for service: Cogency Global Inc., 1601 Elm Street, Suite 4360, Dallas, Texas 75201. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed La Quinta located at 2307 W. 306 Loop, San Angelo, TX 76904 ("San Angelo La Quinta") through inter-organization agreements with the LQ Brand Defendants.

14.     BRE/LQ TXGP, LLC ("BRE LQ") is a for-profit limited liability company with its principal place of business in Irving, Texas. BRE/LQ TXGP, LLC may be served through its registered agent for service: Corporation Service Company d/b/a CSC-Lawyers Inco 211 E. 7th St., Suite 620, Austin, TX 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the La Quinta located 5001 W. Hwy. 80, Odessa, TX 79761 ("Odessa La Quinta") and the La Quinta located at 4130 West Wall Avenue, Midland, TX 79703 ("West Wall La Quinta") through inter-organization agreements with the LQ Brand Defendants.

15.     Defendant La Quinta Holdings Inc. ("LQ Holdings") is a Delaware corporation.  It can be served by its registered agent Corporate Creations Network, Inc, 3411 Silverside Road, Tattnall Building Ste 104, Wilmington, DE 19810. At relevant times, it was an "owner, operator, and franchisor of select-service hotels . . . under the La Quinta brand."[2] Upon information and belief, through a 2013 corporate reorganization, LQ Holdings acquired the assets and liabilities of predecessor La Quinta entities that had previously owned, operated, managed, and/or controlled

---

[2] https://www.annualreports.com/HostedData/AnnualReportArchive/l/NYSE_LQ_2016.pdf

the subject La Quinta hotels.[3] LQ Holdings is responsible for the wrongful acts of the predecessor LQ entities (and their agents and alter-egos) that operated, managed, and controlled the Subject La Quinta hotels prior to this 2013 reorganization. All references to LQ Holdings include any predecessor entities.

16.     Wyndham Hotels and Resorts ("Wyndham") is a for-profit Delaware corporation with its principal place of business in New Jersey. Wyndham Hotels and Resorts may be served through its registered agent for service: Corporate Creations Network, Inc., 3411 Silverside Road Tatnall Building – Suite No. 104, Wilmington, Delaware 19810. Upon information and belief, in 2018 Wyndham purchased La Quinta's management and franchise businesses, including interest in numerous hotels in Texas, which it actively operates and controls. Upon information and belief, Wyndham is the successor in interest to LQ Holdings and other predecessor LQ entities with respect to the operation of the subject La Quinta hotels. Wyndham is responsible for the wrongful acts of the predecessor LQ entities (and their agents and alter-egos) that operated, managed, and controlled the subject La Quinta hotels. All references to Wyndham include any predecessor entities.

17.     LQ Management, LQ Franchising, LQ Holdings, and Wyndham (in its capacity as successor) are referred to collectively as the "LQ Brand Defendants."

18.     CPLG TX and BRE LQ are referred to collectively as the "LQ Owner Defendants."

19.     The LQ Brand Defendants and the LQ Owner Defendants—which upon information and belief are all affiliated entities subject to common ownership and control—are referred to collectively as the "LQ Defendants."

---

[3] https://www.sec.gov/Archives/edgar/data/1594617/000119312515104620/d859384d424b4.htm

20.     Pristine Hospitality, Inc. ("Pristine") is a for-profit corporation with its principal place of business in Odessa, Texas. Pristine Hospitality, Inc. may be served through its registered agent for service: Ashit Singh, 2606 North Loop 250 W., Midland, Texas 79707. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed La Quinta located at 2606 N Loop 250, Midland, Texas 79707 ("N Loop La Quinta") through the La Quinta franchising system.

### III.  Choice Defendants

21.     Choice Hotel International, Inc. is a for-profit Delaware corporation with its principal place of business in Maryland. Choice Hotel International, Inc. may be served through its registered agent for service: United State Corporation Company, 2011 E. 7th Street, Suite 620, Austin, TX 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the San Angelo Econo Lodge located at 415 W Beauregard Ave, San Angelo, TX 76903 (hereinafter known as "San Angelo Econo Lodge"), and Quality Inn located at 4706 N Garfield St, Midland, TX 79705 (hereinafter known as "Midland Quality Inn") through the Choice Hotel International, Inc franchising system.

22.     Gurkarn Diamond Hotel Corporation ("Gurkan Diamond") is a for-profit corporation with its principal place of business in Fairfield, California. Gurkarn Diamond may be served through its registered agent for service: Jaswant Gill, 1601 North B Street, Midland, TX 79701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed Midland Quality Inn through the Choice International, Inc. franchising system.

23.     Inn of the West LLC ("Inn of the West") is a for-profit limited liability company with its principal place of business in Las Vegas, Nevada. Inn of the West LLC may be served through its registered agent for service: Layne R. Turner, 202 West Twohig Ave., Suite 100, San

Angelo, TX 76903. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed San Angelo Econo Lodge through the Choice Hotel International, Inc. franchising system.

**IV.   America's Best Value Defendants**

24.     VHGI, Inc., formerly known as Vantage Hospitality Group, Inc., ("Vantage") is a Florida corporation with its principal place of business in Coral Springs, Florida. Upon information and belief, at relevant times, Vantage, directly and through its wholly owned and controlled subsidiaries, owned, operated, controlled, and/or managed the American Best Value Inn located at 3610 Bankhead Highway, Midland, Texas 79701 ("Midland America's Best Value").

25.     Red Lion Hotels Corporation (RLH) ("Red Lion") is a for-profit Massachusetts corporation with its principal place of business in New Jersey.  Red Lion Hotels Corporation (RLH) may be served through its registered agent for service: Corporation Service Company d/b/a CSC-Lawyers Incorporated, 211 E. 7th Street, Suite 620, Austin, TX 78701. Upon information and belief, in 2016, Red Lion acquired the brands and brand operations of Vantage and its subsidiaries. This included all or substantially all of Vantage's operating assets, including the America's Best Value Inn brand, which Red Lion continues to operate at locations around the United States, including in Texas. Upon information and belief, Red Lion is a successor to the liability of Vantage and its predecessors. All references to "Red Lion" include references to the acts and omission of its predecessors for which it is liable. Upon information and belief, at relevant times Red Lion—through its predecessors—owned, operated, controlled, and/or managed the Midland America's Best Value Inn.

26.     Vantage and Red Lion (in its capacity as successor) are referred to collectively as "ABV Brand Defendants."

27.     Bankhead Hotels, LLC ("Bankhead") is a for-profit limited liability company with its principal place of business in Las Vegas, Nevada. Bankhead may be served through its registered agent for service: Mahendra Patel, 1003 S. Midkiff Road, Midland, Texas 79701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed Americas Best Value Midland through the ABV franchising system.

28.     Bankhead, Inn of the West, Pristine, and the LQ Defendants in their role at the LQ owner-operator properties, are collectively referred to as "Franchisee Defendants."

29.     The ABV Brand Defendants, Choice, and the LQ Brand Defendants in their role at the N Loop La Quinta are referred to collectively as "Franchisor Defendants."

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

31.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because this is the Judicial District where a substantial part of the events or omissions giving rise to the claim occurred.

## STATEMENT OF FACTS

**I. Jane Doe A.S. was a victim of unlawful sex trafficking at hotels owned, operated, managed, and controlled by Defendants.**

32.     Jane Doe A.S. was compelled to engage in commercial sex for the benefit of her trafficker who used force, fraud, and coercion to control Jane Doe A.S.

33.     Jane Doe A.S.'s sexual exploitation repeatedly occurred in rooms of Defendants' hotels (collectively "the Subject Hotels") and was facilitated by each Defendant.

34.     Jane Doe A.S.'s trafficker used a consistent *modus operandi* such that obvious signs of trafficking were apparent each time Jane Doe A.S. or another victim was trafficked at one of the Subject Hotels.

35.     Jane Doe A.S.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of each of the subject Hotels. This included effects on Jane Doe A.S.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that Jane Doe A.S. was being continually subjected to coercion, control, and exploitation.

36.     During the time that Jane Doe A.S. was trafficked at each of the Subject Hotels, it was obvious and apparent she was the victim of sex trafficking.

37.     Because it was known among the community of traffickers that staff at the each of the Subject Hotels turned a blind eye to sex trafficking, Jane Doe A.S.'s trafficker made little or no effort to disguise the trafficking activities.

**A. Jane Doe A.S. Was Trafficked at the Subject La Quinta hotels.**

38.     Between approximately March 2013 and July 2013, Jane Doe A.S. was trafficked at the LaQuinta located at the N Loop La Quinta. The LQ Brand Defendants and Pristine facilitated this trafficking.

39.     Jane Doe A.S.'s sexual exploitation occurred repeatedly and regularly occurred in rooms of the N Loop La Quinta.

40.     Pristine employed the hotel staff and provided boots on the ground at the N Loop La Quinta.

41.     At all relevant times, the LQ Brand Defendants were directly involved in the relevant operations of the N Loop La Quinta, including aspects of operations directly related to the claims of Jane Doe A.S. A.S in this lawsuit.

42.     At all relevant times, the LQ Brand Defendants exercised systematic control over Pristine with respect to operation of the N Loop La Quinta, such that Pristine acted as an actual agent of the LQ Brand Defendants when operating the N Loop La Quinta.

43.     Between approximately January 2013 and December 2013, Jane Doe A.S. was trafficked at the San Angelo La Quinta. This trafficking was facilitated by the LQ Brand Defendants and CPLG TX.

44.     Between approximately January 2013 and December 2013, Jane Doe A.S. was trafficked at the West Wall La Quinta. This trafficking was facilitated by the LQ Brand Defendants and BRE LQ.

45.     Between approximately January 2013 and December 2013, Jane Doe A.S. was trafficked at the Odessa La Quinta. This trafficking was facilitated by the LQ Brand Defendants and BRE LQ.

46.     The San Angelo La Quinta, the West Wall La Quinta, and the Odessa La Qunita were all corporate owned and operated properties and are referred to collectively as the "LQ owner-operated hotels."

47.     Collectively the LQ owner-operated hotels and the N Loop La Quinta are referred to as the "Subject LQ Hotels."

48.     Upon information and belief, the LQ owner-operated hotels were directly operated and managed by the LQ Defendants pursuant to agreements between the LQ Owner Defendants and the LQ Brand Defendants.

49.     Each of the LQ Defendants participated in a hotel-operating venture that also included all staff of the owner-operated LQ hotels.

