CIVIL

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:23-cv-01676-DAD-KJN

| | |
|---|---|
| Doe v. Wyndham Hotels and Resorts et al | Date Filed: 08/11/2023 |
| Assigned to: District Judge Dale A. Drozd | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Kendall J. Newman | Nature of Suit: 890 Other Statutory Actions |
| Cause: 28:1331 Fed. Question | Jurisdiction: Federal Question |

**Plaintiff**

**Jane Doe**
*also known as*
T.R.S.

represented by **Christopher Moze Cowper**
Cowper Law LLP
12301 Wilshire Boulevard
Suite 303
Los Angeles, CA 90025
877-529-3707
Fax: 877-284-0980
Email: mcowper@cowperlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward Fisher , PHV**
Email: efisher@pulf
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Barrett , PHV**
Email: pbarrett@pulf.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Glassman**
Panish Shea Boyle Ravipudi LLP
11111 Santa Monica Blvd.,
Suite 700
Los Angeles, CA 90025
310-477-1700
Email: rglassman@psbr.law
*TERMINATED: 12/04/2023*

V.

**Defendant**

**Wyndham Hotels and Resorts**

represented by **David S. Sager , PHV**
DLA Piper LLP (US)

51 John F. Kennedy Parkway
Ste 120
Short Hills, NJ 07078
973-520-2570
Email: david.sager@dlapiper.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory George Sperla**
DLA Piper LLP (US)
555 Mission Street
Suite 2400
San Francisco, CA 94105-2933
415-836-2500
Email: greg.sperla@us.dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa A. Reinckens**
DLA Piper LLP (US)
4365 Executive Drive
Suite 1100
San Diego, CA 92121-2133
619-699-2798
Fax: 619-764-6624
Email: melissa.reinckens@us.dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Virginia Weeks , PHV**
Email: virginia.weeks@us.dlapiper.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SKAVP Enterprises, LP**

**Defendant**

**Vitarag Hospitality, Inc.**                represented by **Brian H. Gunn**
Wolfe & Wyman LLP
980 9th Street
Suite 2350
Sacramento, CA 95814-2716
916-912-4700
Fax: 916-329-8905
Email: bhgunn@wolfewyman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica B. Coffield**
Wolfe & Wyman LLP
980 9th St.

Suite 1750
Sacramento, CA 95814
916-912-4700
Fax: 916-329-8905
Email: JBCoffield@ww.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marriott International, Inc.**             represented by **Ellen E. Dew , PHV**
*Doing business as*                            DLA Piper LLP US
Courtyard by Marriott San Jose Campbell        650 S. Exeter Street
                                               Baltimore, MD 21202
                                               410-580-4127
                                               Fax: 410-580-3127
                                               Email: ellen.dew@dlapiper.com
                                               *LEAD ATTORNEY*
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*

                                               **Michael P. O'Day , PHV**
                                               DLA Piper LLP (US)
                                               650 S. Exeter Street
                                               Suite 1100
                                               Baltimore, MD 21202-4576
                                               410-580-4293
                                               Fax: 410-580-3293
                                               Email: michael.oday@us.dlapiper.com
                                               *LEAD ATTORNEY*
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*

                                               **Amanda L. Morgan**
                                               DLA Piper LLP (US)
                                               555 Mission Street, Suite 2400
                                               San Francisco, CA 94105
                                               415-836-2500
                                               Email: amanda.morgan@dlapiper.com
                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**Campbell HHG Hotel Development, LP**

**Defendant**

**Days Inn Worldwide, Inc.**

**Defendant**

**Wyndham Hotel Group, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/11/2023 | 1 | COMPLAINT against All Defendants by Jane Doe. (Filing fee $ 402, receipt number ACAEDC-11012074) (Attachments: # 1 Civil Cover Sheet)(Glassman, Robert) Modified |

| | | on 8/11/2023 (Licea Chavez, V). (Entered: 08/11/2023) |
|---|---|---|
| 08/11/2023 | 2 | SUMMONS ISSUED as to *Campbell HHG Hotel Development, LP, Marriott International, Inc. d/b/a Courtyard by Marriott San Jose Campbell, SKAVP Enterprises, LP, Vitarag Hospitality, Inc., Wyndham Hotels and Resorts* with answer to complaint due within *21* days. Attorney *Robert Glassman* *Panish Shea Boyle Ravipudi LLP* *11111 Santa Monica Blvd Suite 700* *Los Angeles, CA 90025*. (Licea Chavez, V) (Entered: 08/11/2023) |
| 08/11/2023 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; (Attachments: # 1 Consent Form, # 2 VDRP) (Licea Chavez, V) (Entered: 08/11/2023) |
| 08/17/2023 | 4 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Jane Doe for attorney Edward Fisher to appear Pro Hac Vice. (Filing fee $ 225, receipt number ACAEDC-11022086) (Attachments: # 1 Certificate of Good Standing from TX Supreme Court, # 2 Certificate of Good Standing from TX State Bar)(Glassman, Robert) (Entered: 08/17/2023) |
| 08/17/2023 | 5 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Jane Doe for attorney Patrick Barrett to appear Pro Hac Vice. (Filing fee $ 225, receipt number ACAEDC-11022168) (Attachments: # 1 Certificate of Good Standing)(Glassman, Robert) (Entered: 08/17/2023) |
| 08/18/2023 | 6 | ORDER signed by Magistrate Judge Kendall J. Newman on 8/18/2023 GRANTING 4 Application for Pro Hac Vice. Added attorney Edward Fisher, PHV for Jane Doe. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. (Clemente Licea, O) (Entered: 08/18/2023) |
| 08/18/2023 | 7 | ORDER signed by Magistrate Judge Kendall J. Newman on 8/18/2023 GRANTING 5 Application for Pro Hac Vice. Added attorney Patrick Barrett, PHV for Jane Doe. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. (Clemente Licea, O) (Entered: 08/18/2023) |
| 10/30/2023 | 8 | NOTICE of APPEARANCE by Christopher Moze Cowper on behalf of Jane Doe. Attorney Cowper, Christopher Moze added. (Cowper, Christopher) (Entered: 10/30/2023) |
| 11/09/2023 | 9 | SUMMONS RETURNED EXECUTED: Vitarag Hospitality, Inc. served on 11/8/2023, answer due 11/29/2023. (Cowper, Christopher) (Entered: 11/09/2023) |
| 11/09/2023 | 10 | SUMMONS RETURNED EXECUTED: Campbell HHG Hotel Development, LP served on 11/8/2023, answer due 11/29/2023. (Cowper, Christopher) (Entered: 11/09/2023) |
| 11/09/2023 | 11 | SUMMONS RETURNED EXECUTED: Marriott International, Inc. served on 11/8/2023, answer due 11/29/2023. (Cowper, Christopher) (Entered: 11/09/2023) |
| 11/09/2023 | 12 | MOTION for 14-DAY EXTENSION OF TIME to Serve Defendant Wyndham Hotels and Resorts and Defendant SKAVP Enterprises, LP by Jane Doe. Motion Hearing set for 12/19/2023 at 09:00 AM in Courtroom 25 (KJN) before Magistrate Judge Kendall J. Newman. (Attachments: # 1 Memorandum, # 2 Exhibit A , # 3 Exhibit B , # 4 Exhibit C , # 5 Proposed Order)(Cowper, Christopher) Modified on 11/13/2023 (Licea Chavez, V). (Entered: 11/09/2023) |
| 11/15/2023 | 13 | ORDER signed by Magistrate Judge Kendall J. Newman on 11/15/2023 GRANTING 12 Motion for Extension of Time and VACATING the Motion Hearing set for 12/19/2023. (Clemente Licea, O) (Entered: 11/15/2023) |
| 11/21/2023 | 14 | STIPULATION and PROPOSED ORDER for Extension of Time to File Responsive Pleading by Marriott International, Inc. Attorney Morgan, Amanda L. added. (Morgan, Amanda) Modified on 11/22/2023 (Benson, A.). (Entered: 11/21/2023) |

| 11/30/2023 | 15 | STIPULATION re 1 Complaint *Joint Stipulation for an Extension of Time for Defendant Wyndham Hotels & Resorts, Inc. to Respond to Complaint* by Wyndham Hotels and Resorts. Attorney Sperla, Gregory George added. (Sperla, Gregory) (Entered: 11/30/2023) |
|---|---|---|
| 12/04/2023 | 16 | NOTICE of Disassociation of Counsel by Jane Doe. (Glassman, Robert) (Entered: 12/04/2023) |
| 12/05/2023 | 17 | CONSENT/DECLINE of U.S. Magistrate Judge Jurisdiction. Pursuant to Fed. R. Civ. P. 73(b)(1), this document is restricted to attorneys and court staff only. Judges do not have access to view this document and will be informed of a party's response only if all parties have consented to the referral. (Sperla, Gregory) (Entered: 12/05/2023) |
| 12/05/2023 | 18 | NOTICE of APPEARANCE by Melissa A. Reinckens on behalf of Wyndham Hotels and Resorts. Attorney Reinckens, Melissa A. added. (Reinckens, Melissa) (Entered: 12/05/2023) |
| 12/06/2023 | 19 | CLERK'S NOTICE REASSIGNING CASE (TEXT ONLY). This case has been assigned to District Judge Dale A. Drozd and Magistrate Judge Kendall J. Newman. The new case number is: 2:23-cv-01676-DAD-KJN. (Mena-Sanchez, L) (Entered: 12/06/2023) |
| 12/06/2023 | 20 | AMENDED CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference SET for 4/9/2024 at 01:30 PM in Courtroom 4 (DAD) before District Judge Dale A. Drozd. (Attachments: # 1 Standing Order, # 2 Consent Form, # 3 VDRP) (Mena-Sanchez, L) (Entered: 12/06/2023) |
| 12/13/2023 | 21 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Wyndham Hotels and Resorts for attorney David S. Sager to appear Pro Hac Vice. (Filing fee $ 225, receipt number ACAEDC-11239985) (Sperla, Gregory) (Entered: 12/13/2023) |
| 12/13/2023 | 22 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Wyndham Hotels and Resorts for attorney Virginia Weeks to appear Pro Hac Vice. (Filing fee $ 225, receipt number ACAEDC-11240015) (Sperla, Gregory) (Entered: 12/13/2023) |
| 12/18/2023 | 23 | STIPULATION For Extension of Time to Respond to Complaint by Vitarag Hospitality, Inc.. Attorney Gunn, Brian H. added. (Gunn, Brian) Modified on 12/19/2023 (Licea Chavez, V). (Entered: 12/18/2023) |
| 12/19/2023 | 24 | MINUTE ORDER (Text Only Entry) issued by Courtroom Deputy for District Judge Dale A. Drozd on 12/19/2023: On 12/18/2023, the parties filed a 23 stipulation to extend the time for defendant Vitarag Hospitality, Inc. to respond to plaintiff's complaint. Pursuant to the 23 stipulation and good cause appearing, defendant Vitarag Hospitality, Inc. shall file a response to plaintiff's complaint no later than 1/12/2024. (Buzo, P) (Entered: 12/19/2023) |
| 12/19/2023 | 25 | ORDER signed by District Judge Dale A. Drozd on 12/18/23 GRANTING 21 Application for Pro Hac Vice. Added Attorney David S. Sager, PHV for Wyndham Hotels and Resorts. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. (Kastilahn, A) (Entered: 12/19/2023) |
| 12/19/2023 | 26 | ORDER signed by District Judge Dale A. Drozd on 12/18/23 GRANTING 22 Application for Pro Hac Vice. Added Attorney Virginia Weeks, PHV for Wyndham Hotels and Resorts. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. (Kastilahn, A) (Entered: 12/19/2023) |
| 12/20/2023 | 27 | STIPULATION and ORDER signed by Magistrate Judge Kendall J. Newman on 12/20/23 EXTENDING the deadline up to and including 12/29/23, for Marriott to answer or otherwise plead in response to the Complaint. (Licea Chavez, V) (Entered: 12/20/2023) |
| 12/29/2023 | 28 | MOTION to DISMISS by Marriott International, Inc.. Motion Hearing set for 3/19/2024 at 01:30 PM in Courtroom 4 (DAD) before District Judge Dale A. Drozd. (Morgan, Amanda) |