50.     Some of the obvious signs of Jane Doe A.S.'s trafficking at the Subject La Quinta Hotels included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the do not disturb sign was constantly on the door to the room being used, there were multiple requests for sheets and towels but hotel staff was not allowed in the room and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

51.     There were also other signs of Jane Doe A.S.'s trafficking at the Subject La Quinta Hotels, consistent with the *modus operandi* of her trafficker, as described throughout this Complaint.

**B. Jane Doe A.S. Was Trafficked at Choice-Brand Hotels.**

52.     Between approximately May 2013 and July 2013, Jane Doe A.S. was trafficked at the Midland Econo Lodge. Choice and Inn of the West facilitated this trafficking.

53.     Between approximately May 2013 and July 2013, Jane Doe A.S. was at the Midland Quality Inn. Choice and Gurkarn Diamond facilitated this trafficking.

54.     Inn of the West and Gurkarn Diamond are referred to collectively as "Choice Franchisees."

55.     Jane Doe A.S.'s sexual exploitation occurred repeatedly and regularly occurred in rooms of the Midland Econo Lodge and the Midland Quality Inn (collectively "the Subject Choice Hotels").

56.     The Choice Franchisees employed the hotel staff and provided boots on the ground at the Subject Choice Hotels.

57.     At all relevant times, Choice was directly involved in the relevant operations of the Subject Choice Hotels, including aspects of operations directly related to the claims of Jane Doe A.S. A.S in this lawsuit.

58.     At all relevant times, Choice exercised systematic control over the Choice Franchisees with respect to operation of the Subject Choice Hotels, such that the Choice Franchisees acted as actual agents of Choice when operating the hotels where Jane Doe A.S. was trafficked.

59.     Some of the obvious signs of Jane Doe A.S.'s trafficking at Subject Choice Hotels included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the do not disturb sign was constantly on the door to the room being used, there were multiple requests for sheets and towels but hotel staff was not allowed in the room and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

60.     There were also other signs of Jane Doe A.S.'s trafficking at the Subject Choice Hotels, consistent with the *modus operandi* of her trafficker, as described throughout this Complaint.

C. **Jane Doe A.S. was Trafficked at the America's Best Value Inn.**

61.     Between approximately May 2013 and December 2013, Jane Doe A.S. was trafficked at the Midland America's Best Value Inn. Bankhead and the ABV Brand Defendants facilitated this trafficking.

62.     Jane Doe A.S.'s' sexual exploitation occurred repeatedly and regularly occurred in rooms of the Midland America's Best Value Inn.

63.     Bankhead employed the hotel staff and provided boots on the ground at the Midland America's Best Value Inn.

64.     At all relevant times, the ABV Brand Defendants were directly involved in the relevant operations of the Midland America's Best Value Inn, including aspects of operations directly related to the claims of Jane Doe A.S. A.S in this lawsuit.

65.     At all relevant times, the ABV Brand Defendants exercised systematic control over Bankhead with respect to operation of the Midland America's Best Value Inn, such that Bankhead acted as an actual agent of the ABV Brand Defendants when operating the hotels where Jane Doe A.S. was trafficked.

66.     Some of the obvious signs of Jane Doe A.S.'s trafficking at the Midland America Best Value Inn included the fact that she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

67.     There were also other signs of Jane Doe A.S.'s trafficking at the subject La Quinta hotels, consistent with the *modus operandi* of her trafficker, as described throughout this Complaint.

## II.  The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem

77.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe A.S.

78.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[5] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90 percent of commercial exploitation of children.[7]

79.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

---

[4] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id
[5] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.
[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf
[7] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

80.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.[8]

---

[8] *Id.*

81.     Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[9] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

82.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[10] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

83.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

84.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating controlling and managing their hotel properties when enacting and enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of that hotel.

85.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash

---

[9] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[11] *Id.*

payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex
ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing
Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise
commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being
aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged,
including guest name, visitor name, arrival time, departure time, and room number; and (8)
developing a protocol for response to indicia of trafficking activity.[12]

86.     The most effective weapon against sexual exploitation and human trafficking is
education and training.  As ECPAT concluded

> The hospitality industry is in a unique position to identify and report human
> trafficking due to its perceived anonymity.  Traffickers believe they can go
> unnoticed while exploiting victims across the globe in hotels— ranging from
> budget properties to luxury resorts.  From check-in to check-out, there are a number
> of indicators victims and exploiters exhibit during the time they are on a hotel
> property.[13]

87.     This same conclusion is echoed by others who seek to eliminate or minimize sex
trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel
employees who have undergone training are more aware of trafficking when it happens – and are
more willing to report it – than those who have not been trained.  In reference to companies like
the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child
trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

---

[12] ECPAT USA, *Training for Anti-Trafficking Hotel Checklist*,
https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/
ECPAT-USA_AntiTraffickingHotelChecklist.pdf
[13] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April
13, 2023).  *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015),
https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

88.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

89.     Accordingly, many hotel chains—including Defendants' chains—have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels.

90.     Each of the Defendants had a responsibility to adopt, implement, and enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

91.     Unfortunately for Jane Doe A.S., the promises made by Defendants and Franchisee have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe A.S.

## III.   Sex Trafficking Has Long Been Prevalent at Franchisor's Branded Properties, and Franchisor Defendants Have Known It.

92.     Defendants' actual knowledge is *not* limited to general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe A.S. trafficking, that sex trafficking was ongoing and widespread at its branded properties.

93.     Upon information and belief, each of the Franchisor Defendants monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe A.S. was trafficked. Upon information and belief, each of the

Franchisee Defendants monitored criminal activity occurring at the hotels they operated and other areas hotels and were aware of activity indicating commercial sex trafficking or related crimes.

**A.      The use of La Quinta branded properties for sex trafficking is prevalent.**

90.      The use of La Quinta hotels for sex trafficking is well known to the LQ Defendants. Scores of news stories dating back as far as 2011, prior to Jane Doe A.S.'s trafficking, highlight the LQ Defendants' knowledge of such conduct. The LQ Defendants knew, or should have known, of the use of La Quinta branded hotels for sex trafficking. Among other notable press involving the frequent use of La Quinta hotels for illegal activity, the follow was reported:

- "Four Atlanta-area women have been arrested on Prostitution charges at a local hotel as part of an FBI-led initiative targeting child exploitation and child prostitution nationwide. The women, ranging in age from 18 to 22, were arrested Friday, July 26, at LaQuinta Inn….",[14]

- "After he dropped [the 15 year-old girl] off at the La Quinta Inn & Suites….last week, the girl solicited an undercover police officer for sex -  and was promptly arrested as part of a nationwide FBI-led crackdown on child prostitution."[15]

- "Raleigh police responded to the La Quinta Inn…where the victim said she was forced into the commercial sex trade, the warrant said:"[16]

- In 2012, "Two women — whom Round Rock police took to the hospital because of injuries — told officials that they had been kidnapped in Houston and taken to Austin for the purpose of prostitution and robbing potential "Johns," arrest records said. The women told police they had been housed at the La Quinta Inn on East 11th Street for four days, according to arrest records."[17]

- A La Quinta "hotel has been ordered to increase security after complaints of prostitution and nuisance activity. La Quinta Hotel….must now install more security cameras and signs to deter criminal activity.  The hotel agreed to do this as part of a settlement with the San Diego City Attorney's office. The San Diego Police

---

[14] http://www.rockdalenewtoncitizen.com/news/four-arrested-on-prostition-charges-as-part-of-fbi-effort/article_19553201-4d38-5036-a0eb-6514d193488e.html
[15] https://www.sfgate.com/crime/article/How-girls-fall-into-clutches-of-pimps-4705407.php
[16] https://www.wral.com/larceny-call-unveils-family-run-sex-trafficking-ring/14031981/
[17] https://www.statesman.com/story/news/local/2012/09/22/human-trafficking-ring-leaders-arrested-in-austin-police-say/9890372007/

Department discovered prostitution at the hotel during several undercover sting operations. Court documents show multiple undercover operations where investigators said they arranged to meet at the hotel with prostitutes through websites."[18]

60.     Reviews of La Quinta branded properties, including the subject La Quinta hotels, which upon information and belief the LQ Defendants monitor regularly, also show the pervasiveness of sex trafficking at La Quinta branded properties. For example:

- In a TripAdvisor review for the La Quinta located at 2307 W. 306 Loop posted on May 15, 2013 a customer wrote, "…there was a condom next to the dresser by the wall it had dust and webs around it so it tells me its been there for a long time!"[19]

- In a TripAdvisor review for the La Quinta located at 2307 W. 306 Loop posted on November 12, 2017 a customer wrote, "Area is shady and not safe. A lot of prostitution going on here. Appeared to be drugs as well."[20]

- In a TripAdvisor review for the La Quinta located at 2307 W. 306 Loop posted on July 4, 2019 a customer wrote, "Tons of non-hotel traffic through the parking lot all night, on a Wednesday night…..Doors slamming all night from other rooms, and I'm pretty sure a drug dealer set up shop 5 doors down. Cars and trucks in front of his room all night. Drivers stayed in vehicle, passengers went inside."[21]

- In a google review posted on January 5, 2022 at the La Quinta located at 2307 W. 306 Loop a customer wrote, "witnessed the General Manager assault one of his employees! Threatened to kill him then I see the same GM walking around property intoxicated. Wyndam should be ashamed of themselves for allowing."[22]

---

[18] https:// www.nbcsandiego.com/news/local/la-quinta-hotel-rancho-penasquitos-san-diego-paseo-montril/2050904/
[19] https://www.tripadvisor.com/Hotel_Review-g56609-d99400-Reviews-
La_Quinta_Inn_by_Wyndham_and_Conference_Center_San_Angelo-San_Angelo_Texas.html
[20] https://www.tripadvisor.com/Hotel_Review-g56609-d99400-Reviews-
La_Quinta_Inn_by_Wyndham_and_Conference_Center_San_Angelo-San_Angelo_Texas.html
[21] https://www.tripadvisor.com/Hotel_Review-g56609-d99400-Reviews-
La_Quinta_Inn_by_Wyndham_and_Conference_Center_San_Angelo-San_Angelo_Texas.html