| | | Modified on 1/2/2024 (Licea Chavez, V). (Entered: 12/29/2023) |
|---|---|---|
| 12/29/2023 | 29 | CORPORATE DISCLOSURE STATEMENT by Defendant Marriott International, Inc.. (Morgan, Amanda) (Entered: 12/29/2023) |
| 12/29/2023 | 30 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Marriott International, Inc. for attorney Ellen E. Dew to appear Pro Hac Vice. (Filing fee $ 300, receipt number ACAEDC-11264673) (Morgan, Amanda) (Entered: 12/29/2023) |
| 12/29/2023 | 31 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Marriott International, Inc. for attorney Michael P. O'Day to appear Pro Hac Vice. (Filing fee $ 300, receipt number ACAEDC-11264688) (Morgan, Amanda) (Entered: 12/29/2023) |
| 12/29/2023 | 32 | MOTION to DISMISS by Wyndham Hotels and Resorts. Motion Hearing set for 3/19/2024 at 01:30 PM in Courtroom 4 (DAD) before District Judge Dale A. Drozd. (Attachments: # 1 Points and Authorities , # 2 Notice of Interested Parties, # 3 Proposed Order, # 4 Proof of Service )(Sperla, Gregory) Modified on 1/2/2024 (Licea Chavez, V). (Entered: 12/29/2023) |
| 01/02/2024 | 33 | PRO HAC VICE ORDER signed by District Judge Dale A. Drozd on 12/29/2023 GRANTING 30 Application for Pro Hac Vice. Added attorney Ellen E. Dew, PHV for Marriott International, Inc. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. (Woodson, A) (Entered: 01/02/2024) |
| 01/02/2024 | 34 | PRO HAC VICE ORDER signed by District Judge Dale A. Drozd on 12/29/2023 GRANTING 31 Application for Pro Hac Vice. Added attorney Michael P. O'Day, PHV for Marriott International, Inc. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. (Woodson, A) (Entered: 01/02/2024) |
| 01/10/2024 | 35 | NOTICE of APPEARANCE by Jessica B. Coffield on behalf of Vitarag Hospitality, Inc.. Attorney Coffield, Jessica B. added. (Coffield, Jessica) (Entered: 01/10/2024) |
| 01/11/2024 | 36 | FIRST AMENDED COMPLAINT against All Defendants by Jane Doe. (Attachments: # 1 Civil Cover Sheet)(Cowper, Christopher) (Entered: 01/11/2024) |
| 01/12/2024 | 37 | MINUTE ORDER (Text Only Entry) issued by Courtroom Deputy for District Judge Dale A. Drozd on 1/12/2024: On 1/11/2024, plaintiff filed a 36 first amended complaint in this action. In light of the 36 first amended complaint superseding the 1 original complaint, the pending 28 32 motions to dismiss the original complaint are hereby denied, without prejudice, as having been rendered moot.(Buzo, P) (Entered: 01/12/2024) |
| 01/12/2024 | 38 | SUMMONS ISSUED as to *Campbell HHG Hotel Development, LP, Days Inn Worldwide, Inc., SKAVP Enterprises, LP, Wyndham Hotel Group, LLC* with answer to complaint due within *21* days. Attorney *Christopher Moze Cowper* *12301 Wilshire Blvd, Suite 303* *Los Angeles, CA 90025*. (Kastilahn, A) (Entered: 01/12/2024) |
| 01/18/2024 | 39 | STIPULATION and PROPOSED ORDER for Joint Extension of Time to Respond re 36 Amended Complaint by Wyndham Hotels and Resorts. (Sperla, Gregory) Modified on 1/19/2024 (Mena-Sanchez, L). (Entered: 01/18/2024) |
| 01/19/2024 | 40 | MINUTE ORDER (Text Only Entry) issued by Courtroom Deputy for District Judge Dale A. Drozd on 1/19/2024: On 1/18/2024, the parties filed a 39 stipulation to extend the time for defendant Wyndham Hotels & Resorts, Inc. to respond to plaintiff's 36 first amended complaint. Pursuant to that stipulation and good cause appearing, defendant Wyndham Hotels & Resorts, Inc. shall file a response to plaintiff's first amended complaint by no later than 2/29/2024, which is also the deadline for defendants Days Inn Worldwide, Inc., and Wyndham Hotel Group, LLC, to respond to the first amended complaint.(Buzo, P) (Entered: 01/19/2024) |

| 01/19/2024 | 41 | JOINT STIPULATION and PROPOSED ORDER for an Extension of Time to Respond to First Amended Complaint 36 by Marriott International, Inc. (Morgan, Amanda) Modified on 1/22/2024 (Reader, L). (Entered: 01/19/2024) |
|---|---|---|
| 01/22/2024 | 42 | MINUTE ORDER (Text Only Entry) issued by Courtroom Deputy for District Judge Dale A. Drozd on 1/22/2024: On 1/19/2024, the parties filed a 41 stipulation to extend the time for defendant Marriott International, Inc. to respond to plaintiff's first amended complaint. Pursuant to that stipulation and good cause appearing, defendant Marriott International, Inc. shall file a response to plaintiff's first amended complaint by no later than 02/29/2024. (Buzo, P) (Entered: 01/22/2024) |
| 01/25/2024 | 43 | STIPULATION and PROPOSED ORDER for an Extension of Time for defendant Vitarag Hospitality to respond to plaintiff's first amended complaint, by Vitarag Hospitality, Inc.. (Coffield, Jessica) Modified on 1/26/2024 (Kastilahn, A). (Entered: 01/25/2024) |
| 01/26/2024 | 44 | MINUTE ORDER (Text Only Entry) issued by Courtroom Deputy for District Judge Dale A. Drozd on 1/26/2024: On 1/25/2024, the parties filed a 43 stipulation to extend the time for defendant Vitarag Hospitality, Inc. dba Days Inn Sacramento to respond to plaintiff's first amended complaint. Pursuant to that stipulation and good cause appearing, defendant Vitarag Hospitality, Inc. dba Days Inn Sacramento shall file a response to plaintiff's first amended complaint by no later than 2/29/2024. (Buzo, P) (Entered: 01/26/2024) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/14/2024 09:19:27 | | | |
| **PACER Login:** | bblevins110290 | **Client Code:** | htraffic-1 dlf |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-01676-DAD-KJN |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

C. Moze Cowper (Bar No. 326614)
**COWPER LAW PC**
12301 Wilshire Boulevard, Suite 303
Los Angeles, California 90025
Tel.: (877) 529-3707

Edward Fisher (*pro hac vice*)
**PROVOST ⋆ UMPHREY LAW FIRM**
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 838-8859

Patrick Barrett (*pro hac vice*)
**PROVOST ⋆ UMPHREY LAW FIRM**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
Tel.: (615) 297-1932

*Attorneys for Plaintiff (additional listed on signature page)*

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO

| | |
|---|---|
| JANE DOE (T.R.S.),<br><br>Plaintiff,<br><br>vs.<br><br>WYNDHAM HOTELS AND RESORTS, INC.; SKAVP ENTERPRISES, LP; VITIRAG HOSPITALITY, INC.; MARRIOTT INTERNATIONAL, INC. D/B/A/ COURTYARD BY MARRIOTT SAN JOSE CAMPBELL; CAMPBELL HHG HOTEL DEVELOPMENT, LP; DAYS INN WORLDWIDE, INC.; and WYNDHAM HOTEL GROUP, LLC,<br><br>Defendants. | Case No. 2:23-cv-01676-DAD-KJN<br><br>Hon. Dale A. Drozd<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

Jane Doe T.R.S., Plaintiff in the above-styled and numbered cause, files this First Amended Complaint against Wyndham Hotels and Resorts, Inc.; Days Inn Worldwide, Inc.; Wyndham Hotel Group, LLC; SKAVP Enterprises, LP; Vitarag Hospitality, Inc.; Marriott International, Inc. d/b/a Courtyard by Marriott San Jose Campbell; and Campbell HHG Hotel Development, LP as Defendants and respectfully shows the Court as follows:

### SUMMARY

1.      Jane Doe T.R.S. files this civil lawsuit for the harms and losses she suffered because of the sex trafficking she endured at the Days Inn Sacramento Downtown and the Courtyard by Marriott San Jose Campbell, hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

3.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

4.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those

1

who—while not criminally liable under the TVPRA—benefit from participation in a venture that they know or *should know* engages in sex trafficking.

5.     Defendants herein derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including Jane Doe T.R.S., with minimal risk of detection or interruption.

6.     Each Defendant developed a continuous business relationship with sex traffickers, including Jane Doe T.R.S.'s trafficker, by providing these traffickers with hotel rooms and related services despite apparent "red flags" that blatantly alerted Defendants to sex trafficking occurring. Defendants were, therefore, knowingly receiving a benefit from participation in a venture with traffickers that each Defendant knew or should have known was facilitating sex trafficking.

7.     Each Franchisor Defendants also benefited from maintaining a commercial venture with its respective franchisee operating its respective hotel. Each Franchisor Defendants continued participating in this venture even though it knew or should have known that its franchisee was facilitating widespread trafficking at the hotel, ultimately resulting in the trafficking of Jane Doe T.R.S. Each of the Franchisor Defendants was, therefore, knowingly receiving a benefit from participation in a venture with its franchisee that the Franchisor Defendant knew or should have known was facilitating sex trafficking.

8.     Defendants had the knowledge and opportunity **to cease benefiting from** the severe and permanent harm that Jane Doe T.R.S. experienced as the result of

continuous sexual exploitation she endured in Defendants' hotels. Defendants failed to do so. Instead, Defendants chose to benefit from the facilitation of sex trafficking.

**PARTIES**

9.     Plaintiff, Jane Doe T.R.S. is a resident of Kansas City, Missouri. She may be contacted through her lead counsel, whose information is contained below.

10.     Jane Doe T.R.S. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

11.     The trafficking of Jane Doe T.R.S. occurred in or affected interstate commerce.

12.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe T.R.S.

13.     Wyndham Hotels & Resorts, Inc. ("WHR") is a for-profit Delaware corporation with its principal place of business in New Jersey. WHR has appeared and is before the Court. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Sacramento Days Inn. All references to WHR include the acts and omissions of

predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

14.    Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation. WHG may be served through its registered agent for service, Sarah Clemens, 5901 W Century Blvd., Los Angeles, CA.

15.    Days Inns Worldwide, Inc. ("DIW") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, DIW is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation. DIW may be served through its registered agent for service, Sarah Clemens, 5901 W Century Blvd., Los Angeles, CA.

16.    WHR, WHG, and DIW are referred to collectively as the "Wyndham Brand Defendants."

17.    All references to the Wyndham Brand Defendants include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international of any of the Wyndham Brand Defendants or their predecessor entities. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of any of the Wyndham Brand Defendants or their predecessor entities now or at any time relevant to the claims herein.

4

18.     At all relevant times, the Wyndham Brand Defendants owned, operated, and controlled the Days Inn Sacramento Downtown located at 228 Jibboom Street, Sacramento, CA 95811 ("Sacramento Days Inn").

19.     SKAVP Enterprises, LP is a limited partnership with its principal place of business at 817 W. Capital Ave. West, Sacramento, CA 95691. It may be served through its registered agent for service: Shirish Patel, 817 W. Capital Ave., West Sacramento, CA 95691. At all relevant times, SKAVP Enterprises, LP owned, operated, and controlled the Sacramento Days Inn.

20.     All references to SKAVP Enterprises, LP, include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of SKAVP Enterprises, LP now or at any time relevant to the claims herein.

21.     Vitarag Hospitality, Inc. is a domestic corporation with its principal place of business at 228 Jibboom St., Sacramento, CA 95811. It may be served with process through its registered agent for service: Shirish Patel, 228 Jibboom St., Sacramento, CA 95811. At all relevant times, Vitarag Hospitality, Inc. owned, operated, and controlled the Sacramento Days Inn .

22.     All references to Vitarag Hospitality, Inc., include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign,

and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Vitarag Hospitality, Inc. now or at any time relevant to the claims herein.

23.     SKAVP Enterprises, LP, and Vitarag Hospitality, Inc., are referred to collectively as "Days Inn Franchisees."

24.     Marriott International, Inc. d/b/a Courtyard by Marriott San Jose Campbell is a for-profit Delaware corporation with its principal place of business in Bethesda, Maryland. Marriott International, Inc., has appeared and is before the Court.

25.     At all relevant times, Marriott International, Inc. owned, operated, and controlled the Courtyard by Marriott San Jose Campbell located at 655 Creekside Way, Campbell, CA 95008 ("Campbell Marriott").

26.     All references to Marriott International, Inc., include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Marriott International, Inc., now or at any time relevant to the claims herein.

27.     Campbell HHG Hotel Development, LP is a Delaware limited partnership with its principal place of business in Irving, Texas. It may be served through its

registered agent for service: CSC Lawyers Incorporating Service, 2710 Gateway Oaks, Drive, Sacramento, CA 95833. At all relevant times, Campbell HHG Hotel Development, LP owned, operated, and controlled the Campbell Marriott .

28.   Campbell HHG Hotel Development, LP will be referred to herein as "Marriott Franchisee."

29.   All references to Marriott Franchisee include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Marriott Franchisee now or at any time relevant to the claims herein.

30.   The Wyndham Brand Defendants and Marriott International, Inc., are referred to collectively as "Franchisor Defendants."

31.   Days Inn Franchisees and Marriott Franchisee are referred to collectively as "Franchisee Defendants."

32.   The Sacramento Days Inn and Campbell Marriott are referred to collectively as the "Subject Hotels."

## JURISDICTION AND VENUE

33.   This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

34.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

35.     Jane Doe T.R.S. was trafficked in this District.

## STATEMENT OF FACTS

**I.      Jane Doe T.R.S. is a Survivor of Sex Trafficking at Hotels Owned, Operated, Managed, and Controlled by the Defendants.**

36.     Jane Doe T.R.S. is a survivor of sex trafficking. She was forced to engage in commercial sex for her trafficker's financial benefit, including at hotels owned, operated, managed, and controlled by Defendants.

**A.  Jane Doe T.R.S.'s trafficking at the Sacramento Days Inn.**

37.     On or about August 10, 2013, and August 11, 2013, Jane Doe T.R.S., along with other sex trafficking victims, was unlawfully trafficked at the Sacramento Days Inn. Jane Doe's sexual exploitation occurred repeatedly in rooms of the Sacramento Days Inn.