[22]https://www.google.com/travel/hotels/La%20Quinta%202307%20W%20306%20Loop%20,%20San%20Angelo,%
20TX%20%2076904/entity/CgsIhr3F_o-
4mpu3ARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,45
15404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,48864
80,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930753,4931360,4934306,4936396,4937897,4
946042&hl=en-
PK&gl=pk&ssta=1&q=La+Quinta+2307+W+306+Loop+,+San+Angelo,+TX++76904&grf=EmQKLAgOEigSJnIk
KiIKBwjnDxACGAYSBwjnDxACGAcgADAeQMoCSgcI5w8QAhgFCjQIDBIwEi6yASsSKQonCiUweDg2NTdl
NTExZDI1MDdhZGY6MHhiNzM2NjljMGZmZDE1ZTg2&rp=EIa9xf6PuJqbtwEQhr3F_o-

- In a TripAdvisor review for the La Quinta located at 2606 North Loop 250 posted on June 19, 2019, a customer wrote, "At least two used condoms (one on the bed, one thrown onto the desk)"[23]

- In a TripAdvisor review for the La Quinta located at 5001 W. Hwy 80 E. posted on August 11, 2011, a customer wrote, "The parking lot has no lighting and seems to be infested with drug dealers and prostitutes. Only problem was the rough location and sketchy people around."[24]

- In an Expedia review for the La Quinta located at 5001 W. Hwy 80 E. in Odessa posted on June 28, 2011, a customer wrote, "In the two days I stayed there I was approached by prostitutes twice... Once as I got out of my car and another time at 2:00am in the morning beating on my door. There were drunken men with beer bottles standing in front of my room, blocking my way in."[25]

- In a Bookings review for the La Quinta located at 5001 W. Hwy 80 E. in Odessa posted on May 5, 2021 a customer wrote, "Outside in the parking lot I was approached by a Drug dealer and twice by Prostitutes."[26]

- In an Expedia review for the La Quinta located at 5001 W. Hwy 80 E. in Odessa posted on September 16, 2022 a customer wrote, "This place is a run down roach motel complete with all the crackheads and prostitutes your heart desires!"[27]

61.    Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, the LQ Defendants continued to earn revenue through conduct that they knew or should have known would continue to facilitate that trafficking.

**B.    The use of Choice branded properties for sex trafficking is prevalent.**

---

4mpu3ATgCQABIAcABApoCAggA&ictx=1&sa=X&ved=2ahUKEwje1IPlzP78AhU1UGwGHWA3DhEQ4gl6BA
hwEAU

[23] https://www.tripadvisor.com/Hotel_Review-g56287-d672594-Reviews-
La_Quinta_by_Wyndham_Midland_North-Midland_Texas.html

[24] https://www.tripadvisor.com/Hotel_Review-g56385-d105884-Reviews-La_Quinta_Inn_by_Wyndham_Odessa-
Odessa_Texas.html
[25] https://www.expedia.co.in/Midland-Hotels-La-Quinta-Inn-By-Wyndham-Odessa.h25599.Hotel-Reviews
[26] https://www.booking.com/hotel/us/la-quinta-inn-odessa.en-gb.html?aid=356980&label=gog235jc-
1DCAso7AFCFGxhLXF1aW50YS1pbm4tb2Rlc3NhSDNYA2i1AYgBAZgBCbgBF8gBDNgBA-
gBAYgCAagCA7gCqpf3ngbAAgHSAiQxMzIxODBiOC04ZTVlLTRjYzctOGI2Yy1iY2EwYzU1MDI5OWbYAgT
gAgE&dist=0&keep_landing=1&sb_price_type=total&type=total&
[27] https://www.expedia.co.in/Midland-Hotels-La-Quinta-Inn-By-Wyndham-Odessa.h25599.Hotel-Reviews

62.     The use of Choice properties for sex trafficking is well known to Choice. Information that has become public through news stories and online reviews establishes the entrenched and pervasive nature of Choice's role in providing a venue where sex trafficking has continued unabated for years.

63.     Scores of news stories dating back as far as 2004, prior to Jane Doe A.S.'s trafficking, highlight Choice's knowledge of such conduct. Choice knew, or should have known, of the use of Econo Lodge branded hotels for sex trafficking. Among other notable press involving the frequent use of Econo Lodge hotels for illegal activity, the following was reported:

- The LA Times reported in February of 2004 "Maria De La Luz Menjivar, 43, of Wilmington was arrested Feb. 4 after the women, all in their 20s, reported the alleged sex slave ring to Anaheim police and officers conducted a sting operation at the Econo Lodge. Police said they were uncertain how many women might have worked at the makeshift brothel. The owner of the motel, Nareshkumar Patel, 44, of Anaheim was arrested with Menjivar on suspicion of running a brothel."[28]

- In November 2012 the Wichita Eagle reported, "Brown was charged with 10 counts each of rape and aggravated human trafficking for having sex with the girls, who are now 14 and 15, at the Econo Lodge at 8302 E. Kellogg in 2010 and 2011. Some of the charges cover a time when the girls were 11 and 12 years old."[29]

- In June of 2014 Tallahassee.com reported, "two other violent confrontations at the Econo Lodge on North Monroe Street involved women working as prostitutes with Backpage ads. On May 1, a man was found shot to death in an Econo Lodge motel room. An Alabama woman, Amber Ward, 18, was arrested in his murder. On May 19, a woman with a Backpage ad was beaten with a baseball bat and sexually assaulted outside of the same motel."[30]

- July 2017 in North Carolina "Two were arrested by the U.S. Marshal's Fugitive Task Force at the Econo Lodge in Burlington. Alamance County Sheriff's Office executed a search warrant in connection with the investigation on Room 224 at the same hotel. The investigation began with a citizen saying his granddaughter was involved in drugs and prostitution. Johnson said multiple hotels have engaged in hosting the prostitution and human trafficking rings."[31]

---

[28] https://www.latimes.com/archives/la-xpm-2004-feb-13-me-sexslave13-story.html
[29] https://www.kansas.com/news/local/crime/article1102606.html
[30] https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/
[31] https://greensboro.com/multiple-arrests-in-connection-with-alamance-county-human-trafficking-ring/article_c01dfa4d-cf4e-5443-bb9d-2a483bcc6b77.html

- KRDO News in Colorado Springs, CO reported "Colorado Springs man arrested on charges of human trafficking and pimping. Arrest records show a July 12, 2022 incident sparked the investigation after a 21-year-old victim called the Anti-Human Trafficking hotline. Colorado Springs Police officers responded to the Econo Lodge Hotel off North Academy after receiving a report of a person involved in human trafficking. After searching through the Econo Lodge Hotel database, police found that Evans made 81 reservations in the span of about a year."[32]

64.    Reviews of Econo Lodge branded properties, which upon information and belief Choice monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Choice's knowledge of the same. For example:

- A Google review from 2018 a customer wrote, "Do not stay here unlsess you don't mind being surrounded by crime and drug use."[33]

- Another Google review from 2018 a customer wrote, "If you like prostitutes, drugs, and high school partiers!! This is your place!!!"[34]

- A Google review from 2019 a customer wrote, "Horrible car's get broke into place dirty and drug addicts all over the place drugs sold outside."[35]

---

[32] https://krdo.com/news/2023/01/12/court-docs-colorado-springs-man-accused-of-human-trafficking-claimed-he-had-57-women/
[33] https://www.google.com/travel/hotels/Econo%20Lodge%20San%20Angelo%20415%20W%20Beauregard,%20M idland,%20TX%2079703/entity/CgoIypXG6-exm6ZFEAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,451 5404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,488648 0,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930753,4931360,4934306,4936396,4937897,49 46042&hl=en-PK&gl=pk&ssta=1&q=Econo+Lodge+San+Angelo+415+W+Beauregard,+Midland,+TX+79703&rp=EMqVxuvns ZumRRDKlcbr57GbpkU4AkAASAHAAQKaAgIIAA&ictx=1&sa=X&ved=2ahUKEwjw5cyn0f78AhXuR2wGHb8 tB0YQ4gl6BAh0EAU&grf=EnMKNAgMEjASLrIBKxIpCicKJTB4ODY1N2U1ZjcyNDAxMWQ1MToweDQ1NG M2ZDhlN2Q3MThhY2EKLAgOEigSJnIkKilKBwjnDxADGAISBwjnDxADGAMgADAeQMoCSgcI5w8QAhgFC g0IEhIJEgeSAQQIAhAD
[34] https://www.google.com/travel/hotels/Econo%20Lodge%20San%20Angelo%20415%20W%20Beauregard,%20M idland,%20TX%2079703/entity/CgoIypXG6-exm6ZFEAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,451 5404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,488648 0,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930753,4931360,4934306,4936396,4937897,49 46042&hl=en-PK&gl=pk&ssta=1&q=Econo+Lodge+San+Angelo+415+W+Beauregard,+Midland,+TX+79703&rp=EMqVxuvns ZumRRDKlcbr57GbpkU4AkAASAHAAQKaAgIIAA&ictx=1&sa=X&ved=2ahUKEwjw5cyn0f78AhXuR2wGHb8 tB0YQ4gl6BAh0EAU&grf=EnMKNAgMEjASLrIBKxIpCicKJTB4ODY1N2U1ZjcyNDAxMWQ1MToweDQ1NG M2ZDhlN2Q3MThhY2EKLAgOEigSJnIkKilKBwjnDxADGAISBwjnDxADGAMgADAeQMoCSgcI5w8QAhgFC g0IEhIJEgeSAQQIAhAD
[35] https://www.google.com/travel/hotels/Econo%20Lodge%20San%20Angelo%20415%20W%20Beauregard,%20M idland,%20TX%2079703/entity/CgoIypXG6-exm6ZFEAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,451

- A TripAdvisor review dated February 28, 2020 a customer wrote, "Unless you are seriously hard up or planning to just have a room as a drug den then stay away. I will be contacting Choice Hotels CEO it was that bad. This place deserves to lose their franchise license."[36]

65.  The use Quality Inn hotels for sex trafficking is well known to Choice. Scores of news stories dating back as far as 2013, prior to Jane Doe A.S.'s trafficking, highlight Choice's knowledge of such conduct. Choice knew or should have known, of the use of Quality Inn branded hotels for sex trafficking. Among other notable press involving the frequent use of Quality Inn hotels for illegal activity, the follow was reported:

- A News Report published on August 13, 2013, in Dothan, Alabama, "Police say Alonso Santiagito held a Mississippi teen against her will, beat her, forced her to do drugs, and sold her for sex. He was holding the girl and other victims at the Quality Inn on Ross Clark Cir."[37]

- A News report from May of 2014 in Charlotte, North Carolina, "Charlotte-Mecklenburg Police have arrested three people on human trafficking charges. Officers were called out to the Quality Inn on Griffith Street a couple of days ago to investigate a complaint. It's modern-day slavery, that's what it is, said Dr. Joseph Kuhns, a professor of criminal justice at UNCC."[38]

- Another news report from North Carolina in December of 2014, "The girl told police she was staying with friends in a hotel, the department reported. After talking to her, officers determined that she was a 14-year-old runaway from New York. An investigation revealed she was staying at the Quality Inn, 821 S. Memorial Drive.