38.     At all relevant times, the Sacramento Days Inn was a hotel branded by Wyndham Hotels and Resorts.

39.     At all relevant times, the Wyndham Brand Defendants adopted a centralized approach to trafficking-related issues at all Wyndham branded properties, including Days Inn properties and the Sacramento Days Inn. This has included maintaining centralized policies on detecting and response to trafficking, exercising

centralized control over training related to sex trafficking, adopting centralized practices for reporting, and centralized monitoring and assessment of anti-trafficking efforts. The Wyndham Brand Defendants have also acted on behalf of all Wyndham branded properties when communicating and partnering with external entities regarding trafficking issues.

40. At relevant times, Days Inn Franchisees owned and operated the Sacramento Days Inn and employed the staff at the Sacramento Days Inn through the Wyndham franchising system.

41. At all relevant times, the Wyndham Brand Defendants were directly involved in the relevant operations of the Sacramento Days Inn, including directly participating in renting rooms at the Sacramento Days Inn. They also exercised systemic control over Days Inn Franchisees with respect to operation of the Sacramento Days Inn such that Days Inn Franchisees were the Wyndham Brand Defendants' actual agents for operation of the Sacramento Days Inn. The Wyndham Brand Defendants also retained control over aspects of the operations of the Sacramento Days Inn directly related to the claims of Jane Doe T.R.S., including but not limited to: policies and procedures regarding hotel security, policies and procedures regarding identification requirements and payment method requirements, policies and procedures regarding response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity.

42.     Based upon information and belief, the traffickers of Jane Doe T.R.S. and other sex traffickers frequently had in the past routinely used the Sacramento Days Inn for sex trafficking with approval, acquiescence, and/or implicit support of the Wyndham Brand Defendants, Days Inn Franchisees, and their employees and agents.

43.     There were obvious signs that victims, including Jane Doe T.R.S., were being trafficked at the Sacramento Days Inn such that the Wyndham Brand Defendants and Days Inn Franchisees knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing the sexual exploitation of victims, including Jane Doe T.R.S.

44.     Jane Doe T.R.S.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[1] These effects were obvious and apparent to the staff and management of the Sacramento Days Inn, including effects on Jane Doe T.R.S.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Hotel staff and Days Inn Franchises had a duty to report these signs to the Wyndham Brand Defendants and based upon information and belief did in fact report to the Wyndham Brand Defendants with respect to Jane Doe T.R.S. and other sex trafficking victims prior to and after the trafficking of Jane Doe T.R.S.

---

[1] *See supra* paragraphs 61 and 62 and accompanying footnote for discussion of "red flags" of trafficking.

45.     Some of the obvious signs of Jane Doe T.R.S.'s trafficking at the Sacramento Days Inn included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the car used to transport her there would be parked in a spot where the license plate was not visible, the do not disturb sign was constantly on the door to the room being used and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

46.     Additionally, hotel staff at the Sacramento Days Inn interacted directly with the traffickers, including Jane Doe T.R.S.'s trafficker. Hotel staff came to the room, looked in the room and saw evidence of prostitution and drug use, including condoms, lubricant, and illegal drugs.

47.     The Wyndham Brand Defendants knew or should have known that their reservation, check-in, housekeeping and security policies and practices were facilitating widespread sex trafficking at the Sacramento Days Inn, including the trafficking of Jane Doe T.R.S. Alternatively, if the Wyndham Brand Defendants had exercised ordinary diligence, they would have known they were benefitting from sex trafficking at the Days Inn, Thus, constructive knowledge of the trafficking of Jane Doe T.R.S. is imputed to the Wyndham Brand Defendants.

### B. Jane Doe T.R.S.'s trafficking at the Campbell Marriott.

48.     On or about September 4, 2013, through September 7, 2013, Jane Doe T.R.S. was unlawfully trafficked at the Campbell Marriott. Jane Doe's trafficking occurred repeatedly in rooms of the Campbell Marriott.

49.     At all relevant times, the Campbell Marriott was a hotel branded, franchised, and managed by Marriott International, Inc.

50.     At relevant times, Marriott Franchisee owned and opearted the Campbell Marriott and employed the staff at the Campbell Marriott through the franchising system of Marriott International, Inc.

51.     At all relevant times, Marriott International, Inc., were directly involved in the relevant operations of the Sacramento Days Inn, including directly participating in renting rooms at the Sacramento Days Inn. They also exercised systemic control over Marriott Franchisee with respect to operation of the Campbell Marriott such that Marriott Franchisee was Marriott International, Inc.'s actual agent for operation of the Campbell Mariott. Marriott International, Inc., also retained control over aspects of the operations of the Campbell Mariott directly related to the claims of Jane Doe T.R.S., including but not limited to: policies and procedures regarding hotel security, policies and procedures regarding identification requirements and payment method requirements, policies and procedures regarding response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity.

52.     Based upon information and belief, the traffickers of Jane Doe T.R.S. and other sex traffickers frequently have openly and routinely used the Sacramento Days Inn for sex trafficking with approval, acquiescence, and/or implicit support of Marriott International, Inc. and Marriott Franchisee and their employees and agents, including the staff of the Campbell Marriott.

53.     There were obvious signs that victims, including Jane Doe T.R.S., were being trafficked at the Campbell Marriott such that Marriott International, Inc. and Marriott Franchisee knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

54.     Jane Doe T.R.S.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[2] These effects were obvious and apparent to the staff and management of the Campbell Marriott, including effects on Jane Doe T.R.S.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Hotel staff and Marriott Franchisee were required by Marriott International, Inc. to report these signs to Marriott International, Inc. and based upon information and belief did in fact report to the Mariott International, Inc. with respect to Jane Doe T.R.S. and other sex trafficking victims prior to and after the trafficking of Jane Doe T.R.S.

---

[2] *See supra* paragraphs 61 and 62 and accompanying footnote for discussion of "red flags" of trafficking.

55.   Some of the obvious signs of Jane Doe T.R.S.'s trafficking at the Campbell Marriott included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the do not disturb sign was constantly on the door to the room being used, and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

56.   Additionally, hotel staff at the Campbell Marriott interacted directly with the traffickers, including the Trafficker of Jane Doe T.R.S., and were aware of evidence of criminal activity associated with sex trafficking.

57.   Marriott International, Inc., knew or should have known that its reservation, check-in, housekeeping and security policies and practices were facilitating widespread sex trafficking at the Campbell Marriott, including the trafficking of Jane Doe T.R.S. Alternatively, if the Mariott Defendants had exercised ordinary diligence, they would have known not to continue benefiting from the sex trafficking at the Campbell Marriott, including the trafficking of Jane Doe T.R.S. Thus, constructive knowledge of the trafficking of Jane Doe T.R.S. is imputed Marriott International, Inc.

14

## II.     The Hotel Industry's Role in Sex Trafficking and Hotel Defendants' Knowledge of the Problem.

58.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking at the Subject Hotels, including the trafficking of Jane Doe T.R.S.

59.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] This is no accident. For years, sex traffickers have been able to operate with impunity and  with "little risk when attempting to operate within hotels."[4] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90 percent of commercial exploitation of children.[6]

60.     Because of this link between hotels and sex trafficking, government agencies and non-profits, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, and EPCAT, among others, have devoted significant

---

[3] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id

[4] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[6] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

efforts to intervening and educating the hotel industry, including the Defendants, on best practices for identifying and responding to sex trafficking.[7]

61.   Widely recognized signs of sex trafficking, which can be observed by hotel staff and which Defendants were made of aware of, include but are not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

---

[7] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appears to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[8]

62.    Other commonly recurring signs of sex trafficking at a hotel include use of cash or a prepaid card to pay for a room, refusal of housekeeping services for multiple days, requesting housekeeping services (such as new linens or sheets) but refusing hotel staff access to the room, frequent use of a "Do Not Disturb" sign, finding large amounts of cash or sex paraphernalia in a room, the smell of bodily fluids or musk, the same person reserving multiple rooms, unusual traffic patterns to and from a room, individuals loitering in hallways or common areas who appear to be monitoring the area, evidence of illegal drugs or excessive alcohol use, excessive use of hotel computers for adult-oriented websites, cars in parking lots are parked so license plate

---

[8] *Id.*

is not visible, presence of multipole cellphones or computers, and an extended stay booked without significant personal possessions in the hotel.[9]

63.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by properly trained staff and by tools that the Franchisor Defendants had in place to monitor their branded hotels.

64.    Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

65.    The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

66.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a

---

[9] / Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;
www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf
[10] *Id.*

hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

67.    Defendants were aware or should have been aware of these signs of sex trafficking when operating controlling, and managing the Sacramento Days Inn and Campbell Marriott, when enacting and enforcing policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of those hotels.

68.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

69.    The most effective weapon against sexual exploitation and human trafficking is education and training.[12] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out,

---

[11] *Id.*

[12] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

1
2

there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[13]

3
4
5
6
7
8
9
10
11

70.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[14] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

12
13
14
15

71.    Accordingly, many hotel chains—including the Franchisor Defendants' hotels—have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels. For example:

16
17
18
19

    i.The Wyndham Brand Defendants have recognized their "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[15] The Wyndham brand has publicly claimed to be taking steps to avoid sex trafficking in its hotels since at least 2011.[16]

20
21
22

    ii.Marriott International, Inc. has acknowledged its responsibility for training hotel staff about trafficking and publicly touted its success in doing so. Marriott leadership has stated "By educating and empowering our global workforce to say something if they see something, we are not just standing up for the most vulnerable in society, we are also protecting associates and

23
24
25
26
27
28

---

[13] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023).
*See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015),
https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[14] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).
[15] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[16] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

guests as well as living up to a core company value -- serving our world."[17]

72.     Defendants' promises have proved empty. While Defendants' statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. For example, emails among company executives of the Wyndham Brand Defendants reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[18]

73.     Defendants have made the choice, at all levels, not to take appropriate action in response to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like Jane Doe T.R.S.

## III.     Sex Trafficking Has Long Been Prevalent at Defendants' Branded Properties, and Defendants Have Known About It.

74.     Defendants' knowledge is not limited to general awareness of the problem of sex trafficking in the hotel industry. The Franchisor Defendants have also known,

---

[17] https://news.marriott.com/news/2019/01/18/marriott-international-has-trained-500-000-hotel-workers-to-recognize-the-signs-of-human-trafficking#:~:text=Marriott%20International%20today%20announced%20that,fight%20against%20this%20multinational%20crime

[18] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

since well before Jane Doe T.R.S. was trafficked at the Subject Hotels, that sex trafficking is endemic in their branded hotels, and specifically at the Subject Hotels.

75.     Upon information and belief, Franchisor Defendants monitored criminal activity occurring at their branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Subject Hotels.

76.     Countless tales of tragedy, which upon information and belief Franchisor Defendants know about, establish the entrenched and pervasive nature of Franchisor Defendants' role in providing a venue where sex trafficking has continued, unabated, for years.

A. **The Wyndham Brand Defendants Knew Sex Trafficking was Pervasive at Wyndham Branded Properties.**

77.     The problem of sex trafficking at Wyndham branded properties was so prolific that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting the sex trafficking of children .[19] Although, in response, Wyndham publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[20]

---

[19] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels
[20] https://endsexualexploitation.org/wyndham/

78.    In the past twenty years, Wyndham properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[21]

79.    Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. For example:

- In 2010, a man was arrested on human trafficking charges, accused of forcing teens into prostitution at a Days Inn."[22]

- In June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[23]

- In 2012, federal officials caught and arrested a man alleged to have trafficked a 14-year-old girl at a Florida Days Inn.[24]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[25]

- In October 2012, a woman was arrested for prostitution an Ohio Days Inn. This arrest came after a 2011 prostitution sting operation that netted six arrests.[26]

---

[21] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[22] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, NOLA.com (Jul 20, 2010),
Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com
[23] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.
[24] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/
[25] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.
[26] https://patch.com/ohio/lakewood-oh/woman-arrested-for-prostitution-at-days-inn

23

- A Days Inn owner in Pennsylvania was forced to pay 24 million dollars to teenage victims of sex trafficking who were exploited at the hotel in 2012 and 2013.[27]

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[28]

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[29]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[30]

- In 2015, a man was charged with trafficking teenage girls after being arrested at a Days Inn in Maryland.[31]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[32]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Days Inn.[33]

[27] https://northeasttimes.com/2019/04/02/roosevelt-inn-days-inn-named-in-sex-trafficking-lawsuits/

[28] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

[29] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[30] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[31] https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/

[32] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[33] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel*, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

- In 2017, arrests were made after it was discovered women were being trafficked out of another Days in Inn Tennessee.[34]

80.     There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

81.     Reviews of Wyndham branded properties, which upon information and belief each of the Wyndham Brand Defendants, monitored regularly, also show the pervasiveness of sex trafficking at its branded properties and the Wyndham Brand Defendants' knowledge of the same. For example:

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[35]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass"surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in

---

[34] https://www.wgnsradio.com/article/35818/human-trafficking-case-in-murfreesboro
[35] https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html

25

the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were supposed to be bolted to the wall was coming off. We checked out at first light assuming this would be the safest time of day to get out! Prostitutes were hanging around out front and coming in purchasing rooms. Definately not a place for a family!"[36]

- August 2008 Tripadvisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and had a lot of low life people staying there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[37]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisey pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[38]

- December 2008 Tripadvisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!)