---

5404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,488648
0,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930753,4931360,4934306,4936396,4937897,49
46042&hl=en-
PK&gl=pk&ssta=1&q=Econo+Lodge+San+Angelo+415+W+Beauregard,+Midland,+TX+79703&rp=EMqVxuvns
ZumRRDKlcbr57GbpkU4AkAASAHAAQKaAgIIAA&ictx=1&sa=X&ved=2ahUKEwjw5cyn0f78AhXuR2wGHb8
tB0YQ4gl6BAh0EAU&grf=EnMKNAgMEjASLrIBKxIpCicKJTB4ODY1N2U1ZjcyNDAxMWQ1MToweDQ1NG
M2ZDhlN2Q3MThhY2EKLAgOEigSJnIkKilKBwjnDxADGAISBwjnDxADGAMgADAeQMoCSgcI5w8QAhgFC
g0IEhIJEgeSAQQIAhAD

[36] https://www.tripadvisor.com/Hotel_Review-g56609-d217099-Reviews-Econo_Lodge_San_Angelo-
San_Angelo_Texas.html

[37] https://www.wtvm.com/story/23122332/dothan-man

[38] https://www.wcnc.com/article/news/crime/3-arrested-on-human-trafficking-charges-in-charlotte/275-292839989

Maurice Spencer, 21, arrested at the hotel, was charged with human trafficking a child victim and promoting prostitution."[39]

- More recently in a news report from May of 2022 "Mayor Mary-Ann Baldwin said the city has received many complaints about drugs, human trafficking and violence at hotels like the Quality Inn."[40]

- In a news report from Austin, Texas from December 19, 2019 the following was reported, "According to the affidavit, on Oct. 8, police had responded to the Quality Inn at 2751 East Highway 71 westbound service road for a check welfare call. In that case, hotel staff said a victim walked into the lobby, intoxicated and covered in blood, with several injuries. At that time, the victim refused to make a statement to police, but officers noted several things that made them believe she was potentially a human trafficking victim: 1) the person who paid for the victim's room was a man named "Lorenzo Johnson," 2) hotel staff said Johnson had been a customer for the past 28 days and would pay cash for the room every morning, 3) staff said Johnson gave a strict warning that no one should have a room key but him. That day, officers made contact with Johnson and another woman, who were uncooperative. A third woman ran away from the police."[41]

- April 17, 2017 out of Kentucky this was the headline, "Quality Inn employees accused of knowledge, cover-up in human trafficking case"[42]

66.     Reviews of Quality Inn branded properties, which upon information and belief Choice monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Choice's knowledge of the same. For example:

- A Booking review from April 11, 2022 a customer wrote, "We pulled up to see a gentleman doing meth in the parking lot. Another woman, made a drug deal right outside her hotel room in broad daylight. There was a young, pregnant girl escorting men into her room after being given cash, appeared to be prostitution."[43]

- A kayak.com review from June of 2022 at Quality Inn in Arlington a customer wrote, "we witnessed a pimp selling a female prostitute."[44]

---

[39] https://www.reflector.com/news/local/teen-safe-three-in-jail/article_8d512a1d-d11b-5bc2-a477-d4b8e6957c8c.html
[40] https://www.wral.com/city-of-raleigh-deems-quality-inn-on-new-bern-avenue-unsafe-guests-forced-to-leave/20275086/
[41] https://www.kvue.com/article/news/crime/south-austin-swat-call-man-arrested-days-inn/269-a5b5d6f1-d615-470d-a237-b49b2bf476d9

[42] https://www.kentuckynewera.com/news/article_862d485e-232b-11e7-bb20-7b6ffe2cd464.html
[43] https://www.booking.com/hotel/us/san-angelo-4613-south-jackson-days-inn-san-angelo.html
[44] https://www.kayak.com/Arlington-Hotels-Quality-Inn-at-Arlington-Highlands.13568.ksp

- A Google review from 2018 a customer commented, "the face tattoos & over-all clientele  that were probably pimps, junkies, hookers and drug addicts... The GM was incompetent, Night Mgr was inept and simply ignored what was being done in plain sight."[45]

- In a TripAdvisor review at a Quality Inn from January 2006 a customer wrote, "hookers in the parking lot approaching members of our group. When i complained, especially about the hookers, I was told there wasn't much they could do and they would "pass on the complaints to the management."[46]

- In a TripAdvisor review at a Quality Inn from August 2011 a customer wrote, "There were people going into the room next to us that were very suspicious. They were yelling & swearing and we think they were pimps or drug dealers, because we heard one of them yelling at a female telling her that "this is the way I make my money." Needless to say, we left and got our money back. Scary!"[47]

- A Yelp review from July of 2013 a customer wrote, "I am pretty sure there was prostitute "working" from the parking lot and I believe she was using the hotel, ew! I brought this to the staffs attention when we were checking out and she just looked at us and said " oh yeah"."[48]

67.     Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Choice continued to earn revenue through conduct that it knew or should have known would continue to facilitate that trafficking.

**D.     The use of America's Best Value Inn branded properties for sex trafficking is prevalent.**

68.     The use America's Best Value Inn hotels for sex trafficking is well known to the AVB Brand Defendants. Scores of news stories dating back as far as 2013, prior to Jane Doe A.S.'s trafficking, highlight the AVB Brand Defendants' knowledge of such conduct. The AVB Brand Defendants knew, or should have known, of the use of America's Best Value Inn branded hotels

---

[45]https://www.google.com/search?q=Quality%20Inn%20%26%20Suites%207928%20Gessner%20Dr%2C%20Austin%2C%20TX%2078753%20google&hl=en
[46] https://www.tripadvisor.com/Hotel_Review-g34515-d17803954-Reviews-Quality_Inn_Suites_Downtown-Orlando_Florida.html
[47]https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html
[48] https://www.yelp.com/biz/quality-inn-and-suites-fresno-northwest-fresno

for sex trafficking. Among other notable press involving the frequent use of America's Best Value Inn hotels for illegal activity, the follow was reported:

- Reported on usatoday.com on December 2, 2014 stating, "Maryland State Police said Monday two men have been charged with human trafficking and related charges after two women traveling with them were found held against their will. She was being held at the America's Best Value Inn in Princess Anne."[49]

- Reported from Allentown, PA, "In March 2014, Cody raped and assaulted one of the women at the America's Best Value Inn, 2622 Lehigh St. in Allentown, prosecutors said. A week later, Cody began advertising the same woman as a prostitute on Backpage.com in Queens, New York, records say."[50]

- In January of 2023 a report on a case in Arkansas "A Pulaski County jury on Friday ordered the owners of a west Little Rock motel to pay a woman forced into sexual slavery $477,000 in damages for providing a safe haven for her sex-trafficking tormentors, a verdict ending a four-day trial before Circuit Judge Chip Welch. "I should have been protected when I was at America's Best Value Inn," she told jurors."[51]

69.    Reviews of America's Best Value Inn branded properties, which upon information and belief the AVB Brand Defendants monitor regularly, also show the pervasiveness of sex trafficking at its branded properties and the AVB Brand Defendants' knowledge of the same. For example:

- An Expedia review from July 12, 2017 a customer wrote, "My husband and eldest son witnessed what looked like prostitution a couple of rooms down."[52]

- A Yelp review from May 23, 2013 a customer wrote, "a total drug and prostitute infested dump."[53]

- A Yelp review from May of 2014 a customer wrote, "The guy in the next room was a pimping his ole lady."[54]

- Another Yelp review from May of 2014 a customer wrote, "As I was walking to my room (322) a hooker came out of the room next to me, she was wearing shiny bright

[49] https://www.usatoday.com/story/news/nation/2014/12/02/human-trafficking-charges-maryland/19789031/
[50] https://www.lehighvalleylive.com/allentown/2015/08/more_charges_for_man_accused_o.html
[51] https://www.nwaonline.com/news/2023/jan/14/jury-says-motel-owes-sex-trafficking-victim/
[52] https://www.expedia.com/Midland-Hotels-Americas-Best-Value-Inn-Midland.h2713090.Hotel-Reviews
[53] https://www.yelp.com/biz/americas-best-value-inns-and-suites-bridgeton
[54] https://www.yelp.com/biz/americas-best-value-inn-lakewood-tacoma-s-lakewood

yellow daisy dukes and her muffin top was horrible! As I opened the door I noticed the sheets on my need were messed up, and a used condom box was next to my bed."[55]

- In a Yelp review from April 21, 2015 a customer wrote, "i wont be returning and will be contacting corprate to see if they know how this place is being ran if you into drugs gangs or prostitution this is the place for you but as for me id rather sleep in a gas station restroom floor."[56]

- A Yelp review from January 14, 2017 a customer wrote, "there's a lot of prostitutes heroin addicts and a lot of drug dealers that go on."[57]

**E. The Franchisor Defendants' knowledge of widespread and ongoing sex trafficking at their branded hotels.**

70.    This sampling of news stories and reviews establishes that, at the time Jane Doe A.S. was trafficked at the Subject Hotel Properties, each Franchisor Defendant knew, at least the following:

   a.   The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

   b.   Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

   c.   Its franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at its hotel properties;

   d.   Its efforts, if any, to stop facilitating sex trafficking in its branded properties were not effective; and

---

[55] https://www.yelp.com/biz/americas-best-value-inn-visalia-visalia
[56] https://www.yelp.com/biz/americas-best-value-inn-milpitas-silicon-valley-milpitas-4?start=60
[57] https://www.yelp.com/biz/americas-best-value-inn-visalia-visalia

e.  It was, by its acts and omissions, facilitating sex trafficking at its branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

98.    Despite the continually mounting evidence that sex trafficking at its properties was ongoing and growing, each Franchisor Defendants elected not to change its course. Each Franchisor Defendant chose to continue earning revenue and profits from renting out rooms in its hotels as a venue for trafficking.