---

[36] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html
[37] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html
[38] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews

security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[39]

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the lobby and there were six people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[40]

- July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[41]

- August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that their son was offered services by prostitutes while on the premises. We

[39] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html
[40] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[41] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[42] The manager of this hotel responded to it on November 19, 2010.

- September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are nice enough. but the manager and location are just not worth dealing with."[43]

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[44]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[45]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way

[42] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html
[43] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html
[44] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews
[45] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html

and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[46]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[47]

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[48]

- January 2013 review from Days Inn in Copiague, NY states "I would not wish this place on my worst enemy. The room smelled like a dead body and they tried to cover it up with Lysol. I let them know that I tried to air the room out for 20 minutes and it did not help. They moved me to the room next door and it was the same thing.
There were all kinds of ghetto trash hanging around my car when I was leaving and the place seemed like a party/hooker hotel based on the people hanging around there."[49]

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to

---

[46] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton
[47] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city
[48] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota
[49] https://www.tripadvisor.ca/Hotel_Review-g47533-d1176402-Reviews-Days_Inn_by_Wyndham_Long_Island_Copiague-Copiague_Long_Island_New_York.html

accomodate us by giving us another room on the inside of the hotel, but it was still filthy."[50] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people (prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[51]

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is everything okay. One officer referred to the area as the "problem area"."[52] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[53]

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put

[50] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[51]
[52] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html
[53] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn-Kent-Kent_Washington.html

my 8 month old down! The tub was stained and there were "hairs" in the tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door! We checked out and went to another hotel down the road."[54] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[55]

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with a hotel, ever. I'm upset that I paid for such crappy service and room."[56] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[57]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel

---

[54] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html
[55] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews
[56] https://www.tripadvisor.com.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html
[57] https://www.yelp.com/biz/days-inn-by-wyndham-beaumont-beaumont

was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[58]

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[59]

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[60]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[61]

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[62]

- September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with

---

[58] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews
[59] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews
[60] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html
[61] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia
[62] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html

corporate office to get back my $101."[63] The hotel manager responded to this review on October 20, 2014.

82.     The Wyndham Brand Defendants monitored news stories and online reviews for indicia of criminal activity, including sex trafficking.

83.     Upon information and belief, at the time Jane Doe T.R.S. was trafficked at the Sacramento Days Inn, the Wyndham Brand Defendants knew at least the following:

a.  The use of Wyndham properties for sex trafficking was not limited to one location or geographic region but was a widespread problem; Commercial sex work occurring at Wyndham branded properties involved trafficking and compelled prostitution;

b.  Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Wyndham branded hotel properties;

c.  Their efforts, if any, to stop facilitating sex trafficking in Wyndham properties were not effective; and

d.  Their policies and practices were facilitating sex trafficking and creating an environment conducive to widespread and ongoing sex trafficking.

84.     Despite the continually mounting evidence that sex trafficking at Wyndham properties was ongoing and growing, the Wyndham Brand Defendants did not change course. The Wyndham Brand Defendants chose to continue earning revenue from sex trafficking in their hotels.

**B. Marriott International, Inc. Knew Sex Trafficking was Pervasive at Its Properties.**

---

[63] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

85.     The problem of sex trafficking at Marriott properties was well known long before T.R.S. arrived at the Campbell Marriott.

86.     Information that has become public through news stories establishes the entrenched and pervasive nature of Marriott International Inc.' role in providing a venue where sex trafficking has continued unabated for years. For example:

- In 2000, two were arrested on charges related to operating two separate escort rings operating at a Marriott property in Pennsylvania.[64]

- In 2009, there were multiple arrests following a bust of a prostitution ring operating out of New York hotels, including two Marriott properties.[65]

- In 2011, a man trafficked underage girls in hotel rooms in Massachusetts, including a Marriott branded property, leading to his 2013 guilty plea.[66]

- In 2012, a man was arrested for participating in prostitution of a minor after paying for sex at a Marriott property in North Carolina.[67]

- In 2013, three were arrested following a prostitution sting at a Marriott property in New Jersey.[68]

- A 2013 FBI human trafficking sting led to the arrest of a man who was caught pimping prostitutes at a Marriott property in Mississippi.[69]

---

[64] PROSTITUTION STING ENDS IN ARREST OF PODIATRIST TROOPERS POSED AS JOHNS AT A W. CONSHOHOCKEN HOTEL. A FEW HOURS LATER, THEY MADE A SIMILAR ARREST THERE *Philadelphia Inquirer* (April 20, 2000) https://plus.lexis.com/api/permalink/b7d1bb2e-3a5c-4bae-9930-8fe301ab3e0d/?context=1530671
[65] https://abc7ny.com/archive/7055026/
[66] https://www.patriotledger.com/story/news/courts/2013/10/23/dorchester-man-arrested-in-quincy/37936044007/
[67] https://reason.com/2012/03/05/new-mexico-cop-on-paid-leave-while-being/
[68] https://patch.com/new-jersey/bridgewater/report-prostitution-investigation-names-three-in-indictments
[69] https://www.wlbt.com/story/23060304/alleged-pimps-appear-in-rankin-courtroom/

- In 2014, two were indicted on sex-trafficking charges after an arrest at a Louisiana Marriott hotel.[70]

- In 2014, a man was arrested at a Marriott property in Pennsylvania after a woman contacted law enforcement stating she had been held captive at the hotel and exploited by multiple men every day for a week.[71]

- In 2014, 14 were arrested after a prostitution sting at a Tennessee area Marriott hotel.[72]

- According to a 2017 analysis, Marriott branded hotels were among the most common locations for prostitution busts among Houston area hotels.[73]

- In 2017, a man was arrested at a Florida Marriott hotel on trafficking-related charges.[74]

- In 2019, a man was convicted on sex-trafficking charges for trafficking multiple women, including at Marriott hotel in New York.[75]

87.    There are many similar articles about sex trafficking and other associated criminal activity at Marriott branded hotels. Moreover, on information and belief, Marriott International, Inc. is aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

---

[70] Jury indicts two in sex trafficking crimes *** Pair accused of prostitution women, teenage girl, *The Advocate (Baton Rouge)* (April 29, 2014), https://plus.lexis.com/api/permalink/24d5dc1b-951f-4d2a-9970-e60913dd5cf2/?context=1530671

[71] https://www.cbsnews.com/philadelphia/news/i-team-investigation-sold-for-sex-a-local-dad-is-facing-shocking-charges/

[72] https://www.jacksonsun.com/story/news/crime/2019/08/19/jackson-madison-county-prostitution-sting-nets-16-arrests-narcotics-drug-weapon-charges/2053639001/

[73] Fernando Alfonso III, Houston's most popular hotels for prostitution busts, CHRON (AUG. 10, 2017), https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popularhotels-for-prostitution-11744958.php?ipid=hpctp#photo-15603057

[74] https://www.palmbeachpost.com/story/news/crime/2017/09/07/latest-greenacres-prostitution-stings-net/7744817007/

[75] https://buffalonews.com/news/local/crime-courts/jury-finds-buffalo-man-guilty-of-sex-trafficking-after-days-of-lurid-testimony/article_f4fe7493-c44a-5768-9679-ce533d9344ae.html

88.     Upon information and belief, at the time Jane Doe T.R.S. was trafficked at the Campbell Marriott, Marriott International, Inc., knew at least the following:

    a.  The use of Marriott properties for sex trafficking was not limited to one location or geographic region but was a widespread problem; Commercial sex work occurring at its properties involved trafficking and compelled prostitution;

    b.  Marriott franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Marriott hotel properties;

    c.  Its efforts, if any, to stop facilitating sex trafficking in Marriott branded properties were not effective; and

    d.  Its policies and practices were facilitating sex trafficking by creating an environment conducive to sex trafficking where widespread and ongoing sex trafficking would continue to occur.

89.     Despite the continually mounting evidence that sex trafficking at Marriott branded properties was ongoing and growing, Marriott International, Inc., did not change course. Marriott International, Inc., chose to continue earning revenue and profits from providing a venue for sex trafficking in Marriott hotels.

    C.  **Defendants knew about widespread sex trafficking at the Subject Hotels.**

90.     Both Franchisor Defendants and Franchisee Defendants were also specifically aware that sex trafficking was prevalent at their respective Subject Hotels.

91.     Franchisor Defendants and Franchisee Defendants also knew or should have known about the sex trafficking pervasive at the Subject Hotels based on first-hand observations. This activity was continuous and obvious. Hotel staff observed this activity, and, upon information and belief, Franchisor Defendants and Franchisee

36

Defendants observed this activity through on-site employees, surveillance footage, contemporaneous hotel reviews, guest complaints, police incident reporting and/or during inspections of the hotel property. Apparent indicia of sex trafficking at the Subject Hotels included:

a. There was a population of traffickers who were known to hotel staff by name. Communication between the hotel staff and traffickers was friendly and reflected an informal agreement or understanding;

b. Traffickers provided staff with bribes and tips to look the other way rather than taking action to prevent sex trafficking;

c. There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays;

d. There was an area of the hotel that staff informally designated for traffickers, drugs, and prostitution;

e. There was a population of regular traffickers who were known to the staff and who routinely made specific requests, such as requesting rooms next to exit doors, requesting adjoining rooms with those being sexually exploited, and requesting to be in the same area of the hotel as other traffickers;

f. Rooms used by the traffickers regularly displayed "do not disturb" sigs and when observed were messy, contained excessive sex and drug paraphernalia, and to have an unclean smell; and

g. The trafficking victims had visible tattoos that indicated "branding" by their traffickers.

92.     Traffickers, including Jane Doe T.R.S.'s traffickers, repeatedly chose to use the Subject Hotels for their sex trafficking activity. Traffickers, including the trafficker of Jane Doe T.R.S., followed a repetitive and routine procedure during

stays at the Subject Hotels through which Defendants knew or should have known of the trafficking activity.

93.     The traffickers, including Jane Doe T.R.S.'s trafficker, operated with little regard for concealment, due to an implicit understanding between the hotel staff of the Subject Hotels and the traffickers. This understanding enabled the traffickers to operate openly, as they had found venues where they could conduct their operations without disruption from Defendants.

94.     The open and apparent nature of this trafficking activity is confirmed by the fact that multiple guests noticed the activity and made reports or complaints about the activity. Defendants failed to take reasonable steps in response to these reports or complaints.

95.     Upon information and belief and based on hotel reviews, guest reviews, franchisee reporting and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Hotels prior to Jane Doe T.R.S.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, refusing room cleaning services and other signs consistent with the "red flags" of trafficking identified above.

96.     Upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of the victims, as

well as the nature of the victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

97.    All knowledge from the staff at the Subject Hotels is imputed to Franchisee Defendants. Franchisee Defendants knew about this widespread and ongoing trafficking at the Subject Hotels, including the trafficking of Jane Doe T.R.S., through the direct observations of hotel staff, including management-level staff.

98.    Constructive knowledge of the widespread and ongoing trafficking at the Subject Hotels is imputed to Franchisee Defendants and Franchisor Defendants because, had they acted with ordinary diligence, they would have been aware of this trafficking and that they were benefiting from such trafficking.

99.    Upon information and belief, the Wyndham Brand Defendants knew or should have known about the widespread trafficking at the Sacramento Days Inn, based on:

   a.  The obligation of hotel staff and Days Inn Franchisees to report suspected criminal activity, including sex trafficking, to the Wyndham Brand Defendants;

   b.  The Wyndham Brand Defendants' regular monitoring of online reviews;

   c.  The Wyndham Brand Defendants' collection and monitoring of customer surveys and complaints;

   d.  The Wyndham Brand Defendants' requirement that Days Inn Franchisees submit regular and detailed reports to the Wyndham Brand Defendants about day-to-day hotel operations;

e.  The Wyndham Brand Defendants' collection and monitoring of data about guests at the Sacramento Days Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  The Wyndham Brand Defendants' supervision and control over day-to-day operations of the Sacramento Days Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Days Inn Franchisees to use and through which Days Inn Franchisees were obligated to allow the Wyndham Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  The Wyndham Brand Defendants' regular inspections of the hotel property;

h.  The Wyndham Brand Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.  The Wyndham Brand Defendants' access to surveillance and security systems;

j.  Information provided to the Wyndham Brand Defendants by law enforcement; and

k.  Other sources of information uniquely available to the Wyndham Brand Defendants.

100.   Upon information and belief, under the Wyndham Brand Defendants' protocols, which on their face required hotel staff and Day Inn Franchisees to report suspected criminal activity to the Wyndham Brand Defendants, hotel staff and management were required to report, and did report, instances of suspected sex trafficking to the Wyndham Brand Defendants prior to Jane Doe T.R.S.'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Sacramento Days Inn.