## IV.   Sex Trafficking Was Prevalent and Obvious at the Subject Hotel Properties

99.    Defendants were also specifically aware that sex trafficking was prevalent at the Subject Hotel Properties. This activity was continuous and obvious and, upon information and belief, was observed by hotel staff.

100.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at each of the Subject Hotel Properties before to A.S.'s trafficking who exhibited "red flags" of trafficking. Apparent indicia of sex trafficking at the Subject Hotel Properties included:

a.  There was a population of traffickers who were known to hotel(s) staff by name. Communication between the hotel(s) staff and traffickers was friendly and reflected an informal agreement or understanding;

b.  Traffickers provided staff with bribes and tips to look the other way rather than taking action to prevent sex trafficking;

c.  There was a frequent flow of males, who were not guests of the hotel(s), in and out of rooms after brief stays;

d.  There was an area of the hotel that staff informally designated for traffickers, drugs, and prostitution;

e.  There was a population of regular traffickers who were known to the staff and who routinely made specific requests, such as requesting rooms next to exit doors, requesting adjoining rooms with those being sexually exploited, and requesting to be in the same area of the hotel(s) as other traffickers;

f.  Rooms used by the traffickers were regularly observed to be messy, to contain excessive sex and drug paraphernalia, and to have an unclean smell;

g.  The trafficking victims had visible tattoos that indicated "branding" by their traffickers.

101.    Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of the trafficking victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

102.    The traffickers, including Jane Doe A.S.'s trafficker, operated at the Subject Hotel Properties with little regard for concealment, due to an implicit understanding between the hotel staff and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

103.    The open and apparent nature of this trafficking activity is confirmed by the fact that multiple guests noticed the activity and made reports or complaints about the activity at the Subject Hotel Properties. Defendants failed to take reasonable steps in response to these reports or complaints.

104.    Each of the Franchisee Defendants knew or should have known about the sex trafficking pervasive at the Subject Hotel Properties based on its first-hand observations and knowledge imputed from the hotel staff that it employed.

105.    Upon information and belief, each of the Franchisor Defendants knew about this widespread trafficking activity at the Subject Hotel Properties based on:

a.   The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Franchisor Defendants;

b.   The Franchisor Defendants' regular monitoring of online reviews;

c.   The Franchisor Defendants' collection and monitoring of customer surveys and complaints;

d.   The Franchisor Defendants' regular inspections of the hotel property;

e.   Information provided to Franchisor Defendants by law enforcement; and

f.   Other sources of information available to Franchisor Defendants.

**V.   It was Apparent and Obvious that Jane Doe A.S. was Being Trafficked at Subject Hotel Properties**

106.    During the time that Jane Doe A.S. was trafficked at the Subject Hotel Properties, it was obvious and apparent she was the victim of sex trafficking.

107.    Because it was known among the community of traffickers that staff at the Subject Hotel Properties turned a blind eye to sex trafficking, Jane Doe A.S.'s trafficker made little or no effort to disguise his role or his actions.

108.    During interactions with the front desk staff at the Subject Hotel Properties, Jane Doe A.S. and her trafficker exhibited obvious and apparent signs of trafficking, including:

a. Jane Doe A.S. did not have access to her identification card, which was controlled by her trafficker. The trafficker would present Jane Doe A.S.'s identification card when reserving a room in her name;

b. Jane Doe A.S.'s trafficker would pay for rooms with cash or prepaid cards;

c. Jane Doe A.S. and her trafficker would stay for an extended period but would pay on a day-to-day basis. Jane Doe A.S.'s trafficker would escort her in the lobby on a daily basis and require her to pay for the day's rate in cash;

d. Jane Doe A.S. and her traffickers would arrive and book a room for an extended period of time but have little or no luggage with them;

e. Because Jane Doe A.S.'s trafficker forbade her from speaking with anyone, Jane Doe A.S. would stand off to the side and look down out of fear;

f. Jane Doe A.S.'s traffickers provided bribes to hotel staff with an explicit or tacit understanding that the payments were made in exchange for staff to look the other way regarding the trafficking activities;

g. Jane Doe A.S.'s trafficker repeatedly made specific requests regarding their rooms, such as requesting that they be located near an exit door, that they be placed in adjoining rooms, or that they be put in an area of the hotel that was known to be used for drugs, prostitution, and trafficking;

h. Jane Doe A.S.'s trafficker brought her back to the Subject Hotel Properties repeatedly, and Jane Doe A.S. often encountered the same staff members. These staff members, including management level employees, observed Jane Doe A.S.'s physical deterioration caused by her trafficker's abuse;

109.    While in the common areas of the Subject Hotel Properties, Jane Doe A.S. exhibited obvious and apparent signs of trafficking that were observed by hotel staff, including:

a.   Jane Doe A.S. had limited access to clothing and would be forced to wear clothing that was tattered, inappropriate for the weather, sexually suggestive, and inappropriate for her age and the circumstances;

b.   Jane Doe A.S. was prevented from maintaining her hygiene and appearance and would appear unkempt;

c.   Jane Doe A.S. appeared malnourished and sleep deprived;

d.   Jane Doe A.S. had visible bruises;

e.   Jane Doe A.S. had human bite marks visible;

f.   Jane Doe A.S.'s demeanor showed obvious signs of fear and anxiety;

g.   Jane Doe A.S., who was kept in a drugged state by her traffickers, exhibited obvious signs of disorientation and impairment.

h.   Jane Doe A.S. was frequently yelled at by her trafficker in a way that could be heard by customers and staff;

i.   Jane Doe A.S. would frequently exit the hotel crying while with her trafficker;

j.   Jane Doe A.S.'s trafficker was violent with Jane Doe A.S. in public areas of the hotel and on the property surrounding the hotel.

k.   Hotel staff saw or heard specific incidents of physical abuse;

l.   Staff received specific complaints or reports about Jane Doe A.S.'s trafficker;

110.    Hotel staff at the Subject Hotel Properties observed open and apparent signs of activity directly related to the trafficking of Jane Doe A.S.:

    a.   There was constant and heavy foot traffic in and out of Jane Doe A.S.'s room involving men who were not hotel guests. Jane Doe A.S. had multiple men per day sexually exploiting her at Subject Hotel Properties;

    b.   Men sexually exploiting Jane Doe A.S. entered and left her room at unusual times and stayed for brief periods;

    c.   Men would frequently stop at the front desk asking about the location of Jane Doe A.S. or her trafficker;

    d.   Jane Doe A.S.'s trafficker would often wait in the hallway or visibly pace the parking lot while Jane Doe A.S. was engaged in commercial sex work;

    e.   Jane Doe A.S.'s trafficker would attempt to prop open the exit door so that customers could enter and exit freely;

    f.   Jane Doe A.S.'s trafficker would force her to solicit men in the hotel parking lot or lobby, which would be observed by hotel staff;

    g.   Men visiting to sexually exploit Jane Doe A.S. would enter and exit the hotel in a manner such that they would be seen by staff working at the front desk;

    h.   Men visiting to sexually exploit Jane Doe A.S. would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras;

    i.   Cars would form a line outside the Subject Hotel Properties waiting for Jane Doe A.S.'s services;

111.   Hotel staff observed Jane Doe A.S.'s room, which showed obvious and apparent

signs of sex trafficking:

    a.   Jane Doe A.S.'s traffickers would decline room service for several
        consecutive days;

    b.   Jane Doe A.S.s' traffickers would order or require Jane Doe A.S. to order
        additional towels and sheets at varying times of the day or night but
        housekeeping staff would not be permitted to enter to bring them in and
        would be asked to leave them at the door;

    c.   Staff would hear sounds of abuse, physical violence, screaming, and crying
        coming from Jane Doe A.S.'s room;

    d.   Staff would hear and ignore Jane Doe A.S.'s desperate screams and pleas
        for help as she was being physically abused by her trafficker;

    e.   Staff received reports or complaints about noise coming from Jane Doe
        A.S.'s room, while staff occasionally asked them to keep the noise down,
        the staff neither inquired about Jane Doe A.S.'s wellbeing nor asked Jane
        Doe A.S.'s trafficker to leave;

    f.   Jane Doe A.S. would be confined to her room for excessively long periods
        without leaving and would have "Do Not Disturb" signs on her door an
        unusual amount;

    g.   Hotel staff would enter Jane Doe A.S.'s room to find it littered with used
        condoms and other sex paraphernalia left behind;

    h.   Jane Doe A.S.'s traffickers would keep excessive amounts of cash in the
        room;

       i.    Jane Doe A.S.'s trafficker would leave obvious signs of illegal drug use in the room for hotel staff to find;

       j.    Hotel staff entered Jane Doe A.S.'s room to find her but did not inquire about her wellbeing or take any steps to assist her. Instead, they continued to rent a room to her trafficker;

112.    Jane Doe A.S.'s trafficker advertised her services on online sites, specifically naming the Subject Hotel Properties, which Defendants knew or should have, through the exercise of reasonable diligence, known.

113.    Multiple employees at the Subject Hotel Properties, including management level employees, observed and/or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

## VI.  Franchisee Defendants Could Have Stopped Jane Doe A.S.'s Trafficking But, Instead, Facilitated It

114.    Franchisee Defendants are responsible for the acts and omission of all employees of the Subject Hotel Properties because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the risks, known to Franchisee, of human trafficking occurring in the Subject Hotel Properties.

115.    Franchisee Defendants, including through the staff at the Subject Hotel Properties, had an opportunity to and did observe obvious signs that there was widespread sex trafficking in the Subject Hotel Properties and, despite this, allowed this activity to continue unabated.

116.    Franchisee Defendants, including through the staff at the Subject Hotel Properties, had an opportunity to and did observe obvious signs that Jane Doe A.S. was being sex trafficked

such that Franchisee Defendants had actual knowledge or was reckless in not knowing that Jane Doe A.S. was being sex trafficked at the Subject Hotel Properties . Nonetheless, Franchisee Defendants took no steps in response to these signs and, instead, continued providing assistance to her trafficker.