101.    The Wyndham Brand Defendants and Days Inn Franchisees also knew that sex trafficking was prevalent at the Sacramento Days Inn based on online reviews that reflected indicia of sex trafficking and related criminal activity. For example:

- A 2013 review of the Sacramento Days Inn states: "It's also extremely unsafe. The back door was broken so it was unlocked all night. And the morning we checked out, we watched a crack head attack a car in the parking lot. When we told the front desk about this, rather than call the cops, he decided to go outside and "talk" with the druggy. Basically, don't stay here unless a relaxing night for you is being eaten alive by bugs as random people enter the hotel without a key and cracked out individuals dent your car."[76]

- A 2014 review for the Sacramento Days Inn states: "Serious Drug-Prostitution Problem . . . . The partiers in the back quarter of motel kept it up through 5:00 AM. At 5:15 we left our room (128) and came face to face with five or six people. The two young caucasian girls dashed through their door across from ours. The odor of raw weed reeked in the hall when their door was opened. We walked to the nearby back exit and found it blocked open with trash and rocks."[77]

- A 2014 review for the Sacramento Days Inn states: "I have never wrote a bad review before and I wish I would not have to but this place is horrible! Drug deals in the parking lot and we saw 2 hookers inside the buildings. Staff were not friendly took forever to check in as lady had no clue what she was doing. Rules here are questionable."[78]

- A 2014 review for the Sacramento Days Inn states: "BY FAR THE WORST HOTEL IVE EVER STAYED AT! There were hookers and pimps out front, homeless people coming into the hotel and many taxis coming and dropping hoes off and putting a rock in the door to wedge it open for their clients. We talked to front desk they didn't seem to care said they seen nothing."[79]

---

[76] https://www.yelp.com/biz/days-inn-by-wyndham-sacramento-downtown-sacramento
[77] https://www.tripadvisor.com/Hotel_Review-g32999-d119578-Reviews-Quality_Inn_Suites-Sacramento_California.html
[78] https://www.tripadvisor.com/Hotel_Review-g32999-d119578-Reviews-Quality_Inn_Suites-Sacramento_California.html
[79] https://www.yelp.com/biz/days-inn-by-wyndham-sacramento-downtown-sacramento

41

- A 2015 review for the Sacramento Days Inn states: "The area was questionable. A lot of homeless, ladies of the night and drugs."[80]

- A 2015 review for the Sacramento Days Inn states: "Room was ok. Only thing is that the whole floor smelled like weed. Maybe you shouldn't rent to local drug dealers and users. Make days inn look bad msg."[81]

- A 2015 review for the Sacramento Days Inn states: "There was a toothless meth user sitting on the curb in front of the motel all day making cackling noises. Someone opened the gas cap door to my car and took out the gas cap. The car was parked right in front of the office. Other motels adjacent to this one have 7' tall gated fences and entrances. The gates are obviously needed. The pool was in a condition nobody would use it. The hotel hallways stink like pot and vomit. Some of the guests were obviously tweaking. Some of the guests looked dangerous."[82]

- A 2016 review for the Sacramento Days Inn states: "Horrible. Bugs, dirty sheets and hookers."[83]

- A 2016 review for the Sacramento Days Inn states: "If you don't mind all the drug and prostitution activities, then please stay here!!! Once we went inside to the hallway to find our room, you could smell the weed so much that you think they were growing some in the other rooms."[84]

- A 2016 review for the Sacramento Days Inn states "This was one of the worst motels I have ever stayed. . . . Once we left and at another motel they told us "Oh that is a prostitution motel!" This is one to avoid."[85]

- A 2017 review for the Sacramento Days Inn states: "DO NOT!!! DO NOT!!! Stay here. . . . . First thing you see when you go here is the motel 6 across the street with major security ( that should have been my first clue that they had a problem area). So we still rented a room and when we got to our room we noticed people going in and out of this one room, some few minutes later my boyfriend went out to smoke with my sister and I went to take a shower, while I was in the shower you could here tussling

---

[80] https://www.expedia.co.in/Sacramento-Hotels-Quality-Inn-Suites.h1154439.Hotel-Reviews
[81] https://www.tripadvisor.com/Hotel_Review-g32999-d119578-Reviews-Quality_Inn_Suites-Sacramento_California.html
[82] https://www.yelp.com/biz/days-inn-by-wyndham-sacramento-downtown-sacramento
[83] https://www.expedia.co.in/Sacramento-Hotels-Quality-Inn-Suites.h1154439.Hotel-Reviews
[84] https://www.tripadvisor.com/Hotel_Review-g32999-d119578-Reviews-Quality_Inn_Suites-Sacramento_California.html
[85] https://www.yelp.com/biz/days-inn-by-wyndham-sacramento-downtown-sacramento

around in the room above and then you heard some gun shots!!!!!. I thought it was my family coming in and slamming the door but when I went to go ask them why did they slam the door........they were on the ground telling me to get down because it was a shooting. After a few min went by my sister went outside to see if anyone knew if it was upstairs. When she went out side the room above was a young man asking for help and she and her girlfriend went upstairs to help and they had confirmed that the man was dead. So I came out side and was joined by my family, then they found a hooker hiding in the dumpster and held us in the lobby for 6 hours!!!!"[86]

- A 2018 review for the Sacramento Days Inn states: "This place was also pretty sketchy, with questionable drug use and potential prostitution."[87]

- A 2021 review for the Sacramento Days Inn states: "Terrible Stay! I brought my family to the location hoping for a place to spend the night since we have been traveling from a far distance but turned out I was totally wrong. The entire place smelled like Marijuana and had hookers and drug."[88]

- A 2021 review for the Sacramento Days Inn states: "Negative: DO NOT STAY HERE unless you are ok with being surrounded by prostitutes in every other room, drugs being dealt and used in the parking lot and homeless approaching you for money or a cigarette every single time you go out to your car. The hallways and room smelled like weed the whole stay. This hotel and 3-4 surrounding hotels on this block are something you see in every episode of COPS."[89]

---

[86] https://www.yelp.com/biz/days-inn-by-wyndham-sacramento-downtown-sacramento
[87] https://www.tripadvisor.com/Hotel_Review-g32999-d119578-Reviews-Quality_Inn_Suites-Sacramento_California.html
[88] https://www.google.com/travel/hotels/Days%20Inn%20Sacramento%20Downtown%20228%20Jibboom%20St,%20Sacramento,%20CA%2095811%20google/entity/CgsIl-qzz5K4pOPPARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930753,4931360,4934343,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+Sacramento+Downtown+228+Jibboom+St,+Sacramento,+CA+95811+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAwSBwjnDxACGA0gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDgwOWFkNzdmN2FlMGE2OGI6MHhjZmM2OTFjMTI5ZWNmNmNTE3&rp=EJfqs8-SuKTjzwEQl-qzz5K4pOPPATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwiQx7H-zvH8AhU6GFkFHV1ZAIkQ4gI6BAhLEAU
[89] https://www.booking.com/hotel/us/quality-inn-suites-us.html

43

1    102.   Upon information and belief, Marriott International, Inc., knew or should
2
     have known about the widespread trafficking at the Campbell Marriott, based on:
3

4       a. The obligation of hotel staff and Marriott Franchisee to report suspected
5          criminal activity, including sex trafficking, to Marriott International, Inc.;

6       b. Marriott International, Inc.'s regular monitoring of online reviews;
7
8       c. Marriott International, Inc.'s collection and monitoring of customer
           surveys and complaints;
9
10      d. Marriott International, Inc.'s requirement that Marriott Franchisee submit
           regular and detailed reports to the Wyndham Brand Defendants about day-
11         to-day hotel operations;

12      e. Marriott International, Inc.'s collection and monitoring of data about
13         guests at the Campbell Marriott. Data that it collects includes: contact
           information such as name, gender, postal address, telephone number,
14         email address; financial information such as credit and debit card number
15         or other payment data; date and place of birth; membership or loyalty
           program data; social media account IDs, profile photos or data made
16         available by linking social media and loyalty accounts; biometric data;
17         images and video and audio data via security cameras in public areas and
           body-worn cameras carried by loss prevention officers and other security
18         personnel; and other technological data including a customer's browser or
19         device, data collected when downloading or using an app; cookies that
           collect data such as time spent on online services, pages visited, and IP
20         addresses.[90]
21
22      f. Marriott International, Inc.'s supervision and control over day-to-day
           operations of the Campbell Marriott through detailed information and
23         extensive reports that it obtained through the property management
           system and other software systems it required Marriott Franchisee to use
24         and through which Marriott Franchisee was obligated to allow Marriott
25         International, Inc., to obtain real-time data to allow it to monitor hotel
           operations, including the use of cash and refusal of room cleaning
26         services, on a day-to-day basis;
27

28   _____
     [90] https://www.marriott.com/about/privacy.mi#data-covered.

g. Marriott International, Inc.'s regular inspections of the hotel property;

h. Information provided to the Marriott International, Inc., by law enforcement; and

i. Other sources of information uniquely available to Marriott International, Inc..

103.   Upon information and belief, under Marriott International, Inc.'s protocols, which on their face required hotel staff and Marriott Franchisee to report suspected criminal activity to Marriott International, Inc., hotel staff and management were required to report, and did report, instances of suspected sex trafficking to Marriott International, Inc., prior to Jane Doe T.R.S.'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at Campbell Marriott.

**IV.   Defendants knew or should have known Jane Doe T.R.S. was being trafficked at the Subject Hotels because of the apparent and obvious "red flags" of Jane Doe's sex trafficking.**

104.   During the time that Jane Doe T.R.S. was trafficked at the Subject Hotels, the signs of commercial sex where open and obvious, but even further, it was obvious and apparent she was the victim of sex trafficking.

105.   Because it was known among the community of traffickers that staff at the Days Inn and the Campbell Marriott turned a blind eye to sex trafficking, Jane Doe T.R.S.'s trafficker made little or no effort to disguise his role or his actions, and specifically targeted these locations for ease of use..

106.   During interactions with the front desk staff at the Days Inn and the Campbell Marriott, Jane Doe T.R.S. and her trafficker exhibited obvious and apparent signs of trafficking, including:

  a.  Jane Doe T.R.S. did not have access to her identification card, which was controlled by her trafficker. The trafficker would present her identification card when reserving a room in her name;

  b.  Jane Doe T.R.S.'s trafficker would pay for rooms with cash or prepaid cards;

  c.  Jane Doe T.R.S. and her trafficker would stay for an extended period but would pay on a day-to-day basis. Jane Doe T.R.S.'s trafficker would escort her on the lobby on a daily basis and require her to pay for the day's rate in cash; and

  d.  Jane Doe T.R.S. and her traffickers would arrive and book a room for an extended period of time but have little or no luggage with them.

107.   While in the common areas of the hotel, Jane Doe T.R.S. exhibited obvious and apparent signs of trafficking that were observed by hotel staff, including:

  a.  Jane Doe T.R.S. had limited access to clothing and would be forced to wear clothing that was tattered, inappropriate for the weather, sexually suggestive, and inappropriate for her and age the circumstances;

  b.  Jane Doe T.R.S. appeared malnourished and sleep deprived;

  c.  Jane Doe T.R.S. had visible bruises;

  d.  Jane Doe T.R.S.'s demeanor showed obvious signs of fear and anxiety;

  e.  Jane Doe T.R.S., who was kept in a drugged state by her traffickers, exhibited obvious signs of disorientation and impairment.

f. Jane Doe T.R.S. was frequently yelled at by her trafficker in a way that could be heard by customers and staff;

g. Jane Doe T.R.S.'s trafficker was violent with Jane Doe T.R.S. in public areas of the hotel and on the property surrounding the hotel.

h. Hotel staff saw or heard specific incidents of physical abuse; and

i. Staff received specific complaints or reports about Jane Doe T.R.S.'s trafficker.

108. Hotel staff observed open and apparent signs of activity directly related to the trafficking of Jane Doe T.R.S.:

a. There was constant and heavy foot traffic in and out of Jane Doe T.R.S.'s room involving men who were not hotel guests. Jane Doe T.R.S. had multiple men per day sexually exploiting her at the Days Inn and the Courtyard;

b. Men sexually exploiting Jane Doe T.R.S. entered and left her room at unusual times and stayed for brief periods;

c. Jane Doe T.R.S.'s trafficker would often wait in the hallway or visibly pace the parking lot while Jane Doe T.R.S. was engaged in commercial sex work;

d. Men visiting to sexually exploit Jane Doe T.R.S. would enter and exit the hotel in a manner such that they would be seen by staff working at the front desk; and

e. Men visiting to sexually exploit Jane Doe T.R.S.would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

109. Hotel staff observed Jane Doe T.R.S.'s room, which showed obvious and apparent signs of sex trafficking:

a. Jane Doe T.R.S.'s traffickers would decline room service for several consecutive days;

47

b. Jane Does T.R.S.' traffickers would order or require Jane Doe T.R.S. to order excessive additional towels and sheets at varying times of the day or night;

c. Staff would hear sounds of abuse, physical violence, screaming, and crying coming from Jane Doe T.R.S.'s room;

d. Staff received reports or complaints about noise coming from Jane Doe T.R.S.'s room, while staff occasionally asked them to keep the noise down, the staff neither inquired about Jane Doe T.R.S.'s wellbeing nor asked Jane Doe T.R.S.'s trafficker to leave;

e. Jane Doe T.R.S. would be confined to her room for excessively long periods without leaving and would have "Do Not Disturb" signs on her door an unusual amount;

f. Hotel staff would enter Jane Doe T.R.S.'s room to find it littered with used condoms and other sex paraphernalia left behind.

g. Jane Doe T.R.S.'s traffickers would leave obvious signs of illegal drug use in the room for hotel staff to find; and

h. Hotel staff entered Jane Doe T.R.S.'s room to find her but did not inquire about her wellbeing or take any steps to assist her. Instead, they continued to rent a room to her traffickers.