117.    Franchisee Defendants facilitated Jane Doe A.S.'s trafficking at the Subject Hotel Properties through numerous acts and omission, including:

    a.  Franchisee Defendants allowed traffickers to reserve rooms in Jane Doe A.S.'s name by showing her identification card in violation of reasonable practices, industry standards, and/or applicable policies;

    b.  Franchisee Defendants allowed traffickers to reserve rooms while maintaining relative anonymity and non-traceability;

    c.  Franchisee Defendants failed to report known or suspected trafficking activity appropriately according to reasonable practices, industry standards, and/or applicable policies;

    d.  Despite seeing obvious signs of distress, Franchisee Defendants failed to take any steps to inquire about the welfare of Jane Doe A.S.;

    e.  Franchisee Defendants continued to rent rooms to traffickers, including Jane Doe A.S.'s traffickers, despite known or obvious signs of trafficking;

    f.  Franchisee Defendants failed to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at Subject Hotel Properties;

    g.  Franchisee Defendants enabled traffickers to access ancillary services that supported trafficking activities, such as providing Wi-Fi access they used to

advertise commercial sex services, furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts, and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex;

   h.   Franchisee Defendants accommodated specific requests of the trafficker;

   i.   Franchisee Defendants accepted bribes or "tips" from the traffickers in exchange for allowing the trafficking activity to occur without interference.

     118.   By ignoring or remaining willfully blind to obvious signs of trafficking, Franchisee Defendants assisted traffickers by providing them a venue, with the cover of a legitimate business, where they could conduct their trafficking activities without having to expend significant efforts to avoid detection or interference.

**VII.   Franchisor Defendants Retained Control Over Relevant Aspects of Operations at the Subject Hotel Properties and Thus Had Both the Opportunity and Duty to Prevent Sex Trafficking at Subject Hotel Properties , Including Jane Doe A.S.'s Trafficking.**

     119.   Each Franchisor Defendant benefited directly when rooms at its branded hotels were rented to traffickers because this increased gross room revenue which, in turn, increased the payment that the Franchisor Defendant received under the terms of its franchising agreement.

     120.   Franchisor Defendants retained control over the details and methods of aspects of the operation of the Subject Hotel Properties that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, each Franchisor Defendants participated in a venture with sex traffickers who were using the Subject Hotel Properties as a venue for their trafficking. Moreover, as a result of this retained control, Franchisor Defendants had both the opportunity and the duty to prevent Jane Doe A.S.'s trafficking.

121.   Franchisor retained control over the training of the staff of the Subject Hotel Properties regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If Franchisor Defendants had exercised reasonable diligence in providing training, Franchisor Defendants would have prevented the Subject Hotel Properties from being used to facilitate obvious and apparent sex trafficking, including the trafficking of Jane Doe A.S. By failing to take reasonable steps to provide appropriate training, despite the overwhelming evidence it had of an ongoing problem with use of its branded properties for sex trafficking, each Franchisor Defendants was negligently facilitating sex trafficking.

122.   Beyond training, each Franchisor Defendants also retained control over the response of its hotels to human trafficking, including development of policies and procedure regarding detection of and response to human trafficking. By retaining control in this area, Franchisor Defendants assumed a legal duty to the patrons and guests of its hotels. By failing to exercise reasonable diligence in discharge of this duty, Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe A.S., in the Subject Hotel Properties.

123.   At the heart of Defendants' venture with traffickers (including Jane Doe A.S.'s trafficker) is the reservation of hotel rooms. Upon information and belief, Franchisor Defendants retained control over the details of reservations at the Subject Hotel Properties, including controlling the online reservation system that each Franchisee Defendants was required to use, providing software systems each Franchisee Defendant had to use  to check guests in and charge for rooms, controlling the prices of rooms, setting all details of the customer loyalty program that each Franchisee Defendant was required to implement, and setting detailed policies for things such

as payment methods and requirements to show identification. Because reservations and payments were processed through its systems, each Franchisor Defendant had access to guest and payment information. All Franchisor Defendants thus directly participated, through their acts and omissions, in reserving rooms to traffickers, including Jane Doe A.S.'s traffickers. If each Franchisor Defendant had used reasonable diligence in setting, implementing, and enforcing appropriate policies, it would have detected Jane Doe A.S.'s trafficking and/or prevented Jane Doe A.S.'s trafficker from using a room to sexually exploit Jane Doe A.S. By failing to exercise reasonable diligence in discharge of this duty, each Franchisor Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe A.S., in its hotels.

124.    Specifically, each Franchisor Defendant should have known about and prevented Jane Doe A.S.'s trafficking because Jane Doe A.S.'s trafficker repeatedly used Jane Doe A.S.'s identification card to secure rooms in her name and used cash for room purchases, which are recognized sign of sex trafficking. A reasonable policy would not allow someone to secure a room using these tactics. Franchisor Defendants knew that adoption and enforcement of appropriate identification policies and payment-method policies was a crucial tool to avoid use of its hotel properties for trafficking. Franchisor Defendants retained the control to adopt and enforce policies on this subject for its branded properties, including Subject Hotel Properties but failed to adopt and enforce appropriate policies, which facilitated trafficking at the Subject Hotel Properties and allowed Jane Doe A.S.'s traffickers to access rooms for the purpose of trafficking Jane Doe A.S.

125.    Franchisor Defendants also retained control over issues related to reporting security and criminal activity, including human trafficking activity. On information and belief, Franchisor Defendants adopted a policy that required staff at the Subject Hotel Properties to report indicators or potential criminal activity on premises to Franchisor Defendants. Based on each Franchisor

Defendant's retained control over this area, it knew or—with reasonable diligence in implementing and enforcing this policy—should have known that Jane Doe A.S. was being trafficked. By failing to exercise reasonable diligence in discharge of this duty, each Franchisor Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe A.S., at the Subject Hotel Properties.

126.   On information and belief, each Franchisor Defendant also retained control over property-specific data and customer data from the Subject Hotel Properties —which it obtained by controlling the means and methods by which its respective Franchisee Defendants recorded, stored, and reported that data—such that it had actual or constructive knowledge—about the ongoing trafficking that was occurring at the Subject Hotel Properties during the time Plaintiff was trafficked there. However, on information and belief, each Franchisor Defendant was willfully blind to this data and continued to facilitate trafficking at the Subject Hotel Properties by providing a venue—and associated services—where traffickers could profit from sexual exploitation with minimal risk of disruption.

127.   Each Franchisor Defendant also retained control over the security of the Subject Hotel Properties through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Subject Hotel Properties. It also collected data regarding hotel operations and customers, including names, payment information, reservation history, browsing data, and other details associated with their stay. Because each Franchisor Defendant retained this control, it had a duty to the patrons and visitors to the Subject Hotel Properties. If each Franchisor Defendant had exercised reasonable care in the discharge of this duty, it would have detected and known about Jane Doe A.S.'s trafficking- and avoided facilitating it. By failing to exercise reasonable diligence in discharge of

this duty, Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane

Doe A.S., in its hotels.

128.    Each Franchisor Defendants also retained control over the safety and security of

the experience at its branded properties by setting up systems for customers to report issues to

Franchisor Defendants rather than Franchisee Defendants. Despite doing this, Franchisor

Defendants failed to act reasonably in response to complaints about criminal activity and sex

trafficking at its properties, including the Subject Hotel Properties. If Franchisor Defendants had

acted reasonably and prudently in monitoring and responding to customer complaints, it would

have reduced the rampant sex trafficking in its branded properties and would not have facilitated

Jane Doe A.S.'s sex trafficking.

129.    Each Franchisor Defendant required its respective franchisees to offer internet

service to guests at the Subject Hotel Properties and retained control over the details of that internet

service and policies regarding its use. Upon information and belief, each Franchisor Defendant

required its respective franchisees to use a particular platform, set policies, and retained access to

data regarding guests' use of wi-fi. Each Franchisor Defendant was aware that sex traffickers used

the internet to facilitate trafficking by advertising victims' commercial sex services. Because each

Franchisor Defendants retained control over internet service, each Franchisor Defendants could

have but did not enact policies to prevent Jane Doe A.S.'s trafficker from advertising commercial

sex activity online and could have, with reasonable diligence, used tools to determine when its

hotel and wi-fi were being used to facilitate unlawful sexual exploitation.

130.    Based on public reporting, investigations, criminal incidents, hotel reviews and

comments, and direct reporting from Franchisee Defendants, as set out throughout this Complaint,

Franchisor Defendants had actual knowledge of pervasive sex trafficking throughout its owned

hotel properties generally and specifically at the Subject Hotel Properties. Franchisor Defendants, through its acts and omissions, knowingly received financial benefit from activity at its branded hotels, including Subject Hotel Properties, that Franchisor Defendants knew or should have known was unlawful sex trafficking.

131.    If each Franchisor Defendants had acted reasonably, in compliance with industry standard, in compliance with its own promises, and/or in compliance with its own policies and procedures, Jane Doe A.S.'s trafficking would have been prevented.

## VIII.   Franchisor Defendants Exercised Pervasive Control over Franchisee Defendants.

132.    In addition to Franchisor Defendants' direct involvement in the venture through the means outlined above, Franchisor Defendants also participated in the venture through the acts and omissions of Franchisee Defendants, who are their actual agents for the purpose of operating the Subject Hotel Properties.

133.    Upon information and belief, Franchisor Defendants exercised systemic and pervasive control over Franchisee Defendants day-to-day operation of the Subject Hotel Properties, including the methods and details of Franchisee's work, through ways including:

      a.   controlling and requiring franchisees to use a reservation and marketing system;

      b.   controlling and requiring franchisees to use a credit process system

      c.   dictating policies regarding forms of payment;

      d.   setting prices;

      e.   setting wages;

      f.   making or influencing employment decisions;

      g.   requiring standardized training for hotel employees;

    h.   requiring franchisees to collect guest data using Franchisor's systems, to compile reports, and to make that data available to Franchisor;

    i.   requiring Franchisee Defendants to comply with standards, policies, and rules adopted by Franchisor Defendants on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Subject Hotel Properties .

134.    Franchisor Defendants did not merely identify quality or outcome standards. Instead, it specifically directed the means and methods that Franchisee Defendants and the staff at the Subject Hotel Properties property should use for day-to-day operations and dictated many of the core tools that Franchisee Defendants was required to use to conduct those operations, including the means and methods of operations that directly caused Jane Doe A.S.'s damages.

135.    Upon information and belief, Franchisor Defendants had the right to and actually did enforce its control over Franchisee Defendants through various methods including:

    a.   Inspections of the Subject Hotel Properties;

    b.   Monitoring or auditing the Franchisee Defendants for compliance with policies and expectations;

    c.   Directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards;

    d.  Mandating training and education;

    e.  The right to terminate the franchise agreement.

136.    Franchisor Defendants are vicariously liable for the acts and omissions of their agents, Franchisee Defendants, and any sub-agents or employees of Franchisee Defendants with respect to operation of the Subject Hotel Properties.