110.   Multiple employees at the Subject Hotels, including management level employees, observed and/or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

111.   As such, Franchisee Defendants knew or were willfully blind to the fact that Jane Doe T.R.S. was being trafficked at the Subject Hotels.

112.   The Franchisor Defendants also knew or should have known about Jane Doe T.R.S.'s trafficking, specifically, based on the other methods used to monitor and supervise the Subject Hotels.[91]

113.   Upon information and belief, during the period that T.R.S. was trafficked at the Subject Hotels, the Franchisor Defendants had real-time access to guest and property data that reflected the red flags of on site sex trafficking including T.R.S.'s trafficking, including but not limited to the payment for rooms with cash, the payment for rooms with cash day after day and the refusal of room services including cleaning and fresh linens.

114.   Based on their knowledge of the problem of sex trafficking in the hotel industry, at their branded hotels, and at the Subject Hotels specifically, each Defendant had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Subject Hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants would have exercised ordinary prudence, they would have been aware of Jane Doe T.R.S.'s trafficking at the Subject Hotels and that they were benefiting from such trafficking.

V.   **Defendants facilitated sex trafficking at the Subject Hotels.**

115.   Despite having actual or constructive knowledge of the widespread trafficking activity at the Subject Hotels, including the trafficking of Jane Doe T.R.S.,

---

[91] *See supra* paragraph 99.

49

Franchisee Defendants and Franchisor Defendants continued to participate in ventures that facilitated that trafficking.

116.   By continuing to allow the population of traffickers to operate at the Subject Hotels, despite their actual or constructive knowledge of this trafficking, Defendants entered into continuous business relationship with the population of traffickers, which included but was not limited to Jane Doe T.R.S.'s trafficker.

**A. Franchisee Defendants facilitated sex trafficking at the Subject Hotels.**

117.   Days Inn Franchisees are responsible for the acts and omission of all employees of the Sacramento Days Inn because these acts and omissions were committed in the scope and course of employment, because Days Inn Franchisees ratified these acts and omissions, and because Days Inn Franchisees failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the risks, known to Days Inn Franchisees, of human trafficking occurring at the Sacramento Days Inn.

118.   Marriott Franchisee is responsible for the acts and omission of all employees of the Campbell Marriott because these acts and omissions were committed in the scope and course of employment, because Marriott Franchisee ratified these acts and omissions, and because Marriott Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the risks,

known to Marriott Franchisee, of human trafficking occurring at the Campbell Marriott.

119.   Franchisee Defendants, including through their staff at the Subject Hotels, had an opportunity to and did observe obvious signs that Jane Doe T.R.S. was being sex trafficked such that Franchisee Defendants each had actual knowledge that or were reckless in not knowing that Jane Doe T.R.S. was being sex trafficked at the Subject Hotels. Nonetheless, Franchisee Defendants took no steps in response to these signs and, instead, continued providing services to her traffickers.

120.   Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotels, Franchisee Defendants continued renting rooms to these traffickers used to sexually exploit victims, including Jane Doe T.R.S.

121.   Franchisee Defendants knew or were willfully blind to the fact that Jane Doe T.R.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to harbor and maintain Jane Doe T.R.S. and to facilitate her sexual exploitation.

122.   Franchisee Defendants facilitated Jane Doe T.R.S.'s trafficking at the Subject Hotels through numerous acts and omission, including:

> a. Franchisee Defendants failed to report known or suspected trafficking activity to law enforcement appropriately;

b. Despite seeing obvious signs of distress, Franchisee Defendants failed to take any steps to inquire about the welfare of Jane Doe T.R.S.

c. Franchisee Defendants continued to rent rooms to traffickers, including Jane Doe T.R.S.'s traffickers, despite known or obvious signs of trafficking;

d. Franchisee Defendants failed to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Subject Hotels;

e. Franchisee Defendants enabled traffickers to access ancillary services that supported trafficking activities, such as providing Wi-Fi access they used to advertise commercial sex services, furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts, and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

f. Franchisee Defendants continued to inadequately train, educate and monitor hotel staff employees with respect to the detection and disruption of sex trafficking at the subject locations.

g. Franchisee Defendants accommodated specific requests of the traffickers.

123.   By ignoring or remaining willfully blind to obvious signs of trafficking, Franchisee Defendants assisted traffickers by providing them a venue, with the cover of a legitimate business, where they could conduct their trafficking activities without having to expend significant efforts to avoid detection or interference.

124.   Franchisee Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe T.R.S.

125.   Franchisee Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**B. Franchisor Defendants facilitated sex trafficking at the Subject Hotels.**

126.   Franchisor Defendants retained control over the details and methods of aspects of the operation of the Subject Hotels that are directly relevant to the proliferation of sex trafficking at those hotels. As a result of this retained control and their direct involvement, Franchisor Defendants participated in a venture with sex traffickers who were using the Subject Hotels as venues for their trafficking. Moreover, as a result of this retained control, Franchisor Defendants had both the opportunity and the duty to prevent Jane Doe T.R.S.'s trafficking.

127.   Franchisor Defendants retained control over the training of the staff of the Subject Hotels regarding human trafficking and ways to detect, disrupt and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If Franchisor Defendants had exercised reasonable diligence in providing adequate educations training and then enforced that training, Franchisor Defendants would have prevented the Days Inn and the Campbell Marriott from being used to facilitate obvious and apparent sex trafficking, including the trafficking of Jane Doe T.R.S. By failing to take reasonable steps to provide and enforce appropriate education, training, policies

and procedures, despite the overwhelming evidence it had of an ongoing problem with use of its branded properties for sex trafficking, Franchisor Defendants were negligently facilitating sex trafficking.

128.   Beyond training, Franchisor Defendants also retained control over the response of their hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By retaining control in this area, Franchisor Defendants assumed a legal duty to the patrons and guests of its hotels. By failing to exercise reasonable diligence in discharge of this duty, Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe T.R.S. in their hotels.

### 1.   Wyndham Brand Defendants facilitated the trafficking of Jane Doe T.R.S. at the Sacramento Days Inn.

129.   The Wyndham Brand Defendants had a direct business relationship with traffickers operating at the Sacramento Days Inn because, among other things, the Wyndham Brand Defendants directly rented rooms at the hotel, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Wyndham Brand Defendants by developing brand loyalty and intentionally choosing Wyndham branded hotels because it was known they created a favorable environment for trafficking.

130.   At the heart of Defendants' venture with traffickers (including Jane Doe T.R.S.'s traffickers) is the reservation of hotel rooms. Upon information and belief, the

Wyndham Brand Defendants retained control over the details of reservations at the Sacramento Days Inn. The Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Days Inn by, among other things:

    a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

    b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

    c. requiring Franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

    d. reserving rooms and accept payments without requiring franchisee approval or involvement;

    e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

    f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

    g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

    h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

    i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

    j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

    k. exercising control over the price of rooms;

l.  controlling all details of the customer loyalty program that the franchisee was required to implement;

m.  setting detailed policies for the check-in process, including requirements for identification and payment methods;

n.  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o.  assuming sole ownership over all guest information;

p.  establishing and maintaining  Do Not Rent (DNR) lists for its branded properties including the subject locations and the policies and procedures for its use and enforcement

131.   Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Sacramento Days Inn, the Wyndham Brand Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe T.R.S.

132.   The Wyndham Brand Defendants knew or, with exercise of ordinary diligence, should have known that Jane Doe T.R.S. was being trafficked and, despite this, financially benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe T.R.S.'s sexual exploitation.

133.   The Wyndham Brand Defendants retained control over the details and methods of aspects of the operation of the Sacramento Days Inn that are directly relevant to the proliferation of sex trafficking at that property. As a result of this

retained control and its direct involvement, the Wyndham Brand Defendants participated in a venture with sex traffickers who were using the Days Inn as a venue for their trafficking. Moreover, as a result of this retained control, the Wyndham Brand Defendants had both the opportunity and the duty to prevent Jane Doe T.R.S.'s trafficking. The Wyndham Brand Defendants directly participated in and retained control over specific aspects of the operation of Days Inn related to trafficking by:

a. assuming joint responsibility with Franchisees for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the Wyndham Brand Defendants;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report criminal activity and hotel security issues to franchisor;

h. retaining control over the security of the Sacramento Days Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Sacramento Days Inn;

57

i.  retaining control over property-specific data and customer data, , including names, payment information, reservation history, browsing data, and other details associated with their stay, from the Sacramento Days Inn—which they obtained by controlling the means and methods by which Franchisees recorded, stored, and reported that data—such that they had actual or constructive knowledge—about the ongoing trafficking that was occurring at the Sacramento Days Inn during the time Plaintiff was trafficked there;

j.  requiring franchisees to provide Wi-Fi/internet access to guests;

k.  mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

l.  setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

m.  requiring franchisees to use a system to monitor and track housekeeping requests;

n.  setting policies for when and how housekeeping services are provided;

o.  collecting and monitoring data that shows patterns of use of housekeeping services;

134.  Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Sacramento Days Inn, the Wyndham Brand Defendants continued operating the hotel together with Franchisees in a way that it knew or should have known would result in facilitating additional sex trafficking at Days Inn, including by:

a.  adopting inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking.

58

b.  providing inadequate training on issues related to human trafficking and unreasonably delaying training.

c.  adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

d.  adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

e.  adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

f.  continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the hotel;

g.  affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

h.  willfully delaying taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

i.  providing traffickers continued access to Wyndham-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

j.  adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Sacramento Days Inn;

k.  implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

135.   Traffickers chose to operate at a Wyndham-branded hotel because of the Wyndham Brand Defendants' policies and practices that were known to create a favorable environment for trafficking.

136.   Jane Doe T.R.S.'s trafficking resulted directly from the acts and omissions of the Wyndham Brand Defendants that facilitated widespread trafficking at the Sacramento Days Inn.

137.   But for the Wyndham Brand Defendants' failure to exercise ordinary diligence when operating and controlling the Sacramento Days Inn, including when exercising control over staff training and response to suspected criminal activity on property, they would have known that Jane Doe T.R.S. was being trafficked there. Thus, constructive knowledge of Jane Doe T.R.S.'s trafficking is imputed to the Wyndham Brand Defendants.

138.   If The Wyndham Brand Defendants had exercised reasonable diligence when operating the Sacramento Days Inn, the Wyndham Brand Defendants would have prevented this hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.R.S., and would not have benefited from that trafficking. Instead, the Wyndham Brand Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.R.S., resulting in financial benefit to the Wyndham Brand Defendants.

139.   The Wyndham Brand Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe T.R.S.

140.   The Wyndham Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

### 2. Marriott International, Inc. facilitated the trafficking of Jane Doe T.R.S. at the Campbell Marriott.

141.   Marriott International, Inc., had a direct business relationship with traffickers operating at the Campbell Marriott because, among other things, Marriott International, Inc., directly rented rooms at the hotel, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Wyndham Brand Defendants by developing brand loyalty and intentionally choosing Wyndham branded hotels because it was known they created a favorable environment for trafficking.

142.   At the heart of Defendants' venture with traffickers (including Jane Doe T.R.S.'s traffickers) is the reservation of hotel rooms. Upon information and belief, Marriott International, Inc. retained control over the details of reservations at the Campbell Marriott. Marriott International, Inc. directly participated in and retained day-to-day control over renting rooms at the Days Inn by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c. requiring Franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d. reserving rooms and accept payments without requiring franchisee approval or involvement;

e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o. assuming sole ownership over all guest information;

p. overseeing do not rent (DNR) lists for its branded properties.

143. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Campbell Marriott, Marriott International, Inc. continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe T.R.S.

144. Marriott International, Inc. knew or, with exercise of ordinary diligence, should have known that Jane Doe T.R.S. was being trafficked and, despite this, financially benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe T.R.S.'s sexual exploitation.

145. Marriott International, Inc., publicly assumed the responsibility for sex trafficking at its branded hotels, including the Campbell Marriott, including through its conduct—acting on behalf of its franchised hotels—partnering with EPCA, AHLA, and other trade organizations and making it known that it was the entity responsible for anti-trafficking strategy at its branded hotels.

146. Marriott International, Inc. retained control over the details and methods of aspects of the operation of the Days Inn that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct

involvement, Marriott International, Inc. participated in a venture with sex traffickers who were using the Days Inn as a venue for their trafficking. Moreover, as a result of this retained control, Marriott International, Inc. had both the opportunity and the duty to prevent Jane Doe T.R.S.'s trafficking. Marriott International, Inc. directly participated in and retained control over specific aspects of the operation of Days Inn related to trafficking by:

    a.  assuming joint responsibility with Franchisees for detecting and preventing human trafficking at the hotel property;

    b.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to law enforcement and the franchisor;

    c.  assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

    d.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

    e.  assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    f.  establishing systems for guests to report criminal activity and hotel security issues to franchisor;

    g.  retaining control over the security of the Campbell Marriott through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Campbell Marriott;

    h.  retaining control over property-specific data and customer data, , including names, payment information, reservation history, browsing

data, and other details associated with their stay, from the Campbell Marriott—which they obtained by controlling the means and methods by which Franchisees recorded, stored, and reported that data—such that they had actual or constructive knowledge—about the ongoing trafficking that was occurring at the Campbell Marriott during the time Plaintiff was trafficked there;

i.  requiring franchisees to provide Wi-Fi/internet access to guests;

j.  mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

k.  setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

l.  requiring franchisees to use a system to monitor and track housekeeping requests;

m. setting policies for when and how housekeeping services are provided;

n.  collecting and monitoring data that shows patterns of use of housekeeping services;

147.  Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Campbell Marriott, Marriott International, Inc. continued operating the hotel together with Marriott Franchisee in a way that it knew or should have known would result in facilitating additional sex trafficking at the Campbell Marriott, including by:

a.  adopting inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking.

b.  providing inadequate training on issues related to human trafficking and unreasonably delaying training.