137.    In addition to the ways described above, upon information and belief, the LQ Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over the Pristine's day-to-day operation of the franchised La Quinta in ways including but not limited to the following:

    a.  requiring franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for protection of registered trademarks;

    b.  maintaining a team of regionally based trainers to provide training at branded hotels.

    c.  providing hotels staff with training it created through an online learning platform, they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

    d.  controlling training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

    e.  retaining sole discretion to determine whether all training had been completed satisfactorily;

    f.  requiring franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

    g.  for certain products and services that franchisee was required to purchase to operate the hotel, designating approved vendors and prohibiting franchisee from purchasing goods and services from anyone other than an approved vendor;

h.  requiring franchisees to use its revenue management system, through which they dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

i.  setting required staffing levels;

j.  establishing detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

k.  controlling channels for guests to report complaints or provide feedback directly participating in the response and/or supervising franchisee's response to customer complaints or other feedback.

l.  generating reports and analysis of guest complaints and online reviews;

m.  setting detailed requirements for insurance that Pristine must purchase;

n.  exercising or retaining control over Pristine's day-to-day accounting and banking practices;

o.  regularly auditing the books and records of Pristine;

p.  controlling all marketing for Pristine, directly providing marketing services, and prohibiting Pristine from maintaining any online presence unless specifically reviewed and approved;

q.  exercising or retaining control over all aspects of building and facility design;

r.  supervising and controlling day-to-day operations through detailed information and extensive reports that it obtained through the property management system and other software systems it required Pristine to use;

s.  requiring Pristine and hotel staff to implement a data system that gives the LQ Defendants real-time information that they can monitor on a day-to-day basis; and

t.  retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

138.   In addition to the ways described above, upon information and belief, Choice exercised and reserved the right to exercise systemic and pervasive control over the Choice Franchisees' day-to-day operation of Subject Choice Hotels in ways including but not limited to the following:

a.   requiring Choice Franchisees and hotel management to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Choice to protect its trademarks.

b.   retaining the right to mandate and control training for hotel staff and actually maintaining and controlling training for hotel staff on topics it selected.

c.   controlling the details of training conducted for hotel staff by Choice Franchisees by requiring the use of standardized training methods and materials, including developing online, role-specific training that Choice Franchisees were required to use.

d.   adopting detailed job descriptions for each position at the Subject Choice Hotels and drafting numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

e.   setting required staffing levels for the Subject Choice Hotels

f.   exercising significant control over the procurement decisions of Choice Franchisees by requiring Choice Franchisees to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors.

g.   imposing and enforcing detailed requirements for all aspects of hotel facilities.

h.   controlling channels for guests to report complaints or provide feedback regarding the Subject Choice Hotels and directly participated in the response and/or supervised and dictated Choice Franchisees' response to customer complaints or other feedback.

i.   requiring the Subject Choice Hotels to participate in a mandatory guest complaint resolution system operated, managed, and overseen by Choice.

j.   requiring Choice Franchisees to join and participate in a franchisee association with other Choice brand hotels.

k.   controlling all marketing for the Subject Choice Hotels, including all website pages, and prohibiting Choice Franchisees from using any website, social media, advertising, or other public communication without written approval from Choice.

l.   requiring Choice Franchisees to refer all guests who it could not accommodate to other Choice-branded hotels.

m.   requiring Choice Franchisees to purchase insurance and set specific requirements for that insurance.

n. imposing detailed recordkeeping and reporting requirements on Choice Franchisees regarding virtually all aspects of hotel operation.

o. collecting, monitoring, and analyzing dozens of reports regarding the Subject Choice Hotels through the backend of the ChoiceADVANTAGE property management system and used these reports to supervise and control the day-to-day operations of the Subject Choice Hotels.

p. collecting, monitoring, and analyzing guest information in two separate systems: the CIS (Customer Information System) and our GIS (Guest Insight System) through the backend of the ChoiceADVANTAGE property management system and usomg this information to supervise, monitor, manage, and control the day-to-day operations of the Subject Choice Hotels.

q. retaining the virtually unlimited right to supervise the day-to-day operations of the hotel by retaining the right to implement any automatic reporting systems it elected to use.

r. retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

139.    In addition to the ways described above, upon information and belief, the AVB Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-to-day operation of the Midland America's Best Value Inn in ways including but not limited to the following:

a. requiring the franchisee and hotel staff to keep detailed records of the day-to-day operations of the hotel;

b. requiring the franchisee and hotel staff to submit detailed reports on aspects of day-to-day operations;

c. requiring the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis;

d. exercising or retaining control over vendors that franchisees can use to procure supplies for day-to-day operations;

e. dictating the specific tools that franchisee and hotel staff must use to perform day-to-day operations of the hotel;

f. requiring franchisees to use specific complaint resolution programs;

g. dictating the response of franchisees to specific complaints;

h.  exercising or retaining control over the franchisee's day-to-day accounting and banking practices;

i.  requiring franchisees to participate in mandatory marketing and advertising programs;

j.  exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

k.  restricting the franchisee's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

l.  exercising or retaining control over all aspects of building and facility design;

m.  reserving the right to order upgrades and improvements to facilities and operations at the hotel;

n.  retaining control over all in-room services, including whether and under what conditions adult movie should be offered;

o.  retaining the right to use meeting rooms and other space at the hotel property to conduct meetings and other business;

p.  publicly labeling hotel employees as "our staff" or "our hotel staff";

q.  exercising or retaining control over human resources issues at the hotel property;

r.  posting jobs for its branded properties;

s.  providing benefits to staff of its branded properties;

t.  setting parameters and guidelines for mandatory evaluations of hotel staff;

u.  setting pay, pay parameters, or pay ranges for hotel staff;

v.  setting job qualifications for hotel staff;

w.  setting job descriptions for hotel staff;

x.  adopting policies that specifically dictate which positions must perform which day-to-day functions;

y.  dictating staffing levels required at hotels;

z.  making or influencing hiring decisions for hotel staff;

aa. providing or controlling onboarding for hotel staff;

bb. exercising or retaining control over standardized training for hotel employees and management;

cc. controlling the time, manner, and location of training for franchisees and hotel staff;

dd. requiring all management personnel to attend franchisor led training;

ee. exercising or retaining control over training for front desk, housekeeping and operational staff;

ff. retaining sole discretion to determine whether franchisee and hotel staff have satisfactorily completed training;

gg. adopting policies that dictate specific disciplinary steps for specific infractions by hotel staff;

hh. maintaining employment records, including training records, for hotel staff

ii. establishing employee recognition programs for hotel staff;

jj. requiring that franchisee maintain specific levels of insurance and list the franchisor as an additional insured;

kk. retaining sole discretion to transfer the franchising agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

## XII.  Staff of the Subject Hotel Properties are Joint Employees of both Franchisor Defendants and Franchisee Defendants

140.    In addition, each Franchisor Defendant and Franchisee Defendant participated in the ventures at its respective hotels through the acts and omissions of the staff at the Subject Hotel Properties because Franchisor Defendants and Franchisee Defendants jointly employed or ratified the employment of staff at the Subject Hotel Properties.

141.    Upon information and belief, each Franchisor Defendant exercised control over the terms and conditions of the terms and conditions of employment for staff at its hotels by:

     a.  Posting jobs for its branded properties;

     b.  Providing benefits to staff of its branded properties;

     c.  Setting pay, pay parameters, or pay ranges for staff of its branded properties;

     d.  Setting job qualifications;

     e.  Setting job descriptions;

     f.  Dictating staffing levels required at its branded properties;

     g.  Making or influencing hiring decisions;

     h.  Providing onboarding and ongoing training;

     i.  Maintaining employment records, including training records.

142.    Franchisor Defendants and Franchisee Defendants acted as joint employers at their respective hotels because, at the Subject Hotel Properties, there is a high degree of interrelation of operations and profit sharing between the relevant Franchisor Defendants and Franchisee Defendants.

## XIII.  Joint Venture of the LQ Defendants

143.    All the LQ Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

144.    Upon information and belief, the LQ Defendants shared personnel, office space, and officers. The LQ Defendants engaged in agreements without consideration. The LQ Defendants failed to observe corporate formalities. The LQ Defendants acted as an integrated enterprise and/or as alter-egos of one another.

145.    The LQ Brand Defendants are vicariously liable for the acts and omissions of the LQ Owner Defendants with regard to the operation of the owner-operated LQ Hotels the LQ Brand Defendants exercised pervasive and systematic control over the LQ Owner Defendants with respect to the operation of the owner-operated LQ Hotels.

### XIV.   Defendants Knowingly Benefited from Participation in a Venture They Knew Or Should Have Known Was Engaged In Sex Trafficking

146.    In ways described more fully above, Franchisor Defendants and Franchisee Defendants knowingly received a financial benefit from participating in a venture with sex traffickers, including Jane Doe A.S.'s sex trafficker, as follows:

    a.  Sex traffickers, including Jane Doe A.S.'s sex traffickers, frequently used Subject Hotel Properties for their trafficking because they knew that staff members would look the other way. This occurred because Franchisor Defendants and Franchisee Defendants (1) failed to adopt and enact policies to effectively detect sex trafficking and stop use of their facilities to facilitate that trafficking; (2) failed to use reasonable care when hiring, retaining, supervising, and training staff at the Subject Hotel Properties; and (3) affirmatively adopted policies and procedures that allowed sex trafficking to flourish.

    b.  Both Franchisor Defendants and Franchisee Defendants participated in this venture by acting jointly to rent rooms to traffickers. Franchisee Defendants provided "boots on the ground" for reservations, and Franchisor Defendants retained control over reservation systems and applicable policies and guidelines as further described in this Complaint. They participated in the venture by continuing to rent rooms to Jane Doe A.S.'s traffickers long after they knew or should have known that Jane Doe A.S. was being subjected to unlawful trafficking.

c.  Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low-risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

- Staff at the Subject Hotel Properties knew Jane Doe A.S.'s traffickers by name or by his "pimp" nickname;

- Jane Doe A.S.'s traffickers took no steps to conceal their activities from the staff at the Subject Hotel Properties but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

- Despite policies and/or industry standards to the contrary, Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments, not requiring the identification card of the individual actually paying for the room;

d.  Both Franchisor Defendants and Franchisee Defendants participated in this venture by providing additional services to traffickers (including Jane Doe A.S.'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

e.  Defendants' venture with traffickers resulted in revenue from room rentals and other incidental purchases by traffickers, including Jane Doe A.S.'s trafficker, which accrued to the benefit of both Franchisor Defendants and Franchisee

Defendants. Each room rented at Subject Hotel Properties increased revenue for both Franchisor Defendants and Franchisee Defendants.