65

c. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

d. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

e. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

f. continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the hotel;

g. affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

h. willfully delaying taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

i. providing traffickers continued access to Marriott-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

j. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Campbell Marriott;

k. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

148. Jane Doe T.R.S.'s trafficking resulted directly from the acts and omissions of Marriott International, Inc. that facilitated widespread trafficking at the Campbell Marriott.

66

149.   But for Marriott International, Inc.' failure to exercise ordinary diligence when operating and controlling the Campbell Marriott, including when exercising control over staff training and response to suspected criminal activity on property, they would have known that Jane Doe T.R.S. was being trafficked there. Thus, constructive knowledge of Jane Doe T.R.S.'s trafficking is imputed to Marriott International, Inc.

150.   If Marriott International, Inc. had exercised reasonable diligence when operating the Campbell Marriott, then Marriott International, Inc. would have prevented this hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.R.S., and would not have benefited from that trafficking. Instead, Marriott International, Inc. engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.R.S., resulting in financial benefit to Marriott International, Inc.

151.   Marriott International, Inc.' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe T.R.S.

152.   Marriott International, Inc. knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**VI.   Defendants Benefited from Ventures at the Subject Hotels.**

153.   Each Defendant directly benefited from facilitating trafficking at the Subject Hotels. Each Defendant received monetary payment from each room rented at the Subject Hotels, including the rooms where Jane Doe T.R.S. was being trafficked, as follows:

a. Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Sacramento Days Inn. In exchange for providing the services described above, each of the Wyndham Brand Defendants received a share of the profits from room rentals collected at the Sacramento Days Inn. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increase with each room rental at the Sacramento Days Inn. Revenue generated from rooms rented at the Sacramento Days Inn was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room.

b. Days Inn Franchisees profited from every stay by every patron at the Sacramento Days Inn, both from room rentals and other hotel services.

c. Marriott International, Inc. generated substantial income from operations of hotels such as the Campbell Marriott. In exchange for providing the services described above, Marriott International, Inc. received a share of the profits from room rentals collected at the Campbell Marriott. The fees generated by Marriott International, Inc., are primarily based on gross room rentals; therefore, Marriott International, Inc.'s profits increase with each room rental at the Campbell Marriott.

d. Marriott Franchisee profited from every stay by every patron at the Campbell Marriott, both from room rentals and other hotel services.

e. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Subject Hotels specifically.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## A. The Wyndham Brand Defendants and Days Inn Franchisees benefited from ventures at the Sacramento Days Inn.

154. In ways described more fully above, the Wyndham Brand Defendants and Days Inn Franchisees knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with sex traffickers (hereinafter "Venture 1").

155. The Wyndham Brand Defendants and Days Inn Franchisees formed this continuous business relationship and implicit understanding with the traffickers at the Sacramento Days Inn by continuing to rent rooms to traffickers (including Jane Doe T.R.S.'s traffickers) long after the Wyndham Brand Defendants and Days Inn Franchisees knew or should have known that the rooms were being used for unlawful trafficking.

156. This implicit understanding developed because sex traffickers, including Jane Doe T.R.S.'s sex traffickers, frequently used the Sacramento Days Inn for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Brand Defendants and Days Inn Franchisees that created a favorable environment for sex trafficking to flourish.

157. Both the Wyndham Brand Defendants and Days Inn Franchisees participated in this venture by acting jointly to rent rooms to traffickers. Franchisees provided "boots on the ground" for reservations, and the Wyndham Brand Defendants directly participated in renting rooms, retained control over reservation systems, and

developed and enforced applicable policies and guidelines as further described in this Complaint. Wyndham Brand Defendants and Days Inn Franchisees participated in the venture by continuing to rent rooms to Jane Doe T.R.S.'s traffickers long after they knew or should have known that victims like Jane Doe T.R.S. were being subjected to unlawful trafficking.

158.   Wyndham Brand Defendants and Days Inn Franchisees did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

    a.  Jane Doe T.R.S.'s traffickers were familiar to the staff at the Sacramento Days Inn;

    b.  Jane Doe T.R.S.'s traffickers took no steps to conceal their activities from the staff at the Sacramento Days Inn but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

    c.  Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

    d.  Defendants provided additional services to traffickers (including Jane Doe T.R.S.'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

159.   The criminal traffickers operating at the Sacramento Days Inn as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe T.R.S.

160.   Jane Doe T.R.S.'s trafficking at the Sacramento Days Inn was a result of Wyndham Brand Defendants and Days Inn Franchisees' participation in Venture 1 with the criminal traffickers. If Wyndham Brand Defendants and Days Inn Franchisees had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe T.R.S.'s trafficking at the Sacramento Days Inn.

161.   In ways described more fully above, the Wyndham Brand Defendants also knowingly received a financial benefit from participating in a commercial venture with Days Inn Franchisees operating the Sacramento Days Inn (hereinafter "Venture 2").

162.   The Wyndham Brand Defendants and Franchisees had a longstanding business relationship pursuant to which they jointly participated in operation of the Sacramento Days Inn with a shared goal of maximizing revenue, including gross room revenue.

163.   Venture 2 violated the TVRPA through the widespread sex trafficking at the Sacramento Days Inn, including Jane Doe T.R.S., and through the conduct of Days Inn Franchisees who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

164.   Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Brand Defendants participated in the venture by continuing to operate the Sacramento Days

Inn with Days Inn Franchisees in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe T.R.S. The Wyndham Brand Defendants continued providing Days Inn Franchisees with operational support, use of trademarks, marketing services, and other resources to operate the Sacramento Days Inn in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**B. Marriott International, Inc., and Marriott Franchisee benefited from ventures at the Campbell Marriott.**

165.   In ways described more fully above, Marriott International, Inc., and Marriott Franchisee knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with sex traffickers (hereinafter "Venture 1").

166.   Marriott International, Inc., and Marriott Franchisee formed this continuous business relationship and implicit understanding with the traffickers at the Campbell Marriott by continuing to rent rooms to traffickers (including Jane Doe T.R.S.'s traffickers) long after Marriott International, Inc., and Marriott Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

167.   This implicit understanding developed because sex traffickers, including Jane Doe T.R.S.'s sex traffickers, frequently used the Campbell Marriott for their trafficking knowing that staff members would look the other way. This occurred

because of the acts and omissions of Marriott International, Inc., and Marriott Franchisee that created a favorable environment for sex trafficking to flourish.

168.   Both Marriott International, Inc., and Marriott Franchisee participated in this venture by acting jointly to rent rooms to traffickers. Marriott Franchisee provided "boots on the ground" for reservations, and Marriott International, Inc. directly participated in renting rooms, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this Complaint. Marriott International, Inc., and Marriott Franchisee participated in the venture by continuing to rent rooms to Jane Doe T.R.S.'s traffickers long after they knew or should have known that victims like Jane Doe T.R.S. were being subjected to unlawful trafficking.

169.   Marriott International, Inc., and Marriott Franchisee did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

    a. Jane Doe T.R.S.'s traffickers were familiar to the staff at the Campbell Marriott;

    b. Jane Doe T.R.S.'s traffickers took no steps to conceal their activities from the staff at the Campbell Marriott but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including Jane Doe T.R.S.'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

170. The criminal traffickers operating at the Campbell Marriott as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe T.R.S.

171. Jane Doe T.R.S.'s trafficking at the Campbell Marriott was a result of Marriott International, Inc., and Marriott Franchisee's participation in Venture 1 with the criminal traffickers. If Marriott International, Inc., and Marriott Franchisee had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe T.R.S.'s trafficking at the Campbell Marriott.

172. In ways described more fully above, Marriott International, Inc., also knowingly received a financial benefit from participating in a commercial venture with Marriott Franchisees operating the Campbell Marriott (hereinafter "Venture 2").

173. Marriott International, Inc., and Marriott Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the Campbell Marriott with a shared goal of maximizing revenue, including gross room revenue.

174.   Venture 2 violated the TVRPA through the widespread sex trafficking at the Campbell Marriott, including Jane Doe T.R.S., and through the conduct of Mariott Franchisee who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

175.   Despite its actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Marriott International, Inc., participated in the venture by continuing to operate the Campbell Marriott with Marriott Franchisee in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe T.R.S. Marriott International, Inc., continued providing Marriott Franchisee with operational support, use of its trademarks, marketing services, and other resources to operate the Campbell Marriott in a way that it knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VII.   Franchisees Defendants and the staff of the Subject Hotels acted as actual agents of the Franchisor Defendants at their respective hotels.

176.   In addition to Franchisor Defendants' direct involvement in the venture through the means outlined above, Franchisor Defendants also participated in the venture through the acts and omissions of their respective Franchisee Defendants, which are Franchisor Defendants' actual agents for the purpose of operating the Subject Hotels.

177. The Franchisor Defendants subjected their respective Franchisee Defendants to detailed standards and requirements regarding the operation of the Subject Hotels through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Franchisor Defendants.

178. The Franchisor Defendants obscure the full extent of control they exercise over their respective Franchisee Defendants by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Some of the standards that the Franchisor Defendants imposed on Franchisee Defendants:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchise Defendants used at the Subject Hotels, such as telling hotel staff step-by-step how to perform tasks at the hotel and mandating that Franchisee Defendants use computer systems and software selected and controlled by Franchisor Defendants;

    b. covered virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices;

    c. dictated the specific way Franchise Defendants and hotel staff must carry out most day-to-day functions at the Subject Hotels; and

    d. significantly exceeded what was necessary for Franchisor Defendants to protect their registered trademarks.

179.   Franchisor Defendants specifically directed the means and methods of operations used by Franchisee Defendants that directly caused Jane Doe T.R.S.'s damages.

180.   Upon information and belief, the Wyndham Brand Defendants exercised systemic and pervasive control over Days Inn Franchisees' day-to-day operation of the Sacramento Days Inn, including the methods and details of Days Inn Franchisees' work, through ways including:

a.  Controlling and requiring franchisees to use a specified reservation and marketing system that provided Franchisor with day-to-day access to guest reservation, payment and room data;

b.  Directly providing marketing services and prohibiting Franchisees from maintaining any online presence unless specifically reviewed and approved by Wyndham;

c.  Controlling and requiring franchisees to use a credit process system;

d.  Dictating policies regarding forms of payment;

e.  Setting prices;

f.  Setting wages;

g.  Making or influencing employment decisions;

h.  Requiring standardized training for hotel employees. Wyndham maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site at the Sacramento Days Inn and through an online learning platform, Wyndham University, that Wyndham controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

i.   Requiring Franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

j.   Retaining sole discretion to determine whether all training has been completed satisfactorily;

k.   Requiring Franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

l.   Imposing detailed recordkeeping and reporting requirements on Franchisees regarding virtually all aspects of hotel operations;

m.  Establishing detailed job descriptions for all positions in its branded properties and drafting numerous, detailed policies that referenced these positions and dictated which positions must perform which day-to-day tasks at the hotel and how they must do so;

n.   Controlling channels for guests to report complaints or provide feedback regarding the Sacramento Days Inn and directly participating in the response and/or supervising the response to customer complaints or other feedback; and

o.   Requiring franchisees to collect guest data using Wyndham' systems, to compile reports, and to make that data available to Wyndham; and

p.   Requiring Franchisees to comply with standards, policies, and rules adopted by Wyndham on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Days Inn.

q.   Detailed and frequent inspections of the Sacramento Days Inn;

78

r.  Monitoring or auditing Franchisees for compliance with policies and expectations;

s.  Directing Franchisees to take specific steps to come into compliance with detailed and exacting standards for day-to-day operations, including everything from how guests are greeted, to how the physical property is maintained, and how to respond to security incidents on property;

t.  Employing consultants or field agents to become involved in the day-to-day operations of franchised hotels, such as consulting on security issues and response to human trafficking;

u.  Mandating training and education in response to Franchisees' failure to meet expectations;

v.  Maintaining the right to terminate the franchise agreement;

w.  Retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

181.  The Wyndham Brand Defendants specifically retained and exercised control over the aspects of hotel operations at the Sacramento Days Inn that caused or contributed to T.R.S.'s harm, including but not limited to: establishing and implementing security policies, controlling training on security matters including sex trafficking, controlling development and implementation of policies and expectations for hotel staff reporting and responding security issues, including suspected sex trafficking, controlling channels through which guests report security concerns, and controlling when hotel staff may deny a reservation to a guest based on suspected criminal activity.