147.    Franchisor Defendants also knowingly received a financial benefit by engaging in a venture with Franchisee Defendants operating the Subject Hotel Properties despite the fact that Franchisor Defendants knew or should have known that Franchisee Defendants was engaged in violation a of 18 U.S.C §1591(a):

    a.   Franchisor Defendants and Franchisee Defendants entered into a venture to operate the Subject Hotel Properties with the shared objective of maximizing revenue and profits;

    b.   Franchisor Defendants knowingly received a financial benefit from this venture in the form of franchising fees, royalty fees, and other payments from Franchisee Defendants;

    c.   Franchisee Defendants violated 18 U.S.C §1591(a)(1) because, through their management of the Subject Hotel Properties and the acts and omissions of the staff of that hotel, Franchisee Defendants harbored trafficking victims and participated in a venture with sex traffickers;

    d.   Franchisor knew, or with the exercise of reasonable diligence, would have known that Franchisee Defendants were engaged in violations of 18 U.S.C §1591(a). Franchisor Defendants should have known about Franchisee's activity at the Subject Hotel Properties because Franchisor Defendants retained control over relevant aspects of the operations of Subject Hotel Properties and thus owed a corresponding duty. Despite this, Franchisor Defendants continued to knowingly benefit from its relationship with

Franchisee, including the proceeds Franchisee Defendants obtained from
unlawful sex trafficking. The Franchisor Defendants continued providing
Franchisee Defendants with operational support, use of its trademarks, and
other resources to operate the Subject Hotel Properties in a way that
Franchisor Defendants knew or should have known was engaging in
violations of 18 U.S.C §1591(a).

**XV.   Defendants are Jointly and Severally Liable for Jane Doe A.S.'s Damages**

148.   Under the TVPRA, Defendants are jointly and severally liable for all damages a
jury awards to Jane Doe A.S. for past and future losses she suffered as a proximate result of her
sexual exploitation and trafficking.

<u>**CAUSES OF ACTION**</u>

**I.   Cause of Action: Franchisee Defendants Violation of §1591(a)(1) of the TVPRA**

149.   Jane Doe A.S. incorporates all previous allegations.

150.   Jane Doe A.S. is a victim of sex trafficking within the meaning of 18 U.S.C §1591
and is thus entitled to bring a civil action under 18 U.S.C §1595 against any the "perpetrator" of
any violation of the TVPRA.

151.   Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595
because Franchisee Defendants violated 18 U.S.C §1591(a)(1) when, through the acts and
omissions described throughout this Complaint, they harbored individuals (including Jane Doe
A.S.) by renting a room to traffickers and providing them with services despite knowing or in
reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud,
to engage in commercial sex acts while at the Subject Hotel Properties.

152.    Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595 because Franchisee Defendants violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, Franchisee Defendants knowingly received financial benefit by assisting, supporting, or facilitating a venture that Franchisee Defendants knew or was reckless in not knowing engaged in unlawful sex trafficking. Specifically, Franchisee Defendants had an informal, implicit arrangement with sex traffickers, including Jane Doe A.S.'s sex traffickers, whereby Franchisee Defendants received revenue by renting hotel rooms to these traffickers on an ongoing basis despite knowing, or in reckless disregard of the fact, that these rooms would be used as a venue for sexual exploitation of individuals, including Jane Doe A.S..

153.    Franchisee Defendants' violations of 18 U.S.C §1591(a) operated jointly with the other unlawful acts and omissions of Franchisee Defendants and Franchisor Defendants outlined in this Complaint, to cause Jane Doe A.S. to suffer substantial physical and psychological injuries and other harm as a result of being trafficked and sexually exploited.

## II.    Cause of Action: Franchisee Defendants and Franchisor Defendants' Direct Liability as Beneficiaries under §1595 (a) of the TVPRA

154.    Jane Doe A.S. incorporates all previous allegations.

155.    Jane Doe A.S. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

156.    Through acts and omissions described through this Complaint, Franchisor Defendants and Franchisee Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe A.S.'s traffickers, despite the fact that Franchisor Defendants and Franchisee Defendants each knew or should have known that these traffickers were engaged

in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendants are liable to Jane Doe A.S. as beneficiaries under 18 U.S.C §1595.

157.    In addition, through acts and omissions described through this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with Franchisee Defendants to operate the Subject Hotel Properties  despite the fact that Franchisor Defendants knew or should have known that Franchisee Defendants, including through its employees and agents, was using the operation of the Subject Hotel Properties  to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2).  As alleged above, Franchisee Defendants engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). These violations happened within the scope of Franchisee Defendants' venture with Franchisor Defendants operating the Subject Hotel Properties.  Franchisor Defendants knew or should have known that Franchisee Defendants were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Franchisor Defendants are thus liable to Jane Doe A.S. as a beneficiary under 18 U.S.C §1595(a) because they knew or should have known that Franchisee Defendants were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) causing harm to Jane Doe A.S. when they continued participating in and financially benefiting from its relationship with Franchisee.

158.    Violations of 18 U.S.C §1595(a) by both Franchisor Defendants and Franchisee Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions of Franchisor Defendants and Franchisee Defendants alleged in this Complaint, to cause Jane Doe A.S. to suffer substantial physical and psychological injuries and other damages as a result of being trafficked and sexually exploited at the Subject Hotel Properties

III.    **Cause of Action: Franchisor Defendants' Vicarious Liability for Franchisee Defendants' Violations of the TVPRA (Actual Agency)**

159.    Franchisee Defendants are the actual agent of Franchisor Defendants with respect to operation of the Subject Hotel Properties because, as described throughout the Complaint, at all relevant times Franchisor Defendants exercised systemic control over Franchisee Defendants day-to-day operations of the Subject Hotel Properties, including the means and methods of operation.

160.    Franchisee Defendants are the actual agent of Franchisor Defendants with respect to operation of the Subject Hotel Properties because, as described above, at all relevant times Franchisor Defendants exercised systemic control over the aspects of Franchisee's operation of the Subject Hotel Properties that caused Jane Doe A.S.'s injuries.

161.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent.

162.    In addition to its own direct liability, Franchisor Defendants are also vicariously liable to Jane Doe A.S. for the TVPRA violations of Franchisee Defendants, which are Franchisor Defendants actual agent.

163.    As alleged above, Franchisee Defendants are directly liable to Jane Doe A.S. for violations of the TVPRA, both as a perpetrators under 18 U.S.C §1591(a) and as a beneficiaries under 18 U.S.C §1595(a). Franchisor Defendants are vicariously liable to Jane Doe A.S. for those same violations.

IV.    **Cause of Action: Franchisor Defendants' Vicarious Liability for Franchisee Defendants' Violations of the TVPRA as Joint Employer of the Staff at the Subject Hotel Properties**

164.    At all relevant times, Franchisor Defendants and Franchisee Defendants were joint employers of the staff of the Subject Hotel Properties because they exercised joint control over the

terms and conditions of employment and economic realities reflect joint employment in ways described throughout the Complaint.

165.    Under the TVPRA and the federal common law, Franchisor Defendants, as joint employer of the staff of the Subject Hotel Properties, are vicariously liable for the acts and omissions of the staff of the Subject Hotel Properties.

166.    As alleged above, the staff of the Subject Hotel Properties engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). Franchisor Defendants are vicariously liable for these TVPRA violations.

## TOLLING OF THE LIMITATIONS PERIOD

167.    To the extent Defendants assert an affirmative defense of limitations, A.S. invokes the discovery rule. At the time she was harmed and through at least December 2013, A.S. was under coercion and control of a trafficker who abused and manipulated her. Thus, A.S. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, A.S. —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of A.S. being kept under the control of her traffickers, which Defendants facilitated.

168.    At the time A.S. was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

169.    To the extent Defendants assert an affirmative defense of limitations, A.S. invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, A.S. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before A.S. filed this lawsuit.

170.    As a result of her continuous trafficking at the Subject Hotel Properties through at least December 2013, A.S. endured mental, physical, and sexual abuse. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

171.    A.S. was under the continuous control of her traffickers through at least 2013. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

172.    To the extent Defendants assert an affirmative defense of limitations, A.S. also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

173.    A.S. was subject to continuous trafficking at the Subject Hotel Properties through at least December 2013, which is not more than 10 years before A.S. filed this lawsuit.

174.    This continuous trafficking resulted from Defendants' continuous facilitation of trafficking at Subject Hotel Properties and Defendants' ongoing venture with one another and with criminal traffickers.

**DAMAGES**

175.    Jane Doe A.S. seeks the following damages, joint and severally, from all Defendants:

    a.  Actual damages (until trial and in the future)

b.  Direct damages (until trial and in the future)

c.  Incidental and consequential damages (until trial and in the future)

d.  Mental anguish and emotional distress damages (until trial and in the future)

e.  Lost earnings and lost earning capacity (until trial and in the future)

f.  Necessary medical expenses (until trail and in the future)

g.  Life care expenses (until trial and in the future)

h.  Physical pain and suffering (until trial and in the future)

i.  Physical impairment (until trial and in the future)

j.  Unjust enrichment (until trial and in the future)

k.  Exemplary/Punitive damages.

l.  Attorneys' fees

m.  Costs of this action

n.  Pre-judgment and all other interest recoverable

## JURY DEMAND

176.    Jane Doe A.S. AS requests trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Jane Doe A.S. prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe A.S. against all Defendants jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe A.S. may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**PROVOST★UMPHREY LAW FIRM, L.L.P.**


By: */s/ Colin D. Moore*_____

MATTHEW C. MATHENY | SBN 24039040
BRYAN O. BLEVINS | SBN 02487300
JACQUELINE RYALL | SBN 17469445
COLIN D. MOORE | SBN 24041513
350 Pine Street, Suite 1100
Beaumont, Texas 77701
(409) 835-6000
(409) 838-8888 Facsimile
mmatheny@provostumphrey.com
BBlevins@provostumphrey.com
jryall@provostumphrey.com
cmoore@provostumphrey.com


**FIBICH, LEEBRON, COPELAND AND BRIGGS**
Tommy Fibich
Sara Fendia
1150 Bissonnet St.
Houston, TX 77005
sfendia@fibichlaw.com


**ATTORNEYS FOR PLAINTIFF**