182.   Upon information and belief, Marriott International, Inc., exercised systemic and pervasive control over Marriott Franchisee's day-to-day operation of the Campbell Marriott, including the methods and details of Marriott's Franchisee's work, through ways including:

a.   Requiring Franchisee and hotel management to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Marriott to protect their registered trademarks.

b.   Providing training for hotel management and select hotel staff on-site and at locations selected by Marriott.

c.   Requiring all hotel staff to participate in training Marriott created through the Digital Learning Platform that Marriott maintains and controls.

d.   Controlling training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used.

e.   Retaining sole discretion to determine whether all training had been completed satisfactorily.

f.   For certain products and services that Franchisee was required to purchase to operate the Campbell Marriott, designating approved vendors and prohibiting Franchisee from purchasing goods and services from anyone other than an approved vendor.

g.   Requiring Franchisee to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel.

h.   Setting required staffing levels for the Campbell Marriott.

i.   Establishing detailed job descriptions for all positions at the Campbell Marriott and drafted numerous, detailed policies that referenced these

positions and dictated which positions must perform which tasks and how they must do so.

j.   Setting requirements for the hiring process used by Franchisee and overseeing employee discipline processes and termination decisions.

k.   Providing benefits for employees of franchised hotels.

l.   Requiring Franchisee to use a customer resource management program maintained and operated by Marriott.

m.   Controlling channels for guests to report complaints or provide feedback regarding the Campbell Marriott and directly participating in the response and/or supervising and the response to customer complaints or other feedback.

n.   Retaining the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs.

o.   Requiring Franchisee to use an application owned, operated, and maintained by Marriott to manage all guest data and information.

p.   Requiring Franchisee to provide Marriott International, Inc. with access to the backend of systems used to operate the Campbell Marriott such that Marriott International, Inc. had direct and real-time access to information about hotel operations.

q.   Regularly auditing the books and records of Franchisee.

r.   Conducting frequent and unscheduled inspections of the Campbell Marriott.

s.   Retaining the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Campbell Marriott.

t.  Controlling all marketing for the Campbell Marriott and prohibiting Franchisee from maintaining any online presence unless specifically reviewed and approved by Marriott International, Inc.

u.  Imposing detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations.

v.  Supervising and controlling day-to-day operations of the Campbell Marriott through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use.

w.  Retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

183.  Marriott International, Inc., specifically retained and exercised control over the aspects of hotel operations at the Campbell Marriott that caused or contributed to T.R.S.'s harm, including but not limited to: establishing and implementing security policies, controlling training on security matters including sex trafficking, controlling development and implementation of policies and expectations for hotel staff reporting and responding security issues, including suspected sex trafficking, controlling channels through which guests report security concerns, and controlling when hotel staff may deny a reservation to a guest based on suspected criminal activity.

184.  Franchisor Defendants are vicariously liable for the acts and omissions of their agents, Franchisee Defendants, and any sub-agents or employees of Franchisee Defendants with respect to operation of the Subject Hotels.

185.  In addition, both Franchisor Defendants and Franchisee Defendants participated in the venture through the acts and omissions of the staff at the Days Inn

and Campbell Marriott because Franchisor Defendants and Franchisee Defendants jointly employ or ratify the employment of staff at the Days Inn and Campbell Marriott.

186.   Upon information and belief, Franchisor Defendants exercise control over the terms and conditions of the terms and conditions of employment by:

    a.   Posting jobs for their branded properties;

    b.   Providing benefits to staff of their branded properties;

    c.   Setting pay, pay parameters, or pay ranges for staff of their branded properties;

    d.   Setting job qualifications;

    e.   Setting job descriptions;

    f.   Dictating staffing levels required at their branded properties;

    g.   Making or influencing hiring decisions;

    h.   Providing onboarding and ongoing training; and

    i.   Maintaining employment records, including training records.

187.   Franchisor Defendants and Franchisee Defendants act as joint employers because, at the Days Inn and Campbell Marriott, there is a high degree of interrelation of operations and profit sharing.

## VIII.   The Relationships among the Wyndham Brand Defendants.

188.   WHR is responsible, as a successor, for the acts and omissions of its predecessors (including Wyndham Worldwide Corporation and its subsidiaries) with respect to operation, franchising, and control of the Sacramento Days Inn.

189.   Prior to 2018, an entity known as Wyndham Hotels and Resorts was a private company (referred to herein as "predecessor WHR") that was a wholly owned subsidiary of Wyndham Worldwide Corporation. In 2018, Wyndham Worldwide Corporation approved a spin-off of its wholly owned subsidiary, predecessor WHR, to form a public company for the continued operation of the Wyndham hotel business that had previously been conducted by Wyndham Worldwide Corporation and/or its wholly owned subsidiaries. This business included the franchising, control, and operation of the Sacramento Days Inn. This public company that resulted from this spin-off was Defendant WHR.

190.   Defendant WHR and its wholly owned subsidiaries continued to operate all or substantially all the hotel business formerly operated by Wyndham Worldwide Corporation and its subsidiaries, including the franchising, control, and operation of the Sacramento Days Inn.

191.   Upon information and belief, WHR agreed to assume responsibility for liabilities of Wyndham Worldwide Corporation and its former subsidiaries regarding the franchising, control, and operation of the Sacramento Days Inn.

84

192.   Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Sacramento Days Inn were shared and fulfilled jointly by the Wyndham Brand Defendants. Upon information and belief, each of the Wyndham Brand Defendants shared revenue related to operation, franchising, and control of the Sacramento Days Inn, and each of the Wyndham Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Sacramento Days Inn. Upon information and belief, each of the Wyndham Brand Defendants participated directly in the ventures franchising, controlling, operating, and renting rooms at the Sacramento Days Inn in the ways outlined more specifically above. Further, upon information and belief, each of the Wyndham Defendants knew or should have known that these ventures were engaged in facilitation of sex trafficking.

193.   Upon information and belief, each of the Wyndham Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Sacramento Days Inn. The Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Sacramento Days Inn.

**CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**

194.   Jane Doe T.R.S. incorporates all previous allegations.

85

195.   At all relevant times, Jane Doe T.R.S. was and is a victim within the meaning of 18 U.S.C. § 1591 and 1595(a).

**I.     Cause of Action: Perpetrator Liability under 18 U.S.C §1595(a) Based on Violation of 18 U.S.C §1591(a) (Franchisee Defendants).**

196.   Jane Doe T.R.S. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and § 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

197.   Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this First Amended Complaint, they harbored individuals (including Jane Doe T.R.S.) at the Subject Hotels knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this First Amended Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Subject Hotels by trafficking victims, including Jane Doe T.R.S.

198.   Violations of 18 U.S.C §1595(a) by Franchisee Defendants as "perpetrators" operated jointly with other unlawful acts and omissions alleged in this First Amended Complaint, to cause Jane Doe T.R.S. to suffer substantial physical and

psychological injuries and other damages because of being trafficked and sexually exploited at the Subject Hotels.

**II.      Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

199.   Jane Doe T.R.S. is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

200.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

201.   **Venture 1:** Through acts and omissions more fully described throughout this First Amended Complaint, each Defendant received a financial benefit from participating in Venture 1 with sex traffickers, including Jane Doe T.R.S.'s traffickers. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

      a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Hotels by renting them hotel rooms and providing them related services despite the fact that each Defendant knew

or should have known these traffickers were using the Subject Hotels to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe T.R.S.

b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe T.R.S., in the rooms of the Subject Hotels.

c. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe T.R.S.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe T.R.S.). Each Defendant received a financial benefit every time a trafficker rented a room.

e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe T.R.S.'s trafficking).

202. **Venture 2**: Through acts and omissions more fully described throughout this First Amended Complaint, the Franchisor Defendants received a financial benefit from participating in Venture 2 with Franchisee Defendants operating the Subject Hotels. Each of the Franchisor Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between the Franchisor Defendants and Franchisee Defendants to operate the Subject Hotels with a common objective of maximizing revenue at the hotels, including gross room revenue.

88

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Hotels, including the trafficking of Jane Doe T.R.S. This venture also violated the TVPRA through the conduct of Franchisees, who violated 18 U.S.C §1591(a) as perpetrators.

c. Franchisor Defendants knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. The Franchisor Defendants knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Hotels, which increased every time a room was rented including rooms rented to traffickers.

e. The Franchisor Defendants participated in this venture by (1) continuing the ongoing business relationship with Franchisee Defendants despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

203.    The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe T.R.S.

**III.    Cause of Action: Vicarious Liability for TVPRA Violations (Franchisor Defendants).**

204.    Jane Doe T.R.S. further alleges that the Franchisor Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee Defendants and the hotel staff while operating the Subject Hotels.

205.    Through the acts and omissions described throughout this First Amended Complaint, the Franchisor Defendants exercised or retained the right to exercise

89

systematic and day-to-day control over the means and methods used by Franchisee Defendants and hotel staff to operate Subject Hotels.

206. Days Inn Franchises operated as the agents of the Wyndham Brand Defendants when operating the Sacramento Days Inn.

207. Marriott Franchisee operated as the agent of Marriott International, Inc., when operating the Campbell Marriott.

208. While acting as actual agents of the Franchisor Defendants, Franchisee Defendants violated the TVPRA as both beneficiaries and perpetrators.

209. The Franchisor Defendants are vicariously liable for the TVPRA violations of Franchisee Defendants.

210. Jane Doe T.R.S. further alleges that the Franchisor Defendants are vicariously liable for the acts and omissions of the staff at the Subject Hotels as a joint employer. In the ways described throughout this First Amended Complaint, the Franchisor Defendants and Franchisee Defendants jointly controlled the terms and conditions of their employment. As a result, the Franchisor Defendants and Franchisee Defendants are the joint employer of the hotel staff.

211. Each of the Wyndham Brand Defendants is liable for the acts and omissions of each of the other Wyndham Brand Defendants with respect to the operation and franchising of the Sacramento Days Inn. On information and belief, the

Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Sacramento Days Inn. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Sacramento Days Inn.

## **DAMAGES**

212.   Defendants' acts and omissions, individually and collectively, caused Jane Doe T.R.S. to sustain legal damages.

213.   Defendants are joint and severally liable for all past and future damages sustained by Jane Doe T.R.S.

214.   Jane Doe T.R.S. is entitled to be compensated for personal injuries and economic damages, including:

a.   Actual damages (until trial and in the future);

b.   Incidental and consequential damages (until trial and in the future);

c.   Mental anguish and emotional distress damages (until trial and in the future);

d.   Lost earnings and lost earning capacity (until trial and in the future);

e.   Necessary medical expenses (until trial and in the future);

f.   Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Exemplary/Punitive damages;

j.  Attorneys' fees; and

k.  Costs of this action.

l.  Pre-judgment and all other interest recoverable.

## TOLLING OF LIMITATIONS

215.   To the extent Defendants assert an affirmative defense of limitations, T.R.S. invokes the discovery rule. At the time she was harmed and through at least September 2013, R.A. was under continuous coercion and control of traffickers who abused and manipulated her. T.R.S. was subject to force, fraud, coercion, manipulation, and restrictions on her freedom. Thus, T.R.S. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, T.R.S. —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of T.R.S. being kept under the control of her traffickers, which Defendants facilitated.

216.   At the time T.R.S. was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was

1    not in a position to discover the legal cause of her injury, more than ten years before

2    suit was filed..

3

4       217.   To the extent Defendants assert an affirmative defense of limitations,

5    T.R.S. invokes the doctrine of equitable tolling because, as a result of being a victim of

6    trafficking, T.R.S. faced extraordinary circumstances, which arose through no fault of

7

8    her own, that prevented her from filing a lawsuit, and those circumstances did not end

9    more than 10 years before T.R.S. filed this lawsuit.

10

11       218.   As a result of her continuous trafficking at Defendants' hotels, T.R.S. was

12    subjected to threats, manipulation, restriction of her freedom, and extreme coercion. She

13    lacked the mental capacity to recognize the extent and scope of her injuries or those

14

15    responsible particularly those who financially benefited from her trafficking but may

16    not have been seen to be directly involved.

17       219.   While under the control of her traffickers, T.R.S. did not have the freedom

18

19    to investigate her claims, to identify those responsible or to seek legal representation

20    necessary to pursue her legal rights.

21       220.   All claims in the First Amended Complaint relate back to the filing of the

22    Original Complaint in this matter.

23

24                                 **JURY TRIAL**

25    221.   Jane Doe T.R.S. demands a jury trial on all issues.

26

27                           **RELIEF SOUGHT**

28

Wherefore, Jane Doe T.R.S. respectfully requests judgment against Defendants, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

Dated: January 11, 2024                         Respectfully submitted,

                                                By: /s/ Moze Cowper
                                                C. Moze Cowper (Bar No. 326614)
                                                **COWPER LAW PC**
                                                12301 Wilshire Boulevard, Suite 303
                                                Los Angeles, California 90025
                                                Tel.: (877) 529-3707
                                                mcowper@cowperlaw.com

                                                Edward Fisher (*pro hac vice*)
                                                **PROVOST ✶ UMPHREY LAW FIRM**
                                                350 Pine Street, Suite 1100
                                                Beaumont, Texas 77701
                                                Tel.: (409) 838-8859
                                                Fax: (409) 813-8682
                                                efisher@pulf.com

                                                Patrick Barrett (*pro hac vice*)
                                                **PROVOST ✶ UMPHREY LAW FIRM**
                                                4205 Hillsboro Pike, Suite 303
                                                Nashville, Tennessee 37215
                                                Tel.: (615) 297-1932
                                                pbarrett@pulf.com

                                                *Counsel for Plaintiff